MICHAEL Y. LO (SBN 101702)
JONATHAN J. LO (SBN 305306)
KELVIN J. LO (SBN 314611)
**LO & LO LLP**
506 North Garfield Avenue, Suite 280
Alhambra, California 91801
Telephone: 626.289.8838
Facsimile: 626.380.3333
Email: contact@lolollp.com

Proposed Counsel for Chapter 11 Debtor
and Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>VARIO CORP.,<br><br>Debtor and Debtor-in-Possession. | Case No. 6:18-bk-19730-WJ<br><br>Chapter 11<br><br>**DEBTOR'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL THROUGH AND INCLUDING JUNE 30, 2019; DECLARATION OF EVA SHIH**<br><br><u>Hearing</u><br><br>Date: January 8, 2019<br>Time: 3:30 p.m.<br>Crtrm: 304<br>Place: 3420 Twelfth Street<br>       Riverside, CA 92501 |



1

REPLY IN SUPPORT OF MOTION TO USE CASH COLLATERAL

Vario Corp. ("Debtor"), debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case, hereby submits this reply (the "Reply") to the objection (Doc. No. 15) (the "Objection) filed by creditor East West Bank (the "Bank") in opposition to Debtor's Motion for Order Authorizing Debtor to Use Cash Collateral Through and Including June 30, 2019 (Doc No. 10) (the "Motion").

## I. INTRODUCTION

In its Objection, the Bank contends that "there is no credible evidence that [the Bank] will be afforded adequate protection within the meaning of Title 11 U.S.C. 363(c)(2)(B), 363(e) and 361," and that Debtor "has engaged in deceptive conduct" and its representations "are not reliable." Objection at 1:27 to 2:1; 2:6-7. The Objection also raises concerns about certain aspects and the legitimacy of Debtor's operations and finances. *See generally* Objection. While the Bank's skepticism is warranted, its concerns stem from misunderstandings of Debtor's operations that require clarification, but more importantly, are largely irrelevant to the narrow issue of whether the Bank is adequately protected justifying Debtor's use of cash collateral. Because the Bank is clearly adequately protected by a substantial equity cushion, the Motion should be granted in its entirety.

## II. DEBTOR'S REPLY TO THE BANK'S MISCELLANEOUS CONCERNS

In its Objection, the Bank alleges that Debtor sold "105% of its accounts receivable to factoring firms" and that Eva Shih, Debtor's president, "approved the sale of accounts." Objection at 2:19-24. Presumably, the Bank's concern here is that Debtor, without the Bank's consent, gave the factoring firms security interests in the collateral on which the Bank already claims a first priority lien. However, this assertion is not entirely accurate. In or about May 2018, Debtor telephoned the Bank to inquire about obtaining additional financing due to Debtor's tight cash flow. Debtor spoke to Lois Chiang of the Bank's Commercial and Int'l Banking department, who advised that Debtor seek financing from funding companies and introduced Debtor to Janice Orlando



of Pasadena Angels, Inc.,[1] a venture capital firm. Lois Chang advised Debtor that the Bank would not object to additional financing so long as no lenders filed UCC-1 financing statements. Based on this advice, Debtor sought funding from the factoring firms. On recorded telephone calls, all of the factoring firms represented to Debtor that they would not file UCC-1 statements. Debtor was surprised to learn that some of them ultimately did so.[2]

The Bank also mentions that it will sue "[Eva Shih], her husband, and an apparent relative to whom they have transferred assets recently," presumably under the theory that Ms. Shih transferred her house with the intent to defraud the Bank. Objection at 3:2-4. To set the record straight, Ms. Shih sold her house to her niece for fair market value through escrow. Ms. Shih's niece had recently married in August 2018 and wanted to buy a house. During that time, Ms. Shih also wanted to sell her house to pay off various liens encumbering her house because the liens were accruing interest.

The Objection further alleges that Debtor's Taiwanese supplier Grand Wisdom is not a manufacturer but rather it "acts in an undisclosed manner to merely forward orders to manufacturers," that Debtor's PDF purchase orders to Grand Wisdom "contain metadata which indicate that they were recently created and backdated," and that Debtor's wire transfers to Grand Wisdom indicate that their relationship "began not in 2018 as indicated in Debtor's motion, but in no later than early in 2017." Objection at 3:5-17.

Debtor acknowledges the Motion is mistaken as to Grand Wisdom's role in the supply chain. Grand Wisdom is not a manufacturer, but rather a trading company located in Taiwan. Debtor issues purchase orders for LED product to Grand Wisdom, who in turn issues purchase orders to manufacturers in China. The Chinese manufacturer produces the intermediate goods and ships them to Grand Wisdom, who

---

[1] Debtor did not end up borrowing from Pasadena Angels, Inc.

[2] Of the factoring firms that filed UCC-1s, one or more of them filed UCC-1s during this bankruptcy case in violation of the automatic stay rendering them invalid.



assembles them into finished goods by adding power cords and packaging. Next, the finished LED product is shipped from Taiwan to Debtor to avoid the Trump tariffs on goods imported from China. Finally, Debtor resells the LED products to retailers at a 30% markup.

Debtor also acknowledges the Motion is mistaken as to when the relationship between Debtor and Grand Wisdom began. On June 20, 2016, Debtor entered into a contract with Grand Wisdom, effective July 1, 2016 through June 30, 2019, outlining the terms of their relationship. **Exhibit 1**. As early as January 2017, Debtor issued purchase orders to Grand Wisdom. **Exhibit 2**. Contrary to the Bank's suspicion, Debtor's wire transfers to Grand Wisdom were merely payments in the ordinary course of business pursuant to the Grand Wisdom contract for purchase orders which were fulfilled. Grand Wisdom is also a registered company in Taiwan. **Exhibit 3**.

In the Motion, Debtor stated that it "has $1,947,553 with Grand Wisdom, of which $900,000 is a security deposit and $1 million is for prepayment of inventory." Motion at 10:24-25. This statement needs clarification. Debtor currently has $2,112,600 in outstanding purchase orders with Grand Wisdom. Pursuant to the Grand Wisdom contract at paragraph 7 (in Chinese) Debtor must pay Grand Wisdom a 50% deposit[3] and the remaining 50% before goods are delivered to Debtor. Thus, Debtor paid Grand Wisdom $1,056,300 which represents 50% of the $2,112,600 in outstanding purchase orders. Objection pg. 27, Ex. 4, and pg. 30, Ex. 5. Additionally, Debtor paid Grand Wisdom $901,233.50 toward requisite mold manufacturing, product safety inspections, lab testing certifications, factory audit, and cost sharing. *Id.* This clarifies what the $1,947,553 consists of and why Debtor paid it to Grand Wisdom.

The Bank questions the benefit of Debtor's arrangement with Grand Wisdom, asserting that "[f]or a payment of $1,000,000 and application of the deposit of $1,900,000, a total of $2,900,000, the Debtor will get $2,600,000 gross with that further

---

[3] The 50% deposit pays for the purchase of raw materials from manufacturers.



reduced by the operational costs by a Debtor which historically breaks even? What is the benefit from this?" Objection at 4:25-27. However, most of the $901,233.50 has been used to manufacture molds which Debtor now owns, and toward product safety inspections and lab certifications, all of which can be re-used for many years to come for future purchase orders. Thus, Debtor will not have to pay these costs again, allowing for greater profit margins on future purchase orders, increasing the value of the Bank's collateral to its benefit.

Grand Wisdom has already used the $901,233.50 towards the manufacturing of molds, product safety inspections, lab testing etc., and has already used the $1,056,300 to purchase raw materials which are currently stored at manufacturing factories in China. Thus, Debtor's $1,056,300 deposit has already been applied toward the purchase of goods as a 50% prepayment. But pursuant to the Grand Wisdom contract, Debtor must pay the remaining 50% to Grand Wisdom before the goods are delivered to Debtor. If Debtor cannot use cash collateral to pay the remaining 50%, Debtor will not receive the goods and Debtor will not be able to fulfill the outstanding purchase orders from retailers Walmart, Home Depot, and Hobby Lobby. If Debtor cannot fulfill those outstanding purchase orders, Debtor's cash flow will be severely impacted, Debtor will be forced to shut down operations, and Debtor's $1,947,553 with Grand Wisdom would be effectively wasted.

The Objection states that Debtor's proposed cash collateral budget "indicates a net deficit of $215,146 through May of 2019 while contending that inventory and accounts receivable will be stable in amount through the end of 2019. The budget proposes no payments to factoring companies who likely are not going to sit idly by while EWB gets paid and the Debtor runs losses from operations." Objection at 4:15-19. First, the factoring companies have not objected to Debtor's use of cash collateral or the proposed budget, but to the extent they are secured creditors, they are adequately protected not entitling them to payments during this Chapter 11. Second, Debtor's proposed budget shows negative cash flow through May of 2019 because it must first



5

REPLY IN SUPPORT OF MOTION TO USE CASH COLLATERAL

1 purchase more inventory to fulfill the outstanding purchase orders. Walmart, Home Depot, and Hobby Lobby have requested delivery dates of March and April 2019, so Debtor will not get paid on those orders until about April 2019. Beginning April 2019 Debtor will be operating at a profit through the end of 2019 inventory and receivables will stabilize.

The Objection audaciously suggests that the purchase orders from Walmart, Home Depot, and Hobby Lobby, submitted as Exhibit 2 of the Motion, are fabricated. Objection at 4:8-14. The Bank's suspicion here is erroneous. The purchase orders are authentic. With respect to Hobby Lobby, page 1 of **Exhibit 4** is an email from Brittany N. Spaugy to Debtor dated December 18, 2018 attaching purchase order no. 9156120. With respect to Walmart and Home Depot, Debtor receives and downloads purchase orders from the companies' online data systems. Page 2 and 3 of **Exhibit 4**. As to the Walmart orders, the Motion states that Adam McFarlane now does business with Walmart in a "division (D16) that Debtor was supposed to sell into" and that Debtor currently does business with other Walmart divisions (D10, D11, and D18). In other words, McFarlane stole some of the Walmart sales, but not all. The purchase orders from Walmart are for goods in certain Walmart divisions that Debtor still sells into, dispelling the Bank's suspicion that the Walmart orders are falsified because McFarlane stole those orders. Objection at 4:12-14.

The Objection further alleges that Debtor has been transferring funds to an entity named JiangXi Tailong Optronics Corp. ("JiangXi") which is apparently "a Chinese alter ego of Debtor," and thus "Debtor has been dealing with itself without disclosure to [the Bank]." Objection at 3:18-22. The Bank is mistaken. JiangXi is not Debtor's alter ego. In 2015, JiangXi and Adam McFarlane agreed that McFarlane would receive a 5% interest in JiangXi if it became publicly traded in China. JiangXi never went public. JiangXi is merely one of Debtor's suppliers and a completely separate entity from whom Debtor purchased goods.



REPLY IN SUPPORT OF MOTION TO USE CASH COLLATERAL

Next, the Objection suggests that Debtor is dishonest about its financial difficulties, asserting that "[c]ontrary to the representations in the Debtor's motion about lost sales. [sic] the Borrowing Base Certificates indicate a continuing similar level of receivables and as of May 2018 the audited financial statements indicate no unusual events." Objection at 3:23-25. The timing of Debtor's financial difficulties requires clarification. The financial statements and Borrowing Base Certificate cited by the Bank are as of May 2018 and September 19, 2018, before Debtor began experiencing negative cash flow in October 2018. Prior to October 2018, Debtor had always carried 8-12 weeks of inventory in its warehouse, and Debtor had been selling that existing inventory. Moreover, the Trump tariffs did not become effective until September 24, 2019, and the Adam McFarlane conspiracy described in the Motion did not financially impact Debtor until approximately September 2019. Further, the $10 million in Walmart orders stolen by Adam McFarlane as stated in the Motion are lost future sales from a product program that was to begin in March 2019.

The Objection contends that "[w]hether the Debtor owns any of the receivables which its factors think that they own is likely to be debated." Objection at 5:6-8. Debtor recently learned that Walmart and Home Depot have released $136,784.45 in receivables, which the factors claim ownership of, into Debtor's DIP account. Debtor is also considering prosecuting avoidable transfer claims it may have against the factors to recover any preference payments made to them, which would increase the assets of the bankruptcy estate to the Bank's benefit.

Finally, in a recent telephone conversation with Debtor's counsel on January 4, 2019, the Bank contended that four entities[4] with whom Debtor does business are insiders of Debtor, and thus, under the loan agreement they are not "eligible receivables" rendering the Borrowing Base Certificates false. These four entities are all legitimate

---

[4] These four entities are Bright Yard Living Corp., Mix and Match LLC, Centenary Development Corp., and Rona Global Inc.



distributors of Debtor that sell Debtor's products in various territories to maximize Debtor's distribution channels.  Debtor entered into distribution agreements with these entities and provided the agreements to the Bank during its 2016 and 2017 financial audits.  The Bank cannot now go back and claim foul when it should have raised these concerns as part of its due diligence.

Debtor believes that the Bank's concerns are warranted, but that they stem from misunderstandings or a lack of information about Debtor's operations.  Debtor wants to cooperate with the Bank to ensure a smooth Chapter 11 reorganization, and will comply with the Bank's requests for information and documentation moving forward.

### III. THE BANK IS ADEQUATELY PROTECTED BY A SUBSTANTIAL EQUITY CUSHION

More importantly, however, the issues raised in the Objection are not properly before the Court, because they are largely irrelevant to the narrow issue of whether the Bank is adequately protected justifying use of cash collateral.  As set forth in the Motion, the aggregate value of Debtor's assets is a conservative $6,935,383.09,[5] while the Bank's claim is only $2,498,556.00 as of the petition date.  Thus, the Bank is protected by $4,436,827.07 in equity, which amounts to a **177.58% equity cushion**, far exceeding the 20% equity cushion that the Ninth Circuit and California bankruptcy judges hold constitutes clear adequate protection of a secured creditor's interest in cash collateral.  *In re Mellor*, 734 F.2d 1396, 1401 (9th Cir. 1984).  The Bank is also protected by the Debtor's continued business operations.  Accordingly, use of cash collateral should be authorized, and Debtor should not be required to make any adequate protection payments to the Bank during the pendency of this Chapter 11 case.

---

[5] Debtor requests that the Court take judicial notice of Debtor's Schedule A/B on file with the Court which values its assets at $6,935,383.09.  Debtor's opinion as to the value of the assets should be given more weight since Debtor is in the LED lighting industry.  Moreover, the Bank has offered no expert opinion as to the value of the assets.



## IV. THE BANK'S REQUEST TO NOT ALLOW USE OF CASH COLLATERAL TO FULFILL OUTSTANDING PURCHASE ORDERS MAKES LITTLE SENSE

Debtor submits that the Bank's request to limit use of cash collateral "to payment of rent, utilities and salaries of persons necessary for collection of accounts and sale of present inventory" makes little, if any, sense. If Debtor cannot use cash collateral to pay its suppliers (Grand Wisdom, for example), Debtor will not receive the goods and Debtor will not be able to fulfill the outstanding purchase orders from retailers Walmart, Home Depot, and Hobby Lobby. If Debtor cannot fulfill those outstanding purchase orders, Debtor's cash flow will be severely impacted, Debtor will be forced to shut down operations, and Debtor's $1,947,553 with Grand Wisdom would be effectively wasted. Thus, prohibiting Debtor from using cash collateral to pay for more inventory would decimate the going-concern value of Debtor's assets to the detriment of the Bank and creditors.

To the extent the Bank requests that Debtor only be permitted to use cash collateral on a limited, interim basis, this request, if granted, would only cause an increase in administrative expenses of the estate by requiring Debtor's attorneys to draft, file, and serve additional briefings and appear at additional hearings with no appreciable benefit to the Bank.

## V. THE COURT SHOULD NOT ORDER DEBTOR TO MAKE ADEQUATE PROTECTION PAYMENTS TO THE BANK

A secured creditor, whether oversecured or undersecured, is not entitled to adequate protection to compensate for any lost opportunities the creditor may suffer from having its collateral "frozen" by the automatic stay during the course of a bankruptcy case. *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988) (secured creditor not entitled to payment to compensate for its inability to foreclose upon the collateral during bankruptcy proceedings); *In re Delta Resources, Inc.*, 54 F.3d 722, 730 (11th Cir. 1995) (applying



1 | same rationale to oversecured creditors); *In re Cimarron Investors*, 848 F.2d 974, 975-
2 | 976 (9th Cir. 1988).

3 |     As set forth above, the Bank is protected by at least a 177.58% equity cushion
4 | and by Debtor's continued business operations. Additionally, the Bank has not
5 | presented expert opinion evidence of the value of Debtor's assets or that the value of the
6 | collateral is declining. Accordingly, the Court should not order Debtor to make
7 | adequate protection payments to the Bank.

8 | **VI.**   **CONCLUSION**

9 |     Accordingly, Debtor respectfully requests that this Court enter an order:

10 |   (1) granting the Motion in its entirety;

11 |   (2) authorizing Debtor to use cash collateral to (i) pay all of the expenses set forth in
12 | the Budget through and including June 30, 2019, with authority to deviate from
13 | the line items in the Budget by up to 20%, on both a line item and aggregate
14 | basis, with any unused portions to be carried over into the following month(s);
15 | and (ii) pay all quarterly fees owing to the Office of the United States Trustee and
16 | all expenses owing the Clerk of the Bankruptcy Court; and

17 |   (3) granting such other and further relief as the Court deems just and proper.

19 | Dated: January 6, 2019                             LO & LO LLP

21 |                                             By: /s/ Michael Y. Lo
                                                   Michael Y. Lo
                                                   Jonathan J. Lo
                                                   Kelvin J. Lo
                                                   Counsel for Chapter 11 Debtor
                                                   and Debtor-in-Possession



REPLY IN SUPPORT OF MOTION TO USE CASH COLLATERAL

# **DECLARATION OF EVA SHIH**

I, Eva Shih, hereby declare:

1. I am over 18 years of age. I have personal knowledge of the facts set forth herein, unless stated on information and belief, and if called as a witness, I could and would competently testify thereto.

2. I make this declaration in support of the Reply brief submitted herewith and the Motion for Order Authorizing Debtor to Use Cash Collateral Through and Including June 30, 2019. Unless otherwise indicated or implied by context, all capitalized terms used herein have the same meanings as ascribed to them in the Reply.

3. I have reviewed and am knowledgeable about the books and records of Debtor. Such books and records are made in the regular practice of business, kept in the regular course of business, made by a person with knowledge of the events and information related thereto, and made at or near the time of events and information recorded.

4. In or about May 2018, Debtor telephoned the Bank to inquire about obtaining additional financing due to Debtor's tight cash flow. Debtor spoke to Lois Chiang of the Bank's Commercial and Int'l Banking department, who advised that Debtor seek financing from funding companies and introduced Debtor to Janice Orlando of Pasadena Angels, Inc.,[6] a venture capital firm. Lois Chang advised Debtor that the Bank would not object to additional financing so long as no lenders filed UCC-1 financing statements. Based on this advice, Debtor sought funding from the factoring firms. On recorded telephone calls, all of the factoring firms represented to Debtor that they would not file UCC-1 statements. Debtor was surprised to learn that some of them ultimately did so.[7]

---

[6] Debtor did not end up borrowing from Pasadena Angels, Inc.

[7] Of the factoring firms that filed UCC-1s, one or more of them filed UCC-1s during this bankruptcy case in violation of the automatic stay rendering them invalid.



11

REPLY IN SUPPORT OF MOTION TO USE CASH COLLATERAL

5. I sold my house to my niece for fair market value through escrow. My niece recently married in August 2018 and wanted to buy a house. During that time, I also wanted to sell her house to pay off various liens encumbering my house because the liens were accruing interest.

6. Debtor acknowledges the Motion is mistaken as to Grand Wisdom's role in the supply chain. Grand Wisdom is not a manufacturer, but rather a trading company located in Taiwan. Debtor issues purchase orders for LED product to Grand Wisdom, who in turn issues purchase orders to manufacturers in China. The Chinese manufacturer produces the intermediate goods and ships them to Grand Wisdom, who assembles them into finished goods by adding power cords and packaging. Next, the finished LED product is shipped from Taiwan to Debtor to avoid the Trump tariffs on goods imported from China. Finally, Debtor resells the LED products to retailers at a 30% markup.

7. Debtor also acknowledges the Motion is mistaken as to when the relationship between Debtor and Grand Wisdom began. On June 20, 2016, Debtor entered into a contract with Grand Wisdom, effective July 1, 2016 through June 30, 2019, outlining the terms of their relationship. Attached hereto as **Exhibit 1** is a true and correct copy of the Grand Wisdom contract.

8. As early as January 2017, Debtor issued purchase orders to Grand Wisdom. Attached hereto as **Exhibit 2** are true and correct copies of January and February 2017 purchase orders to Grand Wisdom. Contrary to the Bank's suspicion, Debtor's wire transfers to Grand Wisdom were merely payments in the ordinary course of business pursuant to the Grand Wisdom contract for purchase orders which were fulfilled.

9. Grand Wisdom is a registered company in Taiwan. Attached hereto as **Exhibit 3** is a true and correct copy of a printout from a legitimate online database showing that Grand Wisdom is a registered company in Taiwan.



REPLY IN SUPPORT OF MOTION TO USE CASH COLLATERAL

10. Debtor currently has $2,112,600 in outstanding purchase orders with Grand Wisdom. Pursuant to the Grand Wisdom contract at paragraph 7 (in Chinese) Debtor must pay Grand Wisdom a 50% deposit[8] and the remaining 50% before goods are delivered to Debtor. Thus, Debtor paid Grand Wisdom $1,056,300 which represents 50% of the $2,112,600 in outstanding purchase orders. Additionally, Debtor paid Grand Wisdom $901,233.50 toward requisite mold manufacturing, product safety inspections, lab testing certifications, factory audit, and cost sharing.

11. Most of the $901,233.50 paid to Grand Wisdom has been used to manufacture molds which Debtor now owns, and toward product safety inspections and lab certifications, all of which can be re-used for many years to come for future purchase orders. Thus, Debtor will not have to pay these costs again, allowing for greater profit margins on future purchase orders, increasing the value of the Bank's collateral to its benefit.

12. Grand Wisdom has already used the $901,233.50 towards the manufacturing of molds, product safety inspections, lab testing etc., and has already used the $1,056,300 to purchase raw materials which are currently stored at manufacturing factories in China. Thus, Debtor's $1,056,300 deposit has already been applied toward the purchase of goods as a 50% prepayment. But pursuant to the Grand Wisdom contract, Debtor must pay the remaining 50% to Grand Wisdom before the goods are delivered to Debtor. If Debtor cannot use cash collateral to pay the remaining 50%, Debtor will not receive the goods and Debtor will not be able to fulfill the outstanding purchase orders from retailers Walmart, Home Depot, and Hobby Lobby. If Debtor cannot fulfill those outstanding purchase orders, Debtor's cash flow will be severely impacted, Debtor will be forced to shut down operations, and Debtor's $1,947,553 with Grand Wisdom would be effectively wasted.

---

[8] The 50% deposit pays for the purchase of raw materials from manufacturers.



13

REPLY IN SUPPORT OF MOTION TO USE CASH COLLATERAL

13. Debtor's proposed budget shows negative cash flow through May of 2019 because it must first purchase more inventory to fulfill the outstanding purchase orders. Walmart, Home Depot, and Hobby Lobby have requested delivery dates of March and April 2019, so Debtor will not get paid on those orders until about April 2019. Beginning April 2019 Debtor will be operating at a profit through the end of 2019 inventory and receivables will stabilize.

14. The purchase orders from Walmart, Home Depot, and Hobby Lobby are authentic. With respect to Hobby Lobby, attached hereto as page 1 of **Exhibit 4** is a true and correct email from Brittany N. Spaugy to Debtor dated December 18, 2018 attaching purchase order no. 9156120. With respect to Walmart and Home Depot, Debtor receives and downloads purchase orders from the companies' online data systems. Attached hereto as pages 2 and 3 of **Exhibit 4** are screenshots of the online data systems where Debtor received and downloaded the purchase orders. As to the Walmart orders, the Motion states that Adam McFarlane now does business with Walmart in a "division (D16) that Debtor was supposed to sell into" and that Debtor currently does business with other Walmart divisions (D10, D11, and D18). In other words, McFarlane stole some of the Walmart sales, but not all. The purchase orders from Walmart are for goods in certain Walmart divisions that Debtor still sells into, dispelling the Bank's suspicion that the Walmart orders are falsified because McFarlane stole those orders.

15. JiangXi is not Debtor's alter ego. In 2015, JiangXi and Adam McFarlane agreed that McFarlane would receive a 5% interest in JiangXi if it became publicly traded in China. JiangXi never went public. JiangXi is merely one of Debtor's suppliers and a completely separate entity from whom Debtor purchased goods.

16. The financial statements and Borrowing Base Certificate cited by the Bank are as of May 2018 and September 19, 2018, before Debtor began experiencing negative cash flow in October 2018. Prior to October 2018, Debtor had always carried 8-12 weeks of inventory in its warehouse, and Debtor had been selling that existing inventory. Moreover, the Trump tariffs did not become effective until September 24, 2019, and the



14

REPLY IN SUPPORT OF MOTION TO USE CASH COLLATERAL

Adam McFarlane conspiracy described in the Motion did not financially impact Debtor until approximately September 2019. Further, the $10 million in Walmart orders stolen by Adam McFarlane as stated in the Motion are lost future sales from a product program that was to begin in March 2019.

17. Debtor recently learned that Walmart and Home Depot have released $136,784.45 in receivables, which the factors claim ownership of, into Debtor's DIP account.

18. Bright Yard Living Corp., Mix and Match LLC, Centenary Development Corp., and Rona Global Inc. are all legitimate distributors of Debtor that sell Debtor's products in various territories to maximize Debtor's distribution channels. Debtor entered into distribution agreements with these entities and provided the agreements to the Bank during its 2016 and 2017 financial audits.

19. Debtor wants to cooperate with the Bank to ensure a smooth Chapter 11 reorganization, and will comply with the Bank's requests for information and documentation moving forward.

20. The aggregate value of Debtor's assets is a conservative $6,935,383.09,[9] while the Bank's claim is only $2,498,556.00 as of the petition date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on January 7, 2019, in the City of ___Chino___, California.

_____
Eva Shih

---

[9] Debtor requests that the Court take judicial notice of Debtor's Schedule A/B on file with the Court which values its assets at $6,935,383.09. Debtor's opinion as to the value of the assets should be given more weight since Debtor is in the LED lighting industry. Moreover, the Bank has offered no expert opinion as to the value of the assets.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

506 N. Garfield Ave., Suite 280, Alhambra, CA 91801

A true and correct copy of the foregoing document entitled: **REPLY MEMORANDUM IN SUPPORT OF MOTION FOR ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL THROUGH AND INCLUDING JUNE 30, 2019; DECLARATION OF EVA SHIH** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **01/07/2019**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Elmer D Martin, III, Courtesy NEF: elmermartin@gmail.com
Abram Feuerstein, counsel for U.S. Trustee: abram.s.feuerstein@usdoj.gov
Everett L Green, counsel for U.S. Trustee: everett.l.green@usdoj.gov
United States Trustee (RS): ustpregion16.rs.ecf@usdoj.gov
Michael Y. Lo, counsel for Debtor: bklolaw@gmail.com, jaylo1225@gmail.com
Christopher J Langley, former counsel for Debtor: chris@langleylegal.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **01/07/2019**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA PERSONAL DELIVERY
Hon. Wayne Johnson
United States Bankruptcy Court
3420 Twelfth Street, Suite 384
Riverside, CA 92501-3819

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 01/07/2019 | Kelvin J. Lo | /s/ Kelvin J. Lo |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                               **F 9013-3.1.PROOF.SERVICE**