| | |
|---|---|
| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address<br><br>Elmer Dean Martin III (State Bar No. 75517)<br>Elmer Dean Martin III, A Professional Corporation<br>1300 Valley Vista Drive, Suite 201<br>Diamond Bar, CA 91765<br>Telephone: 909-861-6700<br>Facsimile:909-860-3801<br>elmer@bankruptcytax.net | FOR COURT USE ONLY |

☐ *Individual appearing without attorney*
☒ *Attorney for:* Creditor East West Bank

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION

| In re:<br><br>VARIO CORP.,<br><br><br><br><br><br><br><br><br><br><br>Debtor(s). | CASE NO.: 6:18-bk-19730-WJ<br><br>CHAPTER: 11 |
|---|---|
| | **NOTICE OF MOTION FOR:**<br><br>Motion for Approval of Application of Pledged East West Bank Account in Payment of Secured Debt Owed to East West Bank<br><br><br><br>*(Specify name of Motion)* |
| | DATE: 03/05/2019<br>TIME:  10:00 am<br>COURTROOM: 304<br>PLACE: 3420 Twelfth Street<br>            Riverside, CA 92501 |

1. TO (*specify name*):  Honorable Wayne Johnson and other interested parties

2. NOTICE IS HEREBY GIVEN that on the following date and time and in the indicated courtroom, Movant in the above-captioned matter will move this court for an Order granting the relief sought as set forth in the Motion and accompanying supporting documents served and filed herewith. Said Motion is based upon the grounds set forth in the attached Motion and accompanying documents.

3. **Your rights may be affected**. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

4.  **Deadline for Opposition Papers:** This Motion is being heard on regular notice pursuant to LBR 9013-1. If you wish to oppose this Motion, you must file a written response with the court and serve a copy of it upon the Movant or Movant's attorney at the address set forth above no less than fourteen (14) days prior to the above hearing date.  If you fail to file a written response to this Motion within such time period, the court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

5.  **Hearing Date Obtained Pursuant to Judge's Self-Calendaring Procedure:** The undersigned hereby verifies that the above hearing date and time were available for this type of Motion according to the judge's self-calendaring procedures.

Date:  01/31/2019

Elmer Dean Martin III, A Professional Corporation
Printed name of law firm

/s/ Elmer Dean Martin III
Signature

Elmer Dean Martin III
Printed name of attorney

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2012*                          Page 2                          **F 9013-1.1.HEARING.NOTICE**

1   Curtis C. Jung, Esq. (State Bar No. 130657)
    JUNG & YUEN, LLP
2   888 South Figueroa Street, Suite 720
    Los Angeles, California 90017
3   Telephone: (213) 689-8880
    Facsimile: (213) 689-8887
4   curtis@jyllp.com
5   Counsel for Creditor East West Bank

6   Elmer Dean Martin III (State Bar No. 75517)
    Elmer Dean Martin III, A Professional Corporation
7   1300 Valley Vista Drive, Suite 201
    Diamond Bar, CA 91765
8   Telephone: 909-861-6700
    Facsimile:909-860-3801
9   elmer@bankruptcytax.net
10  Counsel for Creditor East West Bank

11  Jonathan J. Lo (SBN 305306)
    Lo & Lo LLP
12  506 North Garfield Avenue, Suite 280
    Alhambra, CA 91801
13  Telephone: 626-289-8838
14  Facsimile: 626-380-3333
    Email: Contact@lolollp.com
15  Proposed Counsel for Chapter 11 Debtor
    and Debtor-in-Possession
16

17              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
18                    **RIVERSIDE DIVISION**

19  In re                              | CASE NO.  6:18-bk-19730-WJ
20  VARIO CORP.,                       | Chapter 11
                 Debtor.
21                                       Motion for Approval of Application of
22                                       Pledged East West Bank Account in
                                         Payment of Secured Debt Owed to East
23                                       West Bank
24
25                                       Hearing:
                                         Date: March 5, 2019
26                                       Time: 10:00 a.m.
                                         Place: Courtroom 304
27                                       3420 Twelfth Street
28                                       Riverside, CA 92501

*(left margin, vertical text)* ELMER DEAN MARTIN III POST OFFICE BOX 4670 DIAMOND BAR, CALIFORNIA 91765 (909)861-6700

c:/winword/pleadings/1t5632

**The Jurisdiction**

This case was commenced in this Court and Division on November 16, 2018. This Court has jurisdiction, authority and venue to consider any motion relating to the property and debts of this estate.

**The Motion**

East West Bank moves the Court for an order approving paragraph 5(c) of the Cash Collateral Stipulation which in other respects the Court generally approved on January 29, 2019. The Cash Collateral Stipulation provided for the application of the balance in a Debtor depository account maintained by Debtor at East West Bank to the debt owed by Debtor to East West Bank. The account balance stated in the Cash Collateral Stipulation is $352,101.19. The debt owed to East West Bank stated in the Cash Collateral Stipulation and the Proof of Claim filed by East West Bank is $2,505,587.49 (the "Debt").

**The Facts**

The Cash Collateral Stipulation is attached hereto as Exhibit 1. The order approving the Cash Collateral Stipulation is attached hereto as Exhibit 2. The Proof of Claim, with attached security documents, is attached as Exhibit 3. The declaration of Frank Chan, for East West Bank, regarding the Proof of Claim amount and documents is attached hereto as Exhibit 4.

Attached at PDF page 48 to the Proof of Claim is a copy of the Assignment of Deposit Account executed by Debtor on December 31, 2016 concurrently with the loan documents between East West Bank which are also attached to the Proof of Claim. The Deposit Account has been maintained continually since December 31, 2016 as it was maintained on that date. As indicated in the loan documents the loan in issue matured on December 31, 2018. Under the terms of the Assignment East West Bank may "take directly all funds in the Account and apply them to the Indebtedness." Also attached to the Proof of Claim are commercial security agreements granting security interests in Debtor's property and a copy of the UCC-1

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909) 861-6700

c:/winword/pleadings/1t5632

1    perfecting these security interests recorded on January 6, 2017.

2    Debtor has no equity in the Deposit Account.

3    **The Law**

4    East West Bank's security interest in the Deposit Account is perfected by

5    expressly specified agreement and possession and control in this commercial loan

6    transaction and therefore is prior to any other subsequent security interest granted by

7    Debtor to any other lender, if any subsequent security interest has been validly

8    granted, Cal. Comm. Code §§9104, 9203 and 9313, and is not subject to avoidance or

9    subordination under the Bankruptcy Code §544 or otherwise.

10    The creditors who claim security interests in the property of Debtor include

11    Business Merchant Funding the proof of claim of which is attached hereto as Exhibit

12    5 and Fora Financial West, LLC the proof of claim of which is attached hereto as

13    Exhibit 6.  These entities claim a security interest through the filing within 90 days of

14    the commencement of this case of a UCC Financing Statement with the California

15    Secretary of State.  These filings are avoidable under Bankruptcy Code §547 as

16    preferences, and potentially otherwise, and do not perfect any enforceable security

17    interest in the Deposit Account superior to East West Bank's possession and control

18    of the Deposit Account.  A UCC lien search is attached to the declaration of Frank

19    Chan attached hereto as Exhibit 4.

20    Notice of this motion has been given to all entities appearing in the schedules

21    of the Debtor or in the Lien Search or otherwise known to East West Bank as

22    potentially having any claim against the Debtor, secured or unsecured.

23    The Deposit Account is collateral which East West Bank is presently

24    authorized by the Assignment to apply to the payment of the Debt which Debtor owes

25    to East West Bank.  East West Bank authorized the use of its cash collateral and

26    Debtor authorized the application of the Deposit Account to payment of a portion of

27    the Debt in the Cash Collateral Stipulation as an adequate protection payment within

28

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

-3-

the meaning of Bankruptcy Code §§361 and 362(d) as well as 363(e).[1] Application of the Deposit Account to the Debt will potentially assist in the reorganization of the Debtor because it will reduce the indebtedness Debtor owes to East West Bank which has a prior perfected unavoidable security interest in all of the Debtor's property, and as already implemented, result in the use of cash collateral for the continuation of the Debtor's essential business operation.

### Request for Relief

Wherefore, East West Bank requests that the Court approve paragraph 5(c) of the Cash Collateral Stipulation and order that East West Bank may apply the balance in the Deposit Account to the EWB Prepetition Indebtedness as stated in the Cash Collateral Stipulation when such order becomes final and not appealable in the absence of an appeal of the order.

DATED: January ___31___, 2019    Elmer Dean Martin III, A Professional Corporation
                                /s/ Elmer Dean Martin III
                                By: Elmer Dean Martin III
                                Counsel for Creditor East West Bank


DATED: January _31_, 2019    Lo & Lo LLP

                             By: _____
                             Jonathan J. Lo.
                             Counsel for Debtor

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

---
[1] To assure compliance with possible   pertinent procedural requirements and to procedurally assure implementation of the cash collateral stipulation a motion for relief from stay is being filed concurrently with this motion to be heard concurrently with this motion.

-4-

c:/winword/pleadings/1t5632

Curtis C. Jung, Esq. (State Bar No. 130657)
JUNG & YUEN, LLP
888 South Figueroa Street, Suite 720
Los Angeles, California 90017
Telephone: (213) 689-8880
Facsimile: (213) 689-8887
curtis@jyllp.com
Counsel for Creditor East West Bank

Elmer Dean Martin III (State Bar No. 75517)
Elmer Dean Martin III, A Professional Corporation
1300 Valley Vista Drive, Suite 201
Diamond Bar, CA 91765
Telephone: 909-861-6700
Facsimile:909-860-3801
elmer@bankruptcytax.net
Counsel for Creditor East West Bank

Jonathan J. Lo (SBN 305306)
Lo & Lo LLP
506 North Garfield Avenue, Suite 280
Alhambra, CA 91801
Telephone: 626-289-8838
Facsimile: 626-380-3333
Email: Contact@lololLp.com
Proposed Counsel for Chapter 11 Debtor
and Debtor-in-Possession

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### RIVERSIDE DIVISION

| | |
|---|---|
| In re<br>VARIO CORP.,<br>　　　　Debtor. | CASE NO.  6:18-bk-19730-WJ<br>Chapter 11<br><br>Stipulation Regarding Use of Cash Collateral and Adequate Protection<br><br><u>Hearing:</u><br>Date: January 29, 2019<br>Time: 3:00 pm<br>Place: Courtroom 304<br>3420 Twelfth Street, Riverside, CA 92501 |

-1-

c:/winword/pleadings/1t5627

Motion Exhibit 1 Page 0005

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909) 861-6700

This Stipulation Regarding Use of Cash Collateral and Adequate Protection (the "Stipulation") is entered into by and between Vario Corp., a California corporation, the debtor and debtor-in-possession herein (the "Debtor"), and secured creditor, East West Bank ("EWB"), with reference to the following facts:

## RECITALS

A.     Petition. On November 16, 2018 (the "Petition Date"), the Debtor commenced the above captioned bankruptcy case (the "Bankruptcy Case") by filing a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California (the "Court"). The Debtor is continuing in possession of its property, and operating and managing its business, as debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

B.     Jurisdiction and Venue. This Court has jurisdiction over the Bankruptcy Case, and the parties and property affected thereby, to the extent of such jurisdiction under 28 U.S.C. §§ 157(b) and 1334. This proceeding constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue for this Bankruptcy Case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     Debtor. The Debtor claims to own certain inventory, accounts receivable, and other property ("Property") encumbered by a lien in favor of EWB.

D.     EWB's Claim. As of the Petition Date, the Debtor was indebted to EWB in the amount of **$2,505,587.49** computed as set forth in **Exhibit 1** hereto. This sum together with all accrued interest, late fees, foreclosure fees and costs and attorneys' fees are due and payable to EWB (the "Prepetition EWB Indebtedness").

E.     The Prepetition EWB Indebtedness is evidenced by a Promissory Note (the "EWB Promissory Note") which is secured by a first priority lien encumbering the Property and rents, issues, proceeds and profits therefrom (the "Prepetition EWB Collateral"), together with other documents including a Business Loan Agreement dated as of December 31, 2016 as modified prior to November 16, 2018, the EWB

-2-

c:/winword/pleadings/1t5627

1    Promissory Note dated December 31, 2016, Commercial Security Agreement dated

2    December 31, 2016 granting to EWB a security interest in the Cash Collateral which

3    was perfected by filing a UCC-1 with the California Secretary of State on January 6,

4    2017, Assignment of Deposit Account dated December 31, 2016 relating to EWB

5    Savings Account Number 178332032 in the approximate balance of $352,101.19

6    ("Savings Account"), and other related documents all of which documents are herein

7    referred to as the "Loan Documents".

8        F.    By virtue of the Commercial Security Agreement and the UCC-1, EWB

9    has a perfected unavoidable first priority lien on the Cash Collateral (as defined in

10   Paragraph 4.a. herein).    EWB asserts that all of the Debtor's cash and proceeds

11   generated by the Debtor before and after the commencement of Debtor's case are

12   "Cash Collateral" of EWB within the meaning of Bankruptcy Code Section 363(a).

13       G.    Need for and Uses of Cash Collateral.  As a result of EWB's lien

14   upon, and security interests in, the Cash Collateral, and by virtue of Bankruptcy

15   Code section 363(c)(2), the Debtor is unable to use the Cash Collateral without the

16   consent of EWB or the authorization of the Court after notice and a hearing.  The

17   Debtor requests entry of an order of the Court approving this Stipulation pursuant to

18   Bankruptcy Rule 4001(b)(2) (the "Approval Order"), to allow the Debtor the use of

19   Cash Collateral (as defined below) for the preservation of the bankruptcy estate and

20   the maintenance and continued operation of the business of Debtor.

21       H.    Prior Cash Collateral Order.  No prior order with respect to EWB

22   regarding the use of Cash Collateral or adequate protection has been entered by the

23   Court in this Bankruptcy Case.

24       I.    Anticipated Use of Cash Collateral.  Debtor has requested, and subject

25   to Court approval, EWB has consented to Debtor's interim use of Cash Collateral for

26   purposes described in the Budget attached hereto as **Exhibit 2** subject to the terms of

27   this Stipulation.

28       NOW, THEREFORE, based upon the foregoing findings and conclusions, and

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

-3-

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

good cause appearing therefor,

**IT IS HEREBY STIPULATED, CONSENTED TO AND AGREED** by and among the Debtor and EWB as follows:

## STIPULATION

1.    <u>Incorporation.</u>    The recitals contained above are incorporated herein by this reference.

2.    <u>Indebtedness.</u>    The Debtor hereby acknowledges and agrees that the Debtor is liable to EWB in the amount of the Prepetition EWB Indebtedness.

3.    <u>Validity of Claims.</u>    The Debtor acknowledges and agrees to the following:

a.    The Prepetition EWB Indebtedness constitutes an allowed claim under the Bankruptcy Code;

b.    The Prepetition EWB Indebtedness is secured by valid, perfected and indefeasible and unavoidable, first priority security interests encumbering the Property and the Cash Collateral; and

c.    Nothing contained herein prohibits the Debtor from curing and reinstating the Debtor's obligations to EWB or to modify the rights of EWB pursuant to a confirmed Chapter 11 plan.

4.    <u>Collection and Use of Cash Collateral.</u>

a.    "Cash Collateral" Defined. "Cash Collateral" includes, without limitation, all cash, negotiable instruments, documents of title, securities, chattel paper, deposit accounts, accounts receivable, inventory or other cash equivalents whenever acquired in which the Debtor's estate has an interest, and includes any and all proceeds, products, offspring, rents or profits of property and all fees, charges, accounts or other payments on the Prepetition EWB Collateral or otherwise generated by or derived from the Prepetition EWB Collateral (collectively, "<u>Cash Collateral</u>").

b.    <u>Permitted Uses of Cash Collateral.</u> Subject to the terms of this

-4-

Stipulation and the Approval Order, EWB hereby consents to Debtor's use of Cash Collateral, **limited to the cash obtained by Debtor from collection of receivables and/or sale of inventory after November 16, 2018**, solely for the purposes and in the amounts **not to exceed** set forth in the Budget (the "Budget") attached hereto as **Exhibit 2** and incorporated by this reference as though set forth in full herein, to and including February 28, 2019. Debtor and EWB may agree to any amendments or modifications to the budget or Budget Period (defined below) subject to further order of the Bankruptcy Court. Debtor shall deposit all Cash Collateral, in kind, into a debtor in possession account which has been established with East West Bank (the "DIP Accounts") and to the extent Cash Collateral is not eligible for deposit in the DIP Accounts Debtor shall segregate and identify such Cash Collateral. EWB's consent to the use of the Budget does not constitute approval of the Budget's accuracy.

c.   Budgeted Use of Cash Collateral.   Debtor may use the Cash Collateral up to the amount and for the specific purposes set forth in the Budget for the Period commencing *nunc pro tunc* from January 1, 2019 through and including February 28, 2019, or such later date as may be agreed to in writing by EWB and Debtor and approved by the Court (the "Budget Period"). The Budget shall exclude any compensation to "insiders" as defined by the Bankruptcy Code, except for health insurance coverage for Eva Shih and Carl Chen which is an allowed expenditure. For this purpose insiders shall include Yi Ting Hsieh and Louie Chang and any entity or person customarily associated with either Debtor or the officers, directors, shareholder or employees of Debtor. The Budget shall exclude any compensation to professionals, including without limitation counsel and advisors for the Debtor. The Budget shall not include commissions to any person related to sales by Debtor.

d.   Reporting.   The Debtor agrees to provide to EWB and EWB's counsel the following:

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

-5-

c:/winword/pleadings/1t5627

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

i.　　Providing on or before February 1, 2019, and continuing on the fifteenth day of each month thereafter during the Budget Period, commencing with a report starting with November 16, 2018 to document operations since the Debtor's case commenced, a Cash Balance Report (showing deposits and disbursements) which identify the sources and purposes of the deposits and the purposes and persons to whom disbursements are made and, during the Budget Period, a Variance Report (comparing Budget to actual figures)(collectively, the "Cash Collateral Reports"), covering the prior bi-monthly period; and

ii.　　The Debtor's monthly operating reports, which the Debtor is required to file with the U.S. Trustee, for the months in the Budget Period (each, a "Monthly Operation Report," and together with the Cash Collateral Reports, the "Reports"). Debtor is currently in default in filing of such reports for November and December which default shall be cured on or before February 1, 2019.

iii.　　Copies of all monthly bank statements, when issued by the bank, for bank accounts maintained by Debtor and all documents referenced therein with 2 sided copies, including all checks received and disbursement checks issued and any debit or credit documents necessary to verify and identify the contents, source or application of all entries in the bank statements.

iv.　　Copies of all contracts to which the Debtor is a party presently existing and as entered into in the future when entered into.

v.　　Detailed listing of inventory and manufacturing molds, in a form susceptible to confirmation upon inspection, of the Debtor on hand at the reporting time and inventory sold initially after November 16, 2018 and before February 1, 2019, delivered to EWB no later than February 1, 2019, and thereafter on hand on February 1, 2019 and sold before February 15, 2019 delivered no later than February 17, 2019, and thereafter on hand on February 15, 2019 and sold before February 28, 2019 delivered no later than March 2, 2019. EWB will upon request by it be allowed to physically inspect the Debtor's inventory where it is

-6-

1   stored to verify that the inventory reports are accurate.  The inventory report and

2   inspection shall include any inventory of any kind, including inventory of materials

3   which Debtor contends it owns located outside the United States and any

4   manufacturing molds which it contends that it owns located outside the United

5   States, and such reports shall include the contact and location information for such

6   inventory and authorization for the inspection of the inventory wherever located.

7       The Reports shall be mailed electronically to the following addresses:

8       EWB's Counsel:

9       Elmer Dean Martin III

10      elmer@bankruptcytax.net
    Curtis Jung

11      curtis@jyllp.com

12      EWB
    Frank Chan

13      frank.chan@eastwestbank.com

14      5.   Further Adequate Protection of EWB's Interests.  As protection for any

15  diminution in value of the interests of EWB, in compliance with section 506(b) of

16  the Bankruptcy Code, and in consideration of consent to the Debtor's use of the Cash

17  Collateral as set forth in this Stipulation:

18      a.   EWB is hereby granted a replacement lien (the "Replacement

19  Lien") on the Property, including the rents, proceeds and profits thereof

20  (collectively, the "Post-petition Collateral"), with such Replacement Lien being

21  a perfected security interest in and to the Post-petition Collateral having the same

22  extent, validity and priority EWB had in the Prepetition EWB Collateral on the

23  Petition Date; provided, however, that the Postpetition Collateral shall not include

24  any causes of action, claims, or rights of the Debtor's bankruptcy estate under

25  sections 506, 544, 547, 548, 549, 550, and/or 553 of the Bankruptcy Code

26  ("Avoidance Actions") except to the extent that any amounts recovered shall be

27  derived from rents, issues, proceeds and profits derived from the Property or as

28  otherwise ordered by the Court.   The replacement lien shall be in the same nature

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

-7-

c:/winword/pleadings/1t5627

and extent as its pre-petition lien. The Replacement Lien shall be valid, perfected, and enforceable as of the Petition Date without any further action by Debtor and EWB and without the execution, filing, or recording of any financing statements, security agreements, or other documents.

b.    Because EWB already has a lien on all future rents, issues, proceeds and profits derived from the Property, and accordingly the Replacement Lien may be redundant with a lien already possessed by EWB except to the extent of avoidance recoveries, under section 507(b) of the Bankruptcy Code, EWB will be and hereby is granted an allowed claim under section 503(b) of the Bankruptcy Code in the amount of any Cash Collateral used by Debtor. Such claim shall have the super-priority provided by section 507(b) of the Bankruptcy Code, and no claim for costs or expenses of administration that have been or may be incurred in this case, any conversion of this case to a case under chapter 7 of the Bankruptcy Code, or otherwise, and no priority claims, are or will be senior to or on a parity with any such claim of EWB, subject only to fees payable to the U.S. Trustee under 28 U.S.C. § 1930 and fees or costs owing to the Clerk of the Court.

c.    The amount held in the Savings Account shall be released to EWB and the payment will be applied first to payment of interest on the amount of the Prepetition EWB Indebtedness with any excess over that amount to be applied to principal.

6.    Access to Collateral. In order to provide further adequate protection to EWB for Debtor's use of Cash Collateral, Debtor:

a.    Shall permit EWB and its agents' access to inspect the Inventory, wherever located in the United States or elsewhere, as that term is defined in the EWB Loan Documents including materials which Debtor contends it owns located outside the United States, on 48 hours' notice to the Debtor; and

b.    Shall keep the Inventory insured as required by the Loan Documents.

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

-8-

c:/winword/pleadings/1t5627

7.    No Post-Petition Debt; No Other Liens. The Debtor represents that it will not incur any post-petition indebtedness, whether pursuant to section 364 of the Bankruptcy Code or otherwise, other than post-petition professional fees and costs, and fees to the U.S. Trustee, and agrees not to seek court approval of any such post-petition indebtedness on an *ex parte* or shortened notice basis except with prior notice to EWB.

8.    No Implied Authorization. Except for transactions in the ordinary course of business or as authorized by the Court, the Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of the Property of its estate without the prior written consent of EWB, and no such consent shall ever be implied from any other action, inaction, or acquiescence by EWB.

9.    Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Stipulation: (i) Debtor fails to perform any of its obligations in accordance with the terms hereof or otherwise defaults hereunder or breaches any provision hereof, including (A) the use and disbursement of Cash Collateral except as expressly permitted hereunder; (B) the actual expenditure of Cash Collateral by the Debtor in excess of the budgeted expenditure in the Budget, without the written consent of EWB or order of the Court; (C) the failure to provide any report, document, or information to EWB or the United States Trustee as required hereby or by law; and (D) the failure to make any payment to EWB as required hereby; (ii) either of Debtor's exclusive periods to file and solicit acceptances of a plan is terminated or lifted under Bankruptcy Code Section 1121; (iii) a trustee is appointed or elected, or an examiner with the power to operate Debtor's business is appointed, in the Bankruptcy Case; (iv) the Bankruptcy Case is converted to a case under Chapter 7 or is dismissed; (v) the Approval Order is reversed, vacated, stayed, amended, or supplemented without the consent of EWB; (vi) relief from the automatic stay is granted to any party to permit the exercise of remedies with respect to any property of Debtor's estate; (vii) any material

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

-9-

representation or warranty, express or implied, made by Debtor in any certificate, report, expense statement, other financial statement, or other document delivered to EWB or to the Court or the United States Trustee before or after the Petition Date proves to have been false or misleading in any material respect as of the time when made or given (including by omission of material information necessary to make such representation, warranty, or statement not misleading) (for the avoidance of doubt, provision of a document to EWB (A) by Debtor constitutes an implied representation and warranty that the contents thereof are true and correct to the best of the Debtor's knowledge; and (B) by or on behalf of the Debtor that is not what it appears to be shall be deemed a false and misleading representation and warranty); (viii) employment by Debtor of Debtor's presently proposed counsel, Lo & Lo LLP, is denied or Debtor's presently proposed counsel does not file its application for employment on or before January 26, 2019 set for hearing on the earliest available calendar date.

10.  Remedies Upon Default.  If an Event of Default occurs under this Stipulation, EWB shall file notice thereof in the Bankruptcy Case (the "Default Notice").  Upon filing of such notice, Debtor shall have until 5:00 pm, Riverside, California time, on the third (3rd) business day thereafter to cure the Event of Default ("Default Cure Deadline").  Notwithstanding the occurrence of an Event of Default under this Stipulation, Debtor shall be permitted to notice an expedited hearing on three (3) business days' notice so that the Court can determine whether to authorize further use of Cash Collateral.

11.  As of the Default Cure Deadline, if Debtor has not (i) cured the Event of Default that is the subject of the Default Notice, or (ii) noticed an expedited hearing before the Court with respect to the Event of Default that is the subject of the Default Notice, Debtor's rights to use Cash Collateral shall immediately cease without further notice, and EWB shall then be permitted to notice an expedited hearing on three (3) business days' notice (with service upon the U.S. Trustee, and

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

-10-

c:/winword/pleadings/1t5627

those parties requesting special notice) so that the Court can determine whether to grant EWB relief from the automatic stay. Furthermore, the Debtor shall hold and segregate all Cash Collateral in trust for EWB.

12. <u>Right to Terminate Use of Cash Collateral</u>. Regardless of the occurrence of any Event of Default, EWB may move the Court on five (5) days' notice for an order terminating the Debtor's right to use Cash Collateral for any appropriate reason, including, but not limited to, lack of adequate protection, relief from the automatic stay being granted to any party to permit the exercise of remedies with respect to any property of Debtor's estate, failure to obtain Court approval of the terms of this Stipulation, and/or the occurrence of one of the events set forth in paragraph 9 hereof.

13. <u>Non-Budgeted Expenditures</u>. In the event Debtor wishes to make an expenditure of Cash Collateral not expressly provided for in the Budget, Debtor shall notify EWB by email addressed to elmer@bankruptcytax.net and curtis@jyllp.com five (5) calendar days before payment or use of Cash Collateral in writing of the amount and nature of the proposed expenditure and provide to EWB such supporting documentation as may be necessary for EWB to evaluate the necessity and propriety of the proposed expense. In the event that the Debtor's counsel does not receive written or electronic approval from EWB for the proposed use within five (5) business days of the request, the request shall be deemed denied by EWB. In the event that EWB consents in writing to Debtor's expenditure of Cash Collateral, which consent shall be in the sole and absolute discretion, opinion and judgment of EWB, then Debtor shall be entitled to expend Cash Collateral subject to the terms of this Agreement as authorized by EWB in writing. In the event that the Debtor's request is denied by EWB in writing, the Debtor shall not use Cash Collateral to pay that expense absent an order of the Court, and EWB agrees that the Debtor may present its request to the Court on an emergency or *ex parte* basis.

14. <u>Section 364(e) of the Bankruptcy Code</u>. Having been found to have

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909) 861-6700

-11-

c:/winword/pleadings/1t5627

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909) 861-6700

acted in good faith in agreeing to the terms of this Stipulation, EWB shall be entitled to the full protection of section 364(e) of the Bankruptcy Code with respect to the Debtor's grant of the Replacement Lien created and authorized by this Stipulation in the event that this Stipulation or any authorization contained in this Stipulation is stayed, vacated, reversed, or modified on appeal. Any stay, modification, reversal, or vacating of this Stipulation will not affect the validity of any obligation of the Debtor incurred under this Stipulation.

15. <u>506(c) Waiver</u>. The Debtor, on behalf of itself and its estate, shall not seek any right to surcharge EWB under section 506(c) of the Bankruptcy Code or other applicable law for any fees or compensation to attorneys or other professionals employed by the Debtor.

16. <u>No Deemed Lender Control</u>. EWB shall not be deemed to be in "control" of the operations of the Debtor, or to be acting as a "responsible person" or "owner" or "operator" with respect to the operation or management of the Debtor solely by reason of any credit extended to Debtor under the EWB Loan Documents, or the grant to and/or exercise by any successor-in-interest of any rights or remedies hereunder or thereunder.

17. <u>Authorization to Sign Documents</u>. The Debtor is authorized to sign such documents and to take all actions necessary to effectuate the relief granted pursuant to this Stipulation. To the extent this Stipulation is inconsistent with any prior order or pleading with respect to the use of Cash Collateral or grant of adequate protection in this case, the terms of this Stipulation shall govern.

18. <u>Reservation of Rights</u>. This Stipulation and the Approval Order shall not prejudice the right of EWB to seek relief from the automatic stay of section 362 of the Bankruptcy Code, or any other relief in this case, including demands for further adequate protection, objections and claims relating to applications or motions for adequate protection, or the use, sale, or other disposition of the Cash Collateral or the Property, or the enforcement of the guaranty of Eva Shih of the payment of the

-12-

Motion Exhibit 1 Page 0016

debt due to EWB from Debtor.   This Stipulation is also without prejudice to the rights of Debtor to oppose any such relief requested. Except as otherwise expressly set forth in this Stipulation, this Stipulation is not a waiver or modification of any of the rights of EWB, including by way of example and without limitation all rights set forth in the EWB Loan Documents, and EWB does not have any obligation or duty to any other entity to exercise any of its rights, remedies, claims, powers, benefits, and privileges.   Delay in or failure to exercise any of its rights, remedies, claims, powers, benefits, or privileges does not constitute a waiver, nor subject EWB to any liability to any entity, and no other entity may rely upon any such delay or failure or in any way seek to assert a defense to any obligation owing based on any such delay or failure.

19.   Successors and Assigns; Survival.   The provisions of this Stipulation shall be binding and inure to the benefit of EWB, the Debtor and its estate, and the respective successors and assigns of each of the foregoing (including, but not limited to, any trustee or trustees hereafter appointed or elected under any chapter or section of the Bankruptcy Code as a representative of Debtor's estate).

20.   Modification of Stipulation and Effect of Modification of Order.   The terms and conditions set forth in this Stipulation may not be altered, modified, or affected without the prior written consent of the Debtor and EWB.   If any or all of the provisions of the Approval Order are hereafter modified, vacated, terminated, amended or stayed, the consent to Debtor's use of Cash Collateral shall cease immediately thereupon; provided, however, that no such occurrence shall affect, limit or modify (a) the validity of any claim for any amounts of Cash Collateral used pursuant to this Stipulation and the Approval Order, or (b) the validity, enforceability, priority or perfection of any lien or security interest granted under this Stipulation and the Approval Order.

21.   Court Approval.   This Stipulation is subject to approval of the Court pursuant to Federal Rule of Bankruptcy Procedure 4001(d).

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

-13-

c:/winword/pleadings/1t5627

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909) 861-6700

22. <u>Unenforceability</u>. If the Court does not approve this Stipulation for any reason, then this Stipulation has no effect, and neither the Stipulation nor any action or procedure taken, nor any statement made, in connection with the negotiation, preparation, formulation or seeking approval of this Stipulation may be referred to by any entity in connection with any proceeding or action, whether in this case or elsewhere.

23. <u>No Agreement to Provide Financial Accommodation</u>. No provision of this Stipulation and the Approval Order shall in any way impose upon EWB any duty or obligation to provide any financing or financial accommodation to Debtor or any other party, to collect, sell, lease or otherwise dispose of any of the Property, to proceed or not proceed against any party, person, individual or entity to proceed against or exhaust any security held by EWB, or any other party, person, individual or entity, or to otherwise pursue any action, right or remedy in EWB 's power whatsoever.

24. <u>Consent and Mutual Agreement</u>. Whenever any action may be taken under this Stipulation upon the prior written consent of EWB or the prior mutual written agreement of the parties, the action may be taken without any further notice or action or order of the Court.

25. <u>Neutral Construction</u>. Each of the parties hereto has been involved in the negotiation, review, and execution of this Stipulation, and each has had the opportunity to receive independent legal advice from attorneys of its choice with respect to the advisability of making and executing this Stipulation. In the event of any dispute or controversy regarding this Stipulation, the parties hereto shall be considered to be the joint authors of this Stipulation, and no provision of this Stipulation and the Approval Order shall be interpreted against a party hereto because of authorship.

26. <u>Headings</u>. The parties acknowledge that the headings set forth herein are for convenience only and shall not be used to limit, define, or interpret the rights

-14-

Motion Exhibit 1 Page 0018

and responsibilities of the parties hereunder.

27. <u>Power of Representatives</u>. Any party executing this Stipulation in a representative capacity warrants that he or she is duly authorized and empowered to do so.

28. <u>Survival of Obligations</u>. The provisions of this Stipulation and any actions taken in accordance with this Stipulation shall survive entry of any order that may be entered: (a) confirming any plan in any case of any Debtor; (b) converting this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; or (c) dismissing this case. Unless otherwise ordered by the Court, the claims and liens on the Cash Collateral and the Property continue in full force and effect and maintain their priority until all the obligations owed under the terms of the EWB Loan Documents and this Stipulation are paid in full.

29. <u>Counterpart</u>. This Stipulation may be executed in counterparts, each of which, when executed and delivered, shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

30. <u>Notice and Approval</u>. Debtor shall, within one (1) business day following execution of this Stipulation, file this Stipulation with the Bankruptcy Court in the Bankruptcy Case and, if required by the Court, file and serve a Financing Motion in compliance with LBR 4001-2 and F.R.B.P. 4001(b)(2) setting a final hearing at the earliest date possible under said rules and the Bankruptcy Court's calendar seeking an order approving this Stipulation (the "Approval Order").

31. <u>Guaranty</u>. This agreement shall have no effect on enforcement by EWB of the guaranty by Eva Shih of Debtor's debt to EWB. The effectiveness of this stipulation is conditioned on the execution by Eva Shih of this stipulation waiving any claim by her that this stipulation affects her obligations under her guaranty.

32. The Approval Order shall be deemed effective when entered on the docket in the Bankruptcy Case.

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6500

-15-

c:/winword/pleadings/1t5627

DATED: January 25, 2019          Lo & Lo LLP

                                 By: _____
                                     Jonathan J. Lo
                                     Attorneys for Debtor

DATED: January 25, 2019          ELMER DEAN MARTIN III,

                                 A Professional Corporation

                                 By: _____
                                     ELMER DEAN MARTIN III
                                     Attorneys for East West Bank

DATED: January 25, 2019

The undersigned Guarantor, Eva Shih, has executed a Commercial Guaranty dated December 31, 2016, in favor of Lender, East West Bank, and subsequently reaffirmed such execution and obligation, under the terms of which she guarantied the full and punctual payment, performance and satisfaction of Debtor's obligations to Lender. Guarantor hereby acknowledges her consent to the terms and provisions of the Guaranty under the terms of which she is obligated to pay to Lender the Prepetition EWB Indebtedness and such other amounts which may be provided for in the Commercial Guaranty. Guarantor hereby reaffirms her obligations to Lender under the Guaranty. Guarantor hereby reaffirms that her obligations under the Guaranty to Lender are separate and distinct from Debtor's obligations to Lender, and Guarantor further reaffirms her waivers set forth in the Commercial Guaranty and acknowledges that she has no defenses to enforcement of the Commercial Guaranty nor counterclaims nor claims for setoff against East West Bank and further agrees to the foregoing stipulation and acknowledges that it shall not reduce or diminish her obligations under the Commercial Guaranty.

                                 By: _____
                                     Eva Shih

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

c:/winword/pleadings/1t5627

-16-

Borrower Name: Vario Corporation
Loan Number: 3803078

| Note | Total |
|------|-------|
| Principal | $2,498,486.36 |
| Interest(11/1/18- 11/16/16) | $6,385.02 |
| Late Charges | $691.11 |
| Return Check Fee | $25.00 |
| Balance as of 11/16/18 | $2,505,587.49 |
| | |
| Per Diem Interest | $399.06 |
| Interest rate | 5.75% |

| Proposed Budget for Necessary Operating Expenses | | | |
|---|---|---|---|
| Category | Estimated Jan 2019 | Estimated Feb 2019 | not greater than |
| **INCOME (Based on Historical)** | | | |
| Accounts Receivables | 60,000.00 | 60,000.00 | |
| **EXPENSES** | | | |
| Alarm and Security | $42.18 | $42.18 | |
| Dues and Subscriptions - EDI & Email | $2,876.00 | $2,876.00 | |
| Equipment Rental - Copy Machine | $337.80 | $337.80 | |
| Freight and Delivery Expense | $838.36 | $838.36 | |
| Insurance Expense | $4,500.00 | $4,500.00 | |
| Office Expenses | $250.00 | $250.00 | |
| Payroll Processing Fees | $220.00 | $220.00 | |
| Payroll Taxes Expense | $1,150.00 | $1,150.00 | |
| Rent Expense | $8,545.00 | $8,545.00 | |
| Repairs and Maintenance | $300.00 | $300.00 | |
| Salary - Employees | $15,000.00 | $15,000.00 | |
| Telephone and Internet Expense | $500.00 | $500.00 | |
| Utilities | $1,250.00 | $1,250.00 | |
| Warehouse Expense | $300.00 | $300.00 | |
| **TOTAL EXPENSES** | -$36,109.34 | -$36,109.34 | |
| **NET INCOME** | 23,890.66 | 23,890.66 | |

Case 6:18-bk-19730-WJ    Doc 41    Filed 02/01/19    Entered 02/01/19 18:32:29    Desc
Main Document    Page 5 of 5

1 | Curtis C. Jung, Esq. (State Bar No. 130657)
JUNG & YUEN, LLP
2 | 888 South Figueroa Street, Suite 720
Los Angeles, California 90017
3 | Telephone: (213) 689-8880
Facsimile: (213) 689-8887
4 | curtis@jyllp.com
5 | Counsel for Creditor East West Bank

6 | Elmer Dean Martin III (State Bar No. 75517)
Elmer Dean Martin III, A Professional Corporation
7 | 1300 Valley Vista Drive, Suite 201
Diamond Bar, CA 91765
8 | Telephone: 909-861-6700
Facsimile:909-860-3801
9 | elmer@bankruptcytax.net
10 | Counsel for Creditor East West Bank

11 | Jonathan J. Lo (SBN 305306)
Lo & Lo LLP
12 | 506 North Garfield Avenue, Suite 280
Alhambra, CA 91801
13 | Telephone: 626-289-8838
Facsimile: 626-380-3333
14 | Email: Contact@lolollp.com
15 | Proposed Counsel for Chapter 11 Debtor
and Debtor-in-Possession
16

**FILED & ENTERED**

**JAN 29 2019**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gooch    DEPUTY CLERK

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

17 |                     UNITED STATES BANKRUPTCY COURT

18 |                     CENTRAL DISTRICT OF CALIFORNIA

19 |                          RIVERSIDE DIVISION

20

| 21 | In re: | Case No.  6:18-bk-19730-WJ |
| 22 | VARIO CORP., | CHAPTER 11 |
| 23 |          Debtor. | **ORDER APPROVING STIPULATION REGARDING USE OF CASH COLLATERAL AND ADEQUATE PROTECTION** |
| 24 | | |
| 25 | | |
| 26 | | Hearing: |
| 27 | | Date:   January 29, 2019<br>Time:   3:00 pm |
| 28 | | Crtrm.: 304 |

-1-

c:/winword/pleadings/1t5629

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909) 861-6700

The Court has reviewed the "Stipulation Regarding Use of Cash Collateral and Adequate Protection" ("Stipulation") [docket number 33] and related documents, and good cause appearing, the Court hereby ORDERS as follows:

1.     The Stipulation is approved except as follows.

2.     The debtor may use cash collateral to and including February 28, 2019, in the amounts and for the purposes specified in the budget attached as Exhibit 2 to the Stipulation, and must comply with all conditions and requirements for such use stated in the Stipulation.

3.     The provisions in paragraphs 1, 2, 3(a), 3(b) and 15 of the Stipulation are binding solely on the debtor-in-possession and not upon the bankruptcy estate, any subsequently appointed trustee, any committee, any other party in interest or the Court.  The provisions of this order supersede and control over the provisions of the Stipulation including, but not limited to, paragraph 19 of the Stipulation.

4.     The amount secured by the Replacement Lien (as defined in paragraph 5(a) of the Stipulation) shall be the amount by which (if any) that cash collateral decreases post-petition and is not replenished post-petition as a result of use of cash collateral by the debtor post-petition ("Diminution Amount").

5.     The amount of the super-priority claim described in paragraph 5(b) of the Stipulation shall be the Diminution Amount.

6.     The provisions in paragraph 5(c) of the Stipulation are not approved at this time. The parties should provide briefing regarding the issue and notice to all creditors.

7.     The provisions in paragraph 7 of the Stipulation are not construed to prohibit the debtor from seeking any relief set forth in that paragraph but, rather, are construed to prohibit the debtor from seeking any such relief set forth in paragraph 7 on an ex parte basis.  To the extent the provisions of paragraph 7 of the Stipulation prohibit the debtor from filing an application for an order shortening time, that relief is not approved.

8.     The provisions in paragraph 10, 11 and 12 of the Stipulation are not approved to the extent that they (a) mandate that the Court consider any matter on shortened notice or (b) relieve any party of the obligation to file an application for an order shortening time.

-2-

Motion Exhibit 2 Page 0024

9.      The Court neither approves nor disapproves paragraphs 16 or 28(a) of the

Stipulation.

10.     A further hearing regarding continued use of cash collateral shall occur on

March 5, 2019 at 10:00 a.m.

###

ELMER DEAN MARTIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909) 861-6700

Date: January 29, 2019

Wayne Johnson
United States Bankruptcy Judge

c:/winword/pleadings/1t5629

Motion Exhibit 2 Page 0025

Case 6:18-bk-19730-WJ    Claim 5    Filed 01/31/19    Desc Main Document    Page 2 of 63

| **Fill in this information to identify the case:** |
|---|

| Debtor 1 | VARIO CORP. |
|---|---|
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 6:18-bk-19730-WJ |

## Official Form 410

# Proof of Claim

04/16

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| **Part 1:** | **Identify the Claim** |
|---|---|

**1. Who is the current creditor?**

East West Bank
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| East West Bank- Frank Chan<br>Name | East West Bank Loan Servicing Department<br>Name |
| 135 N. Los Robles Ave., 6th Floor<br>Number          Street | 9300 Flair Drive, 6th Floor<br>Number          Street |
| Pasadena          CA          91101<br>City          State          ZIP Code | El Monte          CA          91731<br>City          State          ZIP Code |
| Contact phone 626-768-6883 | Contact phone _____ |
| Contact email Frank.Chan@eastwestbank.com | Contact email _____ |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____     Filed on _____
                                                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No
☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: __3__ __0__ __7__ __8__

**7. How much is the claim?**

$_____2,505,587.49_____. **Does this amount include interest or other charges?**

☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Money Loaned

**9. Is all or part of the claim secured?**

☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☑ Other. Describe: Collateral described in Loan Documents

**Basis for perfection:** UCC1 & related documents

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ **At least $711,804.00 with maximum value to be determined.**

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____2,505,587.49___
**Maturity Date was 12/31/2018.**

**Annual Interest Rate** (when case was filed) __5.50__ % **increased to 5.75% on 12/20/2018.**

☐ Fixed
☑ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Official Form 410          **Proof of Claim**        Motion Exhibit 3 Page 0027

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

           **Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.    $_____

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:    Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   1/29/2019
              MM / DD / YYYY

        _____
        Signature

Print the name of the person who is completing and signing this claim:

| Name | Frank | Middle name | Chan |
|---|---|---|---|
| | First name | | Last name |

Title    S.V.P.

Company    East West Bank
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    135 N. Los Robles Ave., 6th Floor
        Number     Street

        Pasadena            CA     91101
        City               State   ZIP Code

Contact phone   626-768-6883      Email Frank.Chan@eastwestbank.com

Motion Exhibit 3 Page 0028

Borrower Name: Vario Corporation
Loan Number: <span style="color:red">Redacted</span>

| Note | Total |
|---|---|
| Principal | $2,498,486.36 |
| Interest (11/1/18- 11/16/16) | $6,385.02 |
| Late Charges | $691.11 |
| Return Check Fee | $25.00 |
| Balance as of 11/16/18 | $2,505,587.49 |
| | |
| Per Diem Interest | $399.06 |
| Interest rate (P+.25%) as of 11/16/18 | 5.50% |

# PROMISSORY NOTE

| Borrower: | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA  91710 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

**Principal Amount: $2,000,000.00**                    **Date of Note:  December 31, 2016**

**PROMISE TO PAY.**  Vario Corp. ("Borrower") promises to pay to East West Bank ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million & 00/100 Dollars ($2,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance.  Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.**  Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on December 31, 2017.  In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning January 14, 2017, with all subsequent interest payments to be due on the same day of each month after that.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.**  The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the daily Wall Street Journal Prime Rate, as quoted in the "Money Rates" column of The Wall Street Journal (Western Edition) all as determined by Lender (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower.  Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each day.  Borrower understands that Lender may make loans based on other rates as well.  **The Index currently is 3.750% per annum.**  Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 0.500 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 4.250%.  NOTICE:  Under no circumstances will the interest rate on this Note be less than 4.000% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.**  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.

**PREPAYMENT; MINIMUM INTEREST CHARGE.**  Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.  In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a **minimum interest charge of $100.00**.  Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest.  Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: East West Bank, Loan Service Department, 9300 Flair Drive, 6th Floor El Monte, CA  91731.

**LATE CHARGE.**  If a payment is 11 days or more late, Borrower will be charged **6.000% of the unpaid portion of the regularly scheduled payment or $5.00, whichever is greater.**

**INTEREST AFTER DEFAULT.**  Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by adding an additional 5.000 percentage point margin ("Default Rate Margin").  The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.

**DEFAULT.**  Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.**  Borrower fails to make any payment when due under this Note.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.**  The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.**  Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan.  This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender.  However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.**  Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.**  Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.**  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or

## PROMISSORY NOTE
**(Continued)**

performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**OTHER DEFAULTS MODIFIED.** Notwithstanding the section above entitled "Other Defaults", Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or Agreement or in any of the Related Documents between Lender and Borrower; or any shareholder, member, trustor, or any owner of the Borrower also holding a controlling interest in given entity's common stock, membership interest, trust interest, or any other ownership interest ("Related Entity"), fails to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and the Related Entity.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER. To the extent permitted by applicable law, Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.**

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.**

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $25.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) inventory, chattel paper, accounts, equipment and general intangibles described in Commercial Security Agreements dated December 31, 2016.

(B) deposit accounts described in an Assignment of Deposit Account dated December 31, 2016.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. All oral requests shall be confirmed in writing on the day of the request, on forms acceptable to Lender. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Eva Shih, President of Vario Corp.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; or (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender.

**CERTIFICATION OF ACCURACY.** Borrower certifies under penalty of perjury that all financial documents provided to Lender, which may include income statements, balance sheets, accounts payable and receivable listings, inventory listings, rents rolls, and tax returns, are the most recent such documents prepared by Borrower, that they give a complete and accurate statement of the financial condition of Borrower, as of the dates of such statements, and that no material change has occurred since such time, except as disclosed to Lender in writing. Borrower agrees to notify Lender immediately of the extent and character of any material adverse change in the Borrower's financial condition. The financial documents shall constitute continuing representations of Borrower and shall be construed by Lender to be continuing statements of the financial condition of Borrower and to be new and original statement of all assets and liabilities of Borrower with respect to each advance under this Note and every other transaction in which Borrower becomes obligated to Lender until Borrower advises Lender to the contrary. The financial documents are being given to induce Lender to extend credit and Lender is relying upon such documents. Lender may verify with third parties any information contained in financial documents delivered to Lender, obtain information from others, and ask and answer questions and requests seeking credit experience about the undersigned.

**CHOICE OF VENUE.** If there is a lawsuit, the undersigned, and if more than one, each of the undersigned, agree upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**JUDICIAL REFERENCE.** If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, who shall be a retired state or federal court judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings

**PROMISSORY NOTE**
(Continued)

Loan No: Redacted

in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: East West Bank Loan Service Department P.O. Box 60021 City of Industry, CA 91716-0021.

**ORAL AGREEMENTS NOT EFFECTIVE.** This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section. Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

VARIO CORP.

By: _____
Eva Shih, President of Vario Corp.

LaserPro, Ver. 16.2.0.015 Copr. D+H USA Corporation 1997, 2016. All Rights Reserved. - CA E:\PROD\LOANDOC\CFNLPL\D20.FC TR-25740 PR-11

# CHANGE IN TERMS AGREEMENT

| Borrower: | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA  91710 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

**Principal Amount:  $2,500,000.00**                    **Date of Agreement:  May 16, 2017**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** The Promissory Note dated December 31, 2016 for Loan Number Redacted  in the original Principal Amount of $2,000,000.00, along with any and all subsequent Change in Terms Agreements (collectively referred to as "Note").

**DESCRIPTION OF CHANGE IN TERMS.**

The Principal Amount of the Note is hereby increased to Two Million and Five Hundred Thousand and 00/100 Dollars ($2,500,000.00).

As a condition precedent to the effectiveness of this Change in Terms Agreement, Borrower hereby promises and agrees to pay to Lender a loan fee in the amount of $500.00.

If such fee is not paid in cash, the fee shall be debited from the following account: # Redacted

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

BORROWER:

VARIO CORP.

By: _____
   Eva Shih, President of Vario Corp.

LaserPro, Ver. 17.1.10.015  Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.   - CA  E:\PRO\LOANDOC\CFI\LPL\D20C.FC  TR-23740  PR-11

# CHANGE IN TERMS AGREEMENT

| Borrower: | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA  91710 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

**Principal Amount: $2,500,000.00**                                    **Date of Agreement:  February 16, 2018**

**DESCRIPTION OF EXISTING INDEBTEDNESS.**  The Promissory Note dated December 31, 2016 for Loan Number Redacted in the original Principal Amount of $2,000,000.00, along with any and all subsequent Change in Terms Agreements (collectively referred to as "Note").

**DESCRIPTION OF COLLATERAL.**  The section entitled "Collateral" is hereby amended as follows:

Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A)  Inventory, chattel paper, accounts, equipment and general intangibles described in Commercial Security Agreement dated December 31, 2016.

(B)  Deposit accounts described in an Assignment of Deposit Account dated December 31, 2016.

(C)  Trademark described in Commercial Security Agreement dated December 31, 2016.

(D)  Patents described in Commercial Security Agreement dated February 16, 2018.

**DESCRIPTION OF CHANGE IN TERMS.**

The **Maturity Date** of the Note is hereby extended from March 31, 2018 to **December 31, 2018**.

The section entitled **"VARIABLE INTEREST RATE"** is hereby modified and restated as follows:

**VARIABLE INTEREST RATE.**  The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the daily Wall Street Journal Prime Rate, as quoted in the "Money Rates" column of The Wall Street Journal (Western Edition) all as determined by Lender (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower.  Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each day.  Borrower understands that Lender may make loans based on other rates as well.  The **Index currently is 4.500% per annum.**  Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 0.250 percentage point over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 4.750%.  NOTICE:  Under no circumstances will the interest rate on this Note be less than 4.250% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.**

**CONTINUING VALIDITY.**  Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

**BORROWER:**

**VARIO CORP.**

By: _____
Eva Shih, President of Vario Corp.

LaserPro, Ver. 17.3.0.019  Copr. D+H USA Corporation 1997, 2018.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CFI\LPL\D20C.FC  TR-25740  PR-11

# BUSINESS LOAN AGREEMENT (ASSET BASED)

**Borrower:**  Vario Corp.
14020 Central Avenue Unit #590
Chino, CA  91710

**Lender:**  East West Bank
Loan Servicing Department
9300 Flair Drive, 6th Floor
El Monte, CA  91731

**THIS BUSINESS LOAN AGREEMENT (ASSET BASED)** dated December 31, 2016, is made and executed between Vario Corp. ("Borrower") and East West Bank ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement;  (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and  (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.**  This Agreement shall be effective as of December 31, 2016, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.**  The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority:  Eva Shih, President of Vario Corp.

**LINE OF CREDIT.**  Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base. Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance.**  Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1)  Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2)  Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3)  The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4)  All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5)  Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Accounts, Inventory, books, records, and operations, and Lender shall be satisfied as to their condition.

(6)  Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7)  There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

**Making Loan Advances.**  Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower (1) when credited to any deposit account of Borrower maintained with Lender or (2) when advanced in accordance with the instructions of an authorized person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments.**  If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base. On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

**Loan Account.**  Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility. Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**COLLATERAL.**  To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require. Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.**  Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneous with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest. Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or

Loan No: **Redacted**

## BUSINESS LOAN AGREEMENT (ASSET BASED)
### (Continued)

Page 2

consolidate with any other entity.

**Collateral Records.** Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings. Records related to Accounts (Receivables) are or will be located at Borrower's address above. With respect to the Inventory, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Inventory and records itemizing and describing the kind, type, quality, and quantity of Inventory, Borrower's Inventory costs and selling prices, and the daily withdrawals and additions to Inventory. Records related to Inventory are or will be located at Borrower's address above. The above is an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

**Collateral Schedules.** Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and Inventory and schedules of Eligible Accounts and Eligible Inventory in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Accounts, schedules shall be delivered as required in the section entitled "Financial Statements". With respect to Eligible Inventory, schedules shall be delivered as required in the section entitled "Financial Statements".

**Representations and Warranties Concerning Accounts.** With respect to the Accounts, Borrower represents and warrants to Lender: (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account; (2) All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Account Debtors the accuracy of such Accounts.

**Representations and Warranties Concerning Inventory.** With respect to the Inventory, Borrower represents and warrants to Lender: (1) All Inventory represented by Borrower to be Eligible Inventory for purposes of this Agreement conforms to the requirements of the definition of Eligible Inventory; (2) All Inventory values listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; (3) The value of the Inventory will be determined on a consistent accounting basis; (4) Except as agreed to the contrary by Lender in writing, all Eligible Inventory is now and at all times hereafter will be in Borrower's physical possession and shall not be held by others on consignment, sale on approval, or sale or return; (5) Except as reflected in the Inventory schedules delivered to Lender, all Eligible Inventory is now and at all times hereafter will be of good and merchantable quality, free from defects; (6) Eligible Inventory is not now and will not at any time hereafter be stored with a bailee, warehouseman, or similar party without Lender's prior written consent, and, in such event, Borrower will concurrently at the time of bailment cause any such bailee, warehouseman, or similar party to issue and deliver to Lender, in form acceptable to Lender, warehouse receipts in Lender name evidencing the storage of Inventory; and (7) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect and examine the Inventory and to check and test the same as to quality, quantity, value, and condition.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) subordinations; (7) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Fees and Expenses Under This Agreement.** Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 14020 Central Avenue Unit #690, Chino, CA 91710. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to

Loan No: Redacted

## BUSINESS LOAN AGREEMENT (ASSET BASED)
### (Continued)

Page 3

the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substances on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.** Borrower understands and agrees that while this Agreement is in effect, Borrower will maintain a financial condition indicated by the following statements at all times, unless otherwise noted:

**Borrower Corporate Financial Statements.** As soon as available, but in no event later than **one hundred twenty (120)** days after the end of each fiscal year, Borrower shall provide Lender with balance sheet, income and expense statements, reconciliation of net worth and statement of cash flows, with notes thereto for the year ended, reviewed by a certified public accountant satisfactory to Lender.

**Borrower Corporate Interim Statements.** As soon as available, but in no event later than **forty-five (45)** days after the end of each fiscal quarter, Borrower shall provide Lender with balance sheet, income and expense statements, reconciliation of net worth and statement of cash flows, with notes thereto for the period ended, prepared by Borrower, **for period ending March 31st, June 30th and September 30th.**

**Borrower Corporate Tax Returns.** Within ten **(10)** days of filing, Borrower shall provide Lender with a signed copy of the Federal Income Tax Return together with K-1's and all other schedules pertaining to the Tax Return, or a signed copy of each of the Request for Tax Return Extensions. Tax returns are to be provided no later than **nine (9)** months after the fiscal year end.

**Guarantor Personal Financial Statements.** Annually, Borrower shall provide Lender with the financial statement of each Guarantor certified by such Guarantor to be true and correct no later than **January 31st.**

**Guarantor Personal Tax Returns.** Within ten **(10)** days of filing, Borrower shall provide Lender with a signed copy of the Feder...

Motion Exhibit 3 Page 0037

Loan No: Redacted

## BUSINESS LOAN AGREEMENT (ASSET BASED)
### (Continued)

Page 4

Income Tax Return of each Guarantor together with K-1's and all other schedules pertaining to the Tax Return, or a signed copy of each of the Request for Tax Return Extension. Tax returns are to be provided no later than October 31st.

**Agings.** Within twenty (20) days, or sooner, after the end of each month, Borrower shall provide Lender with a listing and aging by invoice date of all accounts receivable and all accounts payable in detailed format acceptable to Lender.

**Borrowing Base Certificate.** Within twenty (20) days, or sooner, after the end of each month, Borrower shall provide Lender with a Borrowing Base Certificate in the form attached hereto.

**Inventory.** Within twenty (20) days, or sooner, after the end of each month, Borrower shall provide Lender with a listing of inventory in detailed format acceptable to Lender.

**Debtor Information.** On an annual basis, Borrower shall provide Lender with a listing of all Account Debtors including but not limited to their addresses and telephone numbers.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Financial Covenants and Ratios.** Comply with the following covenants and ratios:

**Additional Requirements.** Borrower understands and agrees that while this Agreement is in effect, Borrower will maintain a financial condition indicated by the following ratios at all times, unless otherwise noted:

**Tangible Net Worth.** Maintain an effective Tangible Net Worth (defined as total book net worth plus minority interest, less due from officers/stockholders/affiliates minus intangible assets and accumulated amortization plus debt subordinated to East West Bank) of not less than $2,300,000.00.

**Debt to Tangible Net Worth.** Maintain a Debt to effective Tangible Net Worth (defined as total liabilities minus debt subordinated to East West Bank divided by effective Tangible Net Worth defined as total book net worth plus minority interest, less due from officers/stockholders/affiliates minus intangible assets and accumulated amortization plus debt subordinated to East West Bank) not to exceed 2.500 to 1.

**Current Ratio.** Maintain a Current Ratio (defined as total current assets divided by total current liabilities) of not less than 1.350 to 1.

**Fixed Charge Coverage Ratio.** (Default definition for C&I loans). Maintain a Fixed Charge Coverage Ratio (defined as earnings before interest, taxes, depreciation, and amortization ("EBITDA") minus dividends/distributions divided by current portion of long term debt plus interest expense plus capital lease expenses) of not less than 1.250 to 1.

**Profitability.** While this Agreement is in effect, Borrower shall maintain an annual profitability of not less than $1.00.

Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantor named below, on Lender's forms, and in the amount and under the conditions set forth in those guaranties.

| Name of Guarantor | Amount |
|---|---|
| Eva Shih | Unlimited |

**Subordination.** Prior to disbursement of any Loan proceeds, deliver to Lender a subordination agreement on Lender's forms, executed by Borrower's creditor named below, subordinating all of Borrower's indebtedness to such creditor, or such lesser amount as may be agreed to by Lender in writing, and any security interests in collateral securing that indebtedness to the Loans and security interests of Lender.

| Name of Creditor | Total Amount of Debt |
|---|---|
| Eva Shih | $2,000,000.00 |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related

# BUSINESS LOAN AGREEMENT (ASSET BASED)
## (Continued)

Documents, and in all other instruments and agreements between Borrower and Lender.  Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.**  Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.**  Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, as or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.**  Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act.  Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized.  Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.**  Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records.  If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.**  Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.**  Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.**  If the imposition of any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would  (A)  increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates,  (B)  reduce the amounts payable to Lender under this Agreement or  the Related Documents, or (C)  reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral.  All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower.  All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.**  Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.**  (1)  Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases,  (2)  sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or  (3)  sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.**  (1)  Engage in any business activities substantially different than those in which Borrower is presently engaged,  (2)  cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or  (3)  pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.**  (1)  Loan, invest in or advance money or assets to any other person, enterprise or entity,  (2)  purchase, create or acquire any interest in any other enterprise or entity, or  (3)  incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.**  Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: Redacted

Page 6

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**Other Defaults Modified.** Notwithstanding the section above entitled "Other Defaults", Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or Agreement or in any of the Related Documents between Lender and Borrower; or any shareholder, member, trustor, or any owner of the Borrower also holding a controlling interest in any given entity's common stock, membership interest, trust interest, or any other ownership interest ("Related Entity"), fails to comply with or to perform any other term, obligation, covenant or condition contained in any other agreement between Lender and the Related Entity.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**JUDICIAL REFERENCE.** If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, who shall be a retired state or federal court judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge appointed in accordance with California Code of Civil Procedure §§ 638 and 640 or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently

Loan No: Redacted

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Page 7

sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**ELECTRONIC INSTRUCTIONS.** Borrower desires to apply for Advances and instruct Lender regarding all other aspects of the Loan electronically, including but not limited to by electronic mail, internet, telex, telefax, facsimile and/or telecopy. Borrower agrees that Lender may act in accordance with electronically transmitted applications and instructions ("Electronic Instructions") subject to the following provisions: 1) Borrower's Electronic Instructions must be sent to Lender electronically only by means of such services and in such format(s) as may be approved from time to time by Lender in its sole discretion; 2) Borrower will provide to Lender, in writing and duly signed by Borrower, any reasonable security or verification procedures, and Lender may require additional security or verification procedures in its sole discretion; 3) Borrower hereby authorizes and instructs Lender to take all actions requested in any and all Electronic Instructions and agrees that each such Electronic Instruction will be deemed an original and, if sent in lieu of manually signed instructions, will be deemed to incorporate all of the terms and provisions of the Lender's standard form or format, if any, for such instructions; 4) Borrower recognizes and agrees that it will be obligated for any loan advance request and/or instruction pursuant to Electronic Instructions to the same extent as if such advance request and/or instruction were provided pursuant to Lender's standard form or Lender approved format(s) manually signed by Borrower; 5) Borrower agrees to indemnify and hold harmless Lender, its officers, directors, employees and affiliates against any and all liability, loss, cost, damages, attorneys' fees and other expenses which Lender may incur in reliance upon and pursuant to any and all of the Electronic Instructions received by Lender and purported to be sent by Borrower; 6) Lender is not responsible for checking electronic communications devices on a regular basis, and Borrower will make arrangements to assure Electronic Instructions have been sent to a current employee of Lender, and the employee of Lender has received and read the Electronic Instructions; 7) Lender is not responsible for delays, errors or omissions resulting from malfunction of electronic communications devices or from other conditions beyond the control of Lender; and 8) Lender is not responsible for misuse of or wrongful access to electronic communications devices by Borrower's representatives and employees nor for any delay in acting on Electronic Instructions caused by Electronic Instructions which Lender deems to be uncertain or unclear or incomplete.

**CHOICE OF VENUE.** If there is a lawsuit, the undersigned, and if more than one, each of the undersigned, agree upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**RIGHT TO AUDIT AND INSPECT.** Borrower shall permit any representative of Lender, at any reasonable time but no less often than annually, on or before October 31st, to inspect, audit, examine and make extracts or copies from all books, records and other data relating to the Collateral, to inspect any of Borrower's properties, to confirm balances due on Accounts by direct inquiry to Account Debtors, and shall furnish Lender with all information regarding the business or finances of Borrower promptly upon Lender's request. Borrower agrees to pay fifty percent of Lender's reasonable fees and expenses related to such audits.

**LINE USAGE.** The usage of the Loan shall be governed by the following sub-limits with:

Maximum aggregate amount that may be outstanding under all sub-limits (Items 1 through 10): $2,000,000.00.

The Maximum aggregate amount that may be outstanding under sub-limits (Items 4 through 10): $2,000,000.00.

1. Up to $2,000,000.00 for issuance of Sight Letters of Credit. A "Sight Letter of Credit" means a Letter of Credit (a formal letter that authorizes a third party "beneficiary" to draw drafts on the Lender, under conditions stated in the letter which often require presentation of required documents in order, under applicable law, hereinafter referred to as "Letter of Credit") issued by Lender for Borrower that are payable upon draft by the beneficiary, provided the terms of the Letter of Credit are met.

2. Up to $2,000,000.00 for issuance of Usance Letters of Credit. A "Usance Letter of Credit" means a Letter of Credit that is payable on a specific date after draft by the beneficiary, provided the terms of the Letter of Credit are met.

3. Up to $1,000,000.00 for issuance of Standby Letters of Credit, with expiration dates not to exceed one (1) year. A "Standby Letter of Credit" is a Letter of Credit that promises payment to the beneficiary on behalf of Borrower in the event of default or other nonperformance by Borrower on its account with beneficiary.

4. Up to $2,000,000.00 for Banker's Acceptances. A "Banker's Acceptance" is a promised future payment, or time draft, which is accepted by Lender, often in connection with a Usance Letter of Credit.

5. Up to $2,000,000.00 for advances of up to maturity date of line for Trust Receipt Financing. "Trust Receipt Financing" means an Advance to pay for release of goods to Borrower based upon title in favor of Lender to the released goods.

6. Up to $2,000,000.00 for advances of up to maturity date of line for Trust Receipt Financing of Banker's Acceptances due and payable under Letters of Credit issued and accepted by Lender with the term of the Advance reduced by the tenor of the usance draft. The words "Trust Receipt Financing of Banker's Acceptances" means an advance to pay on the maturity of an accepted time draft.

7. Up to $2,000,000.00 for advances of up to maturity date of line days to finance payment of Document Against Payment draft or trade purchase supported by invoice(s) paid or are due and payable. "Document Against Payment" means a presentation of shipping and title documents ("documentary collection") payable at sight.

8. Up to $2,000,000.00 for advances of up to maturity date of line to finance payment of Document Against Acceptance draft with the term of the Advance reduced by the tenor of the Documents against Acceptance draft. "Document Against Acceptance" means presentation of shipping and title documents only upon importer's acceptance of bill of exchange or draft by signature.

9. Up to $2,000,000.00 for Clean Advances of up to maturity date of line. "Clean Advance" means all Advances for a business purpose.

10. Up to $2,000,000.00 for advances of up to maturity date of line to pay for Local/Foreign Trade Purchases. "Local/Foreign Trade Purchases" mean trade purchases evidenced by the supplier's invoice(s) paid or due as of a specific date.

The definitions of trade terms in the Line Usage Sub-Limit Paragraphs 1 through 10, above, are for reference only, and are not intended to be inclusive. The actual usage may vary based on the structure of the trade finance transaction for which the instrument is issued.

Loan No: <span style="color:red">Redacted</span>

# BUSINESS LOAN AGREEMENT (ASSET BASED)
## (Continued)

Page 8

**REMITTANCE ACCOUNT.** Borrower agrees that Lender may at any time require Borrower to institute procedures whereby the payments and other proceeds of the Accounts shall be paid by the Account Debtors under a remittance account or lock box arrangement with Lender, or Lender's agent, or with one or more financial institutions designated by Lender. Borrower further agrees that, if no Event of Default exists under this Agreement, any and all of such funds received under such a remittance account or lock box arrangement shall, at Lender's sole election and discretion, either be (1) paid or turned over to Borrower; (2) deposited into one or more accounts for the benefit of Borrower (which deposit accounts shall be subject to a security assignment in favor of Lender); (3) deposited into one or more accounts for the joint benefit of Borrower and Lender (which deposit accounts shall likewise be subject to a security assignment in favor of Lender); (4) paid or turned over to Lender to be applied to the Indebtedness in such order and priority as Lender may determine within its sole discretion; or (5) any combination of the foregoing as Lender shall determine from time to time. Borrower further agrees that, should one or more Events of Default exist, any and all funds received under such a remittance account or lock box arrangement shall be paid or turned over to Lender to be applied to the Indebtedness, again in such order and priority as Lender may determine within its sole discretion. Notwithstanding the foregoing, if there is no Event of Default, all funds received under a remittance account shall be applied as follows: 80% of funds received shall be applied to the Indebtedness and 20% of funds received shall be deposited into Borrower's operating account maintained at Lender.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: <span style="color:red">Redacted</span>

Page 9

---

Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Oral Agreements Not Effective.** This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section. Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Account Debtor.** The words "Account Debtor" mean the person or entity obligated upon an Account.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.** The word "Borrower" means Vario Corp. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean as determined by Lender from time to time, the lesser of (1) $2,000,000.00 or (2) the sum of (a) 75% of the aggregate amount of Eligible Accounts plus (b) the lesser of $1,000,000.00 or 50% of the aggregate amount of Eligible Inventory, except that Advances against Eligible Inventory cannot exceed 125% of the aggregate amount of Advances against Eligible Accounts from December to April of each year and Advances against Eligible Inventory cannot exceed 100% of the aggregate amount of Advances against Eligible Accounts from May to November of each year

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of California.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word Collateral also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

    (1) Accounts with respect to which the Account Debtor is employee or agent of Borrower.

    (2) Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with Borrower or its shareholders, officers, or directors.

    (3) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

    (4) Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

    (5) Accounts which are subject to dispute, counterclaim, or setoff.

    (6) Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

Loan No: <span style="color:red">Redacted</span>

# BUSINESS LOAN AGREEMENT (ASSET BASED)
## (Continued)

Page 10

(7)  Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

(8)  Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

(9)  Accounts with respect to which the Account Debtor is the United States government or any department or agency of the United States.

(10)  That portion of the Accounts of any single Account Debtor which exceeds **25.000%** of all of Borrower's Accounts, except for the following Account Debtors: Walmart and Sam's Club which exceeds 50.000% from February to July of each year and 65.000% from August to January of each year of all of Borrower's Accounts and Canadian Tire which exceeds 50.000% of all of Borrower's Accounts.

(11)  Accounts which have not been paid in full within 90 days from the original date of invoice.

(12)  All Accounts of any single Account Debtor if 25% or more of the dollar amount of all such Accounts are represented by Accounts which have not been paid in full within 90 days from the original date of invoice.

(13)  Accounts with respect to which the Account Debtor is not a resident of the United States, except for Account Debtors located in Canada (excluding companies located in the province of Quebec) and except for Account Debtors located in U.S. Possessions, except to the extent such Accounts are supported by insurance, bonds or other assurances satisfactory to Lender.

(14)  Accounts with credit balances over 90 days from the original date of invoice.

(15)  That portion of Accounts consisting of or arising from retentions and hold-backs by Account Debtors due to disputes, rebates, etc.

(16)  Accounts consisting of non-trade claims, i.e., freight claims, insurance claims, warranty claims, claims against government, etc.

(17)  Accounts arising from cash sales or from collect on delivery sales of inventory.

(18)  Accrued finance charges on Account.

(19)  Any additional reserves against Accounts at the Lender's sole discretion.

(20)  Accounts which consist of progress billings.

**Eligible Inventory.**  The words "Eligible Inventory" mean, at any time, all of Borrower's Inventory as defined below, except:

(1)  Inventory which is not owned by Borrower free and clear of all security interests, liens, encumbrances, and claims of third parties.

(2)  Inventory which Lender, in its sole discretion, deems to be obsolete, unsalable, damaged, defective, or unfit for further processing.

(3)  Work in progress.

(4)  Inventory which is in transit.

(5)  Inventory which consists of supplies and packaging materials.

(6)  Inventory which consists of samples, demos and prototypes.

(7)  Inventory which consists of rental inventory.

(8)  Any additional reserves against Inventory at the Lender's sole discretion.

(9)  Inventory that is not in the Borrower's physical possession or is offsite and a landlord's, warehouseman's or bailee's agreement in form and substance satisfactory to Lender, in its sole discretion, has not been executed by such landlord, warehouseman or bailee in favor of Lender.

**Environmental Laws.**  The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.**  The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.**  The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.**  The word "GAAP" means generally accepted accounting principles.

**Grantor.**  The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.**  The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.**  The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.**  The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled.  The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws.  The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.**  The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any

Loan No: Redacted

### BUSINESS LOAN AGREEMENT (ASSET BASED)
(Continued)

Page 11

of the Related Documents.

**Inventory.** The word "Inventory" means all of Borrower's raw materials, work in process, finished goods, merchandise, parts and supplies, of every kind and description, and goods held for sale or lease or furnished under contracts of service in which Borrower now has or hereafter acquires any right, whether held by Borrower or others, and all documents of title, warehouse receipts, bills of lading, and all other documents of every type covering all or any part of the foregoing. Inventory includes inventory temporarily out of Borrower's custody or possession and all returns on Accounts.

**Lender.** The word "Lender" means East West Bank, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated December 31, 2016 and executed by Vario Corp. in the principal amount of $2,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Primary Credit Facility.** The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED DECEMBER 31, 2016.

BORROWER:

VARIO CORP.

By: _____
Eva Smith, President of Vario Corp.

LENDER:

EAST WEST BANK

By: _____
Authorized Signer

LaserPro, Ver. 16.2.0.016  Copr. D++ USA Corporation 1997, 2016.  All Rights Reserved.  - CA  L:\PROD\LON4\CC07\PLPL\C18\FC  TR-73740  PR-16

# FIRST MODIFICATION TO THE LOAN AGREEMENT

| Borrower: | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA 91710 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA 91731 |
|---|---|---|---|

This **FIRST MODIFICATION TO THE LOAN AGREEMENT** is attached to and by this reference is made a part of the Business Loan Agreement (Loan #Redacted) dated December 31, 2016, including all modifications thereto, and executed in connection with a loan or other financial accommodations between Lender and Borrower.

The section entitled **"Financial Statements"** is hereby amended and restated as follows:

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.** Borrower understands and agrees that while this Agreement is in effect, Borrower will maintain a financial condition indicated by the following statements at all times, unless otherwise noted:

**Borrower Corporate Financial Statements.** As soon as available, but in no event later than **one hundred twenty (120)** days after the end of each fiscal **year**, Borrower shall provide Lender with balance sheet, income and expense statements, reconciliation of net worth and statement of cash flows, with notes thereto for the year ended, **reviewed** by a certified public accountant satisfactory to Lender.

**Borrower Corporate Interim Statements.** As soon as available, but in no event later than **forty-five (45)** days after the end of each fiscal **quarter**, Borrower shall provide Lender with balance sheet, income and expense statements, reconciliation of net worth and statement of cash flows, with notes thereto for the period ended, prepared by **Borrower**.

**Borrower Corporate Tax Returns.** Within **ten (10)** days of filing, Borrower shall provide Lender with a signed copy of the Federal Income Tax Return together with K-1's and all other schedules pertaining to the Tax Return, or a signed copy of each of the Request for Tax Return Extensions. Tax returns are to be provided no later than **nine (9) months** after the fiscal year end.

**Guarantor Personal Financial Statements.** Annually, Borrower shall provide Lender with the financial statement of each Guarantor certified by such Guarantor to be true and correct no later than **March 31st**.

**Guarantor Personal Tax Returns.** Within **ten (10)** days of filing, Borrower shall provide Lender with a signed copy of the Federal Income Tax Return of each Guarantor together with K-1's and all other schedules pertaining to the Tax Return, or a signed copy of each of the Request for Tax Return Extension. Tax returns are to be provided no later than **October 31st**.

**Agings.** Within **twenty (20)** days, or sooner, after the end of each **month**, Borrower shall provide Lender with a listing and aging by invoice date of all accounts receivable and all accounts payable in detailed format acceptable to Lender.

**Borrowing Base Certificate.** Within **twenty (20)** days, or sooner, after the end of each **month**, Borrower shall provide Lender with a Borrowing Base Certificate in the form attached hereto.

**Inventory.** Within **twenty (20)** days, or sooner, after the end of each **month**, Borrower shall provide Lender with a listing of inventory in detailed format acceptable to Lender.

**Debtor Information.** On an annual basis, Borrower shall provide Lender with a listing of all Account Debtors including but not limited to their addresses and telephone numbers.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

The section entitled **"LINE USAGE"** is hereby amended and restated as follows:

**LINE USAGE.** The usage of the Loan shall be governed by the following sub-limits with:

Maximum aggregate amount that may be outstanding under all sub-limits (items 1 through 10): $2,500,000.00.

The Maximum aggregate amount that may be outstanding under sub-limits (items 4 through 10): $2,500,000.00.

1. Up to $2,500,000.00 for issuance of Sight Letters of Credit.   A "Sight Letter of Credit" means a Letter of Credit (a formal letter that authorizes a third party "beneficiary" to draw drafts on the Lender, under conditions stated in the letter which often require presentation of required documents in order, under applicable law, hereinafter referred to as "Letter of Credit") issued by Lender for Borrower that are payable upon draft by the beneficiary, provided the terms of the Letter of Credit are met.

2. Up to $2,500,000.00 for issuance of Usance Letters of Credit.   A "Usance Letter of Credit" means a Letter of Credit that is payable on a specific date after draft by the beneficiary, provided the terms of the Letter of Credit are met.

3. Up to $1,000,000.00 for issuance of Standby Letters of Credit, with expiration dates not to exceed one (1) year.   A "Standby Letter of Credit" is a Letter of Credit that promises payment to the beneficiary on behalf of Borrower in the event of default or other nonperformance by Borrower on its account with beneficiary.

4. Up to $2,500,000.00 for Banker's Acceptances.   A "Banker's Acceptance" is a promised future payment, or time draft, which is accepted by Lender, often in connection with a Usance Letter of Credit.

5. Up to $2,500,000.00 for advances of up to maturity date of line for Trust Receipt Financing. "Trust Receipt Financing" means an Advance to pay for release of goods to Borrower based upon title in favor of Lender to the released goods.

6. Up to $2,500,000.00 for advances of up to maturity date of line for Trust Receipt Financing of Banker's Acceptances due and payable under Letters of Credit issued and accepted by Lender with the term of the Advance reduced by the tenor of the usance draft.   The words "Trust Receipt Financing of Banker's Acceptances" means an advance to pay on the maturity of an accepted time draft.

7. Up to $2,500,000.00 for advances of up to maturity date of line to finance payment of Document Against Payment draft or trade purchase supported by invoice(s) paid or are due and payable. "Document Against Payment" means a presentation of shipping and title documents ("documentary collection") payable at sight.

8. Up to $2,500,000.00 for advances of up to maturity date of line to finance payment of Document Against Acceptance draft with the term of the Advance reduced by the tenor of the Documents against Acceptance draft. "Document Against Acceptance" means presentation of shipping and title documents only upon importer's acceptance of bill of exchange or draft by signature.

9. Up to $2,500,000.00 for Clean Advances of up to maturity date of line . "Clean Advance" means all Advances for a business purpose.

10. Up to $2,500,000.00 for advances of up to maturity date of line to finance payment of Local/Foreign Trade Purchases. "Local/Foreign

Loan No: Redacted

## FIRST MODIFICATION TO THE LOAN AGREEMENT
### (Continued)

Page 2

Trade Purchases" mean trade purchases evidenced by the supplier's invoice(s) paid or due as of a specific date.

The definitions of trade terms in the Line Usage Sub-Limit Paragraphs 1 through 10, above, are for reference only, and are not intended to be inclusive. The actual usage may vary based on the structure of the trade finance transaction for which the instrument is issued.

The definition of **"Borrowing Base"** is hereby amended and restated as follows:

**Borrowing Base**. The words "Borrowing Base" mean as determined by Lender from time to time, the lesser of (1) **$2,500,000.00** or (2) the sum of (a) **75%** of the aggregate amount of Eligible Accounts plus (b) the lesser of **$1,000,000.00** or **50%** of the aggregate amount of Eligible Inventory, except that Advances against Eligible Inventory cannot exceed **125%** of the aggregate amount of Advances against Eligible Accounts from December to April of each year and Advances against Eligible Inventory cannot exceed **100%** of the aggregate amount of Advances against Eligible Accounts from May to November of each year.

The definition of **"Eligible Accounts"** is hereby amended and restated as follows:

**Eligible Accounts**. The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

(1) Accounts with respect to which the Account Debtor is employee or agent of Borrower.

(2) Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with Borrower or its shareholders, officers, or directors.

(3) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

(4) Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

(5) Accounts which are subject to dispute, counterclaim, or setoff.

(6) Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

(7) Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

(8) Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

(9) Accounts with respect to which the Account Debtor is the United States government or any department or agency of the United States.

(10) That portion of the Accounts of any single Account Debtor which exceeds **25.000%** of all of Borrower's Accounts, except for the following Account Debtors: Walmart and Sam's Club which exceeds 50.000% from February to July of each year and 65.000% from August to January of each year of all of Borrower's Accounts; Canadian Tire which exceeds 50.000% of all of Borrower's Accounts; and Home Depot which exceeds 50.000% of all of Borrower's Accounts.

(11) Accounts which have not been paid in full within 90 days from the original date of invoice.

(12) All Accounts of any single Account Debtor if 25% or more of the dollar amount of all such Accounts are represented by Accounts which have not been paid in full within 90 days from the original date of invoice.

(13) Accounts with respect to which the Account Debtor is not a resident of the United States, except for Account Debtors located in Canada (excluding companies located in the province of Quebec) and except for Account Debtors located in U.S.
Possessions, except to the extent such Accounts are supported by insurance, bonds or other assurances satisfactory to Lender.

(14) Accounts with credit balances over 90 days from the original date of invoice.

(15) That portion of Accounts consisting of or arising from retentions and hold-backs by Account Debtors due to disputes, rebates, etc.

(16) Accounts consisting of non-trade claims, i.e., freight claims, insurance claims, warranty claims, claims against government, etc.

(17) Accounts arising from cash sales or from collect on delivery sales of inventory.

(18) Accrued finance charges on Account.

(19) Any additional reserves against Accounts at the Lender's sole discretion.

(20) Accounts which consists of progress billings.

**THIS FIRST MODIFICATION TO THE LOAN AGREEMENT IS EXECUTED AS OF MAY 16, 2017.**

**BORROWER:**

**VARIO CORP.**

By: _____
Eva Shih, President of Vario Corp.

| Loan No: <span style="color:red">Redacted</span> | **FIRST MODIFICATION TO THE LOAN AGREEMENT**<br>**(Continued)** | Page 3 |

---

LENDER:

EAST WEST BANK

X _Lois Cheing_ _____
**Authorized Signer**

---

LaserPro, Ver. 17.1.10.016  Copr. D+H USA Corporation 1997, 2017.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CFILPL\G08.FC  TR-25740  PR-11

# SECOND MODIFICATION TO THE LOAN AGREEMENT

| **Borrower:** | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA  91710 | **Lender:** | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |

THIS SECOND MODIFICATION TO THE LOAN AGREEMENT is attached to and by this reference is made a part of the Business Loan Agreement (Loan Redacted   dated December 31, 2016, including all modifications thereto, and executed in connection with a loan or other financial accommodations between Lender and Borrower.

The section entitled "**Financial Covenants and Ratios**" is hereby amended and restated as follows:

**Financial Covenants and Ratios.**  Comply with the following covenants and ratios:

**Additional Requirements.**  Borrower understands and agrees that while this Agreement is in effect, Borrower will maintain a financial condition indicated by the following ratios at all times, unless otherwise noted:

**Profitability.**  Maintain profitability of no less than **$1.00**, tested at the end of each fiscal year.

**Fixed Charge Coverage Ratio.**  Maintain a Fixed Charge Coverage Ratio (defined as earnings before interest, taxes, depreciation, and amortization ("EBITDA") minus dividends/distributions divided by current portion of long term debt plus interest expense plus capital lease expenses) of not less than **1.25** to 1.

**Debt to Tangible Net Worth.**  Maintain a Debt to effective Tangible Net Worth (defined as total liabilities minus debt subordinated to East West Bank divided by effective Tangible Net Worth defined as total book net worth plus minority interest, less due from officers/stockholders/affiliates minus intangible assets and accumulated amortization plus debt subordinated to East West Bank) not to exceed **2.50** to 1.

**Current Ratio.**  Maintain a Current Ratio (defined as total current assets divided by total current liabilities) of not less than **1.35** to 1.

**Tangible Net Worth.**  Maintain an effective Tangible Net Worth (defined as total book net worth plus minority interest, less due from officers/stockholders/affiliates minus intangible assets and accumulated amortization plus debt subordinated to East West Bank) of not less than **$2,800,000.00**.

Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

The section entitled "**RIGHT TO AUDIT AND INSPECT**" is hereby modified and restated as follows:

**RIGHT TO AUDIT AND INSPECT.**  Borrower shall permit any representative of Lender, at any reasonable time but no less often than **annually**, on or before September 30th, to inspect, audit, examine and make extracts or copies from all books, records and other data relating to the Collateral, to inspect any of Borrower's properties, to confirm balances due on Accounts by direct inquiry to Account Debtors, and shall furnish Lender with all information regarding the business or finances of Borrower promptly upon Lender's request.  Borrower agrees to pay fifty percent of Lender's reasonable fees and expenses related to such audits.

The section entitled "**Depository Relationship**" is hereby added under the section entitled "AFFIRMATIVE COVENANTS" as follows:

**Depository Relationship.**  Maintain one or more deposit account(s) at Lender.

**THIS SECOND MODIFICATION TO THE LOAN AGREEMENT IS EXECUTED AS OF FEBRUARY 16, 2018.**

**BORROWER:**

**VARIO CORP.**

By: _____
Eva Shih, President of Vario Corp.

**LENDER:**

**EAST WEST BANK**

X _____
Authorized Signer

LaserPro, Ver. 17.3.0.019  Copr. D+H USA Corporation 1997, 2018.  All Rights Reserved.   - CA  E:\PROD\LOANDOC\CFI\LPL\G60.FC  TR-25740  PR-11

# CORPORATE RESOLUTION TO BORROW / GRANT COLLATERAL

| | **Lender:** | East West Bank |
|---|---|---|
| **Corporation:** Vario Corp. | | Loan Servicing Department |
| 14020 Central Avenue Unit #590 | | 9300 Flair Drive, 6th Floor |
| Chino, CA  91710 | | El Monte, CA  91731 |

**I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT:**

**THE CORPORATION'S EXISTENCE.** The complete and correct name of the Corporation is Vario Corp. ("Corporation"). The Corporation is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of California. The Corporation is duly authorized to transact business in all other states in which the Corporation is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Corporation is doing business. Specifically, the Corporation is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Corporation has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Corporation maintains an office at 14020 Central Avenue Unit #590, Chino, CA  91710. Unless the Corporation has designated otherwise in writing, the principal office is the office at which the Corporation keeps its books and records. The Corporation will notify Lender prior to any change in the location of the Corporation's state of organization or any change in the Corporation's name. The Corporation shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Corporation and the Corporation's business activities.

**RESOLUTIONS ADOPTED.** At a meeting of the Directors of the Corporation, or if the Corporation is a close corporation having no Board of Directors then at a meeting of the Corporation's shareholders, duly called and held on **December 31, 2016**, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.

**OFFICER.** The following named person is an officer of Vario Corp.:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| Eva Shih | President | Y | X _[signature]_ |

**ACTIONS AUTHORIZED.** The authorized person listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Corporation. Specifically, but without limitation, the authorized person is authorized, empowered, and directed to do the following for and on behalf of the Corporation:

**Borrow Money.** To borrow, as a cosigner or otherwise, from time to time from Lender, on such terms as may be agreed upon between the Corporation and Lender, such sum or sums of money as in his or her judgment should be borrowed, without limitation.

**Execute Notes.** To execute and deliver to Lender the promissory note or notes, or other evidence of the Corporation's credit accommodations, on Lender's forms, at such rates of interest and on such terms as may be agreed upon, evidencing the sums of money so borrowed or any of the Corporation's indebtedness to Lender, and also to execute and deliver to Lender one or more renewals, extensions, modifications, refinancings, consolidations, or substitutions for one or more of the notes, any portion of the notes, or any other evidence of credit accommodations.

**Grant Security.** To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver to Lender any property now or hereafter belonging to the Corporation or in which the Corporation now or hereafter may have an interest, including without limitation all of the Corporation's real property and all of the Corporation's personal property (tangible or intangible), as security for the payment of any loans or credit accommodations so obtained, any promissory notes so executed (including any amendments to or modifications, renewals, and extensions of such promissory notes), or any other or further indebtedness of the Corporation to Lender at any time owing, however the same may be evidenced. Such property may be mortgaged, pledged, transferred, endorsed, hypothecated or encumbered at the time such loans are obtained or such indebtedness is incurred, or at any other time or times, and may be either in addition to or in lieu of any property theretofore mortgaged, pledged, transferred, endorsed, hypothecated or encumbered.

**Execute Security Documents.** To execute and deliver to Lender the forms of mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which Lender may require and which shall evidence the terms and conditions under and pursuant to which such liens and encumbrances, or any of them, are given; and also to execute and deliver to Lender any other written instruments, any chattel paper, or any other collateral, of any kind or nature, which Lender may deem necessary or proper in connection with or pertaining to the giving of the liens and encumbrances.

**Other Actions.** (A) Enter into any interest rate, credit, commodity or equity swap, cap, floor, collar, forward, foreign exchange transaction, currency swap, cross currency swap, currency option, securities puts, calls, collars, options or forwards or any combination of, or option with respect to, the foregoing or similar transactions with the Lender. (B) Apply for letters of credit or seek issuance of banker's acceptances under which the Corporation shall be liable to the Lender for repayment. (C) Purchase and sell foreign currencies, on behalf of the Corporation, whether for immediate or future delivery, in such amounts and upon such terms and conditions as the officer(s) authorized herein may deem appropriate, and give any instructions for transfers or deposits of monies by check, drafts, cable, letter or otherwise for any purpose incidental to the foregoing, and authorize or direct charges to the depository account or accounts of the Corporation for the cost of any foreign currencies so purchased through the Lender.

**Negotiate Items.** To draw, endorse, and discount with Lender all drafts, trade acceptances, promissory notes, or other evidences of indebtedness payable to or belonging to the Corporation or in which the Corporation may have an interest, and either to receive cash for the same or to cause such proceeds to be credited to the Corporation's account with Lender, or to cause such other disposition of the proceeds derived therefrom as he or she may deem advisable.

**Further Acts.** In the case of lines of credit, to designate additional or alternate individuals as being authorized to request advances under such lines, and in all cases, to do and perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements, **including agreements waiving the right to a trial by jury**, as the officer may in his or her discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from the Corporation, at Lender's address shown above, written notice of revocation of such authority: **Eva Shih, President of Vario Corp.**

**ASSUMED BUSINESS NAMES.** The Corporation has filed or recorded all documents or filings required by law relating to all assumed business names used by the Corporation. Excluding the name of the Corporation, the following is a complete list of all assumed business names under which the Corporation does business: **None.**

**NOTICES TO LENDER.** The Corporation will promptly notify Lender in writing at Lender's address shown above (or such other addresses as

# CORPORATE RESOLUTION TO BORROW / GRANT COLLATERAL

Loan No: Redacted                          **(Continued)**                          Page 2

Lender may designate from time to time) prior to any  (A)  change in the Corporation's name;  (B)  change in the Corporation's assumed business name(s);  (C)  change in the management of the Corporation;  (D)  change in the authorized signer(s);  (E)  change in the Corporation's principal office address;  (F)  change in the Corporation's state of organization;  (G)  conversion of the Corporation to a new or different type of business entity; or  (H)  change in any other aspect of the Corporation that directly or indirectly relates to any agreements between the Corporation and Lender.  No change in the Corporation's name or state of organization will take effect until after Lender has received notice.

**CERTIFICATION CONCERNING OFFICERS AND RESOLUTIONS.**  The officer named above is duly elected, appointed, or employed by or for the Corporation, as the case may be, and occupies the position set opposite his or her respective name.  This Resolution now stands of record on the books of the Corporation, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**NO CORPORATE SEAL.**  The Corporation has no corporate seal, and therefore, no seal is affixed to this Resolution.

**CONTINUING VALIDITY.**  Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved.  This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time).  Any such notice shall not affect any of the Corporation's agreements or commitments in effect at the time notice is given.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand and attest that the signature set opposite the name listed above is his or her genuine signature.

I have read all the provisions of this Resolution, and I personally and on behalf of the Corporation certify that all statements and representations made in this Resolution are true and correct.  This Corporate Resolution to Borrow / Grant Collateral is dated December 31, 2016.

**CERTIFIED TO AND ATTESTED BY:**

X _____

Eva Shih, Secretary

NOTE:  If the officer signing this Resolution is designated by the foregoing document as one of the officers authorized to act on the Corporation's behalf, it is advisable to have this Resolution signed by at least one non-authorized officer of the Corporation.

LaserPro, Ver. 16.2.0.015 Copr. D+H USA Corporation 1997, 2016.  All Rights Reserved.  - CA  E:\PROD\LOAN\DOC\CFI\LPLIC10.FC  TR-25740  PR-11

# COMMERCIAL SECURITY AGREEMENT

| | | | |
|---|---|---|---|
| **Grantor:** | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA 91710 | **Lender:** | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA 91731 |

**THIS COMMERCIAL SECURITY AGREEMENT** dated December 31, 2016, is made and executed between Vario Corp. ("Grantor") and East West Bank ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

> All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

> (A)  All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

> (B)  All products and produce of any of the property described in this Collateral section.

> (C)  All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

> (D)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

> (E)  All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

> **Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

> **Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

> **No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

> **Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of California, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $10,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: Redacted

Page 4

---

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**CHOICE OF VENUE.** If there is a lawsuit, the undersigned, and if more than one, each of the undersigned, agree upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**JUDICIAL REFERENCE.** If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, who shall be a retired state or federal court judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: Redacted                                                                                              Page 5

---

within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** **This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.**

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

Case 6:18-bk-19730-WJ   Doc 49   Filed 02/01/19   Entered 02/01/19 13:32:28   Desc of
Main Document   Page 59 of 137
Case 6:18-bk-19730-WJ   Claim 4   Filed 02/01/19   Desc Main Document   Page 52 of
63   Page 59 of 137

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: Redacted

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Oral Agreements Not Effective.** This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section. Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Vario Corp. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Vario Corp..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means East West Bank, its successors and assigns.

**Note.** The word "Note" means the Note dated December 31, 2016 and executed by Vario Corp. in the principal amount of $2,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 31, 2016.**

**Loan No:** Redacted                                                                                                        Page 7

---

GRANTOR:

VARIO CORP.

By: _____
     Eva Shih, President of Vario Corp.

---

Motion Exhibit 3 Page 0058

# COMMERCIAL SECURITY AGREEMENT

| | | | |
|---|---|---|---|
| **Borrower:** | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA 91710 | **Lender:** | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA 91731 |
| **Grantor:** | Eva Shih<br>1582 Pleasant Hill Drive<br>Chino Hills, CA 91709 | | |

**THIS COMMERCIAL SECURITY AGREEMENT** dated December 31, 2016, is made and executed among Eva Shih ("Grantor"); Vario Corp. ("Borrower"); and East West Bank ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

    All Trademarks including but not limited to the following:

       **1.** United States Serial #Redacted with a filing date of 07-13-2015 and Registration #Redacted with a filing date of 04-19-2016.

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

    (A) All accessions, attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later.

    (B) All products and produce of any of the property described in this Collateral section.

    (C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

    (D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

    (E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**BORROWER'S WAIVERS AND RESPONSIBILITIES.** Except as otherwise required under this Agreement or by applicable law, (A) Borrower agrees that Lender need not tell Borrower about any action or inaction Lender takes in connection with this Agreement; (B) Borrower assumes the responsibility for being and keeping informed about the Collateral; and (C) Borrower waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the Collateral or any delay by Lender in realizing upon the Collateral; and Borrower agrees to remain liable under the Note no matter what action Lender takes or fails to take under this Agreement.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (A) this Agreement is executed at Borrower's request and not at the request of Lender; (B) Grantor has the full right, power and authority to enter into this Agreement and to pledge the Collateral to Lender; (C) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (D) Lender has made no representation to Grantor about Borrower or Borrower's creditworthiness.

**GRANTOR'S WAIVERS.** Except as prohibited by applicable law, Grantor waives any right to require Lender to (A) make any presentment, protest, demand, or notice of any kind, including notice of change of any terms of repayment of the Indebtedness, default by Borrower or any other guarantor or surety, any action or nonaction taken by Borrower, Lender, or any other guarantor or surety of Borrower, or the creation of new or additional Indebtedness; (B) proceed against any person, including Borrower, before proceeding against Grantor; (C) proceed against any collateral for the Indebtedness, including Borrower's collateral, before proceeding against Grantor; (D) apply any payments or proceeds received against the Indebtedness in any order; (E) give notice of the terms, time, and place of any sale of any collateral pursuant to the Uniform Commercial Code or any other law governing such sale; (F) disclose any information about the Indebtedness, the Borrower, any collateral, or any other guarantor or surety, or about any action or nonaction of Lender; or (G) pursue any remedy or course of action in Lender's power whatsoever.

Grantor also waives any and all rights or defenses arising by reason of (A) any disability or other defense of Borrower, any other guarantor or surety or any other person; (B) the cessation from any cause whatsoever, other than payment in full, of the Indebtedness; (C) the application of proceeds of the Indebtedness by Borrower for purposes other than the purposes understood and intended by Grantor and Lender; (D) any act of omission or commission by Lender which directly or indirectly results in or contributes to the discharge of Borrower or any other guarantor or surety, or the Indebtedness, or the loss or release of any collateral by operation of law or otherwise; (E) any statute of limitations in any action under this Agreement or on the Indebtedness; or (F) any modification or change in terms of the Indebtedness, whatsoever, including without limitation, the renewal, extension, acceleration, or other change in the time payment of the Indebtedness is due and any change in the interest rate.

Grantor waives all rights and defenses arising out of an election of remedies by Lender even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Grantor's rights of subrogation and reimbursement

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

against Borrower by operation of Section 580d of the California Code of Civil Procedure or otherwise.

Grantor waives all rights and defenses that Grantor may have because Borrower's obligation is secured by real property.  This means among other things:  (1) Lender may collect from Grantor without first foreclosing on any real property collateral pledged by Borrower ; and (2) If Lender forecloses on any real property collateral pledged by the Borrower :  (A)  The amount of the Borrower's obligation may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price;  (B) The Lender may collect from the Grantor even if the Lender, by foreclosing on the real property collateral, has destroyed any right the Grantor may have to collect from the borrower.  This is an unconditional and irrevocable waiver of any rights and defenses the Grantor may have because the Borrower's obligation is secured by real property.  These rights and defenses include, but are not limited to, any rights and defenses based upon Sections 580a, 580b, 580d, or 726 of the Code of Civil Procedure.

Grantor understands and agrees that the foregoing waivers are unconditional and irrevocable waivers of substantive rights and defenses to which Grantor might otherwise be entitled under state and federal law.  The rights and defenses waived include, without limitation, those provided by California laws of suretyship and guaranty, anti-deficiency laws, and the Uniform Commercial Code.  Grantor further understands and agrees that this Agreement is a separate and independent contract between Grantor and Lender, given for full and ample consideration, and is enforceable on its own terms.  Grantor acknowledges that Grantor has provided these waivers of rights and defenses with the intention that they be fully relied upon by Lender.  Until all Indebtedness is paid in full, Grantor waives any right to enforce any remedy Grantor may have against Borrower or any other guarantor, surety, or other person, and further, Grantor waives any right to participate in any collateral for the Indebtedness now or hereafter held by Lender.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.**  With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.**  Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral.  Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.  **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.**

**Notices to Lender.**  Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any  (1)  change in Grantor's name;  (2)  change in Grantor's assumed business name(s);  (3)  change in the authorized signer(s);  (4)  change in Grantor's principal office address;  (5)  change in Grantor's principal residence;  (6)  conversion of Grantor to a new or different type of business entity; or  (7)  change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender.  No change in Grantor's name or principal residence will take effect until after Lender has received notice.

**No Violation.**  The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party.

**Enforceability of Collateral.**  To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral.  There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.**  Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender.  Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following:  (1)  all real property Grantor owns or is purchasing;  (2)  all real property Grantor is renting or leasing;  (3)  all storage facilities Grantor owns, rents, leases, or uses; and  (4)  all other properties where Collateral is or may be located.

**Removal of the Collateral.**  Except in the ordinary course of Grantor's business,  Grantor shall not remove the Collateral from its existing location without Lender's prior written consent.  Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.**  Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral.  Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender.  This includes security interests even if junior in right to the security interests granted under this Agreement.  Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition.  Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.**  Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement.  No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented.  Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.**  Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect.  Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.**  Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.**  Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest a lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $10,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: Redacted

Page 4

any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Borrower, any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's, any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of Borrower or Grantor or the dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower or Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**CHOICE OF VENUE.** If there is a lawsuit, the undersigned, and if more than one, each of the undersigned, agree upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**JUDICIAL REFERENCE.** If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, who shall be a retired state or federal court judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Agreement shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Agreement.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Borrower's or Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Borrower and Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Oral Agreements Not Effective.** This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section. Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Vario Corp. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: Redacted

Page 7

Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.**  The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.**  The word "Grantor" means Eva Shih.

**Guarantor.**  The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.**  The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.**  The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled.  The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws.  The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.**  The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.  Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.**  The word "Lender" means East West Bank, its successors and assigns.

**Note.**  The word "Note" means the Note dated December 31, 2016 and executed by Vario Corp. in the principal amount of $2,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.**  The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.**  The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

BORROWER AND GRANTOR HAVE READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREE TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 31, 2016.

GRANTOR:

X _____
Eva Shih, Individually

BORROWER:

VARIO CORP.

By: _____
Eva Shih, President of Vario Corp.

LaserPro, Ver. 16.2.0.015  Copr. D+H USA Corporation 1997, 2016.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CFI\LPL\E40.FC  TR-25740  PR-11

# COMMERCIAL SECURITY AGREEMENT

| Borrower: | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA  91710 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|
| Grantor: | Sheng-Yi Chuang<br>Room 609-611, No.111 Science Avenue, Science City<br>Guangzhou Hi-tech Industrial Development Zone,<br>Guangzhou  510530  China | | |

**THIS COMMERCIAL SECURITY AGREEMENT** dated February 16, 2018, is made and executed among Sheng-Yi Chuang ("Grantor"); Vario Corp. ("Borrower"); and East West Bank ("Lender").

**GRANT OF SECURITY INTEREST.**  For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.**  The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All Patents including but not limited to the followings:**

1. **United States Patent #Redacted  with a filing date of 03-12-2012 and Application #Redacted**

2. **United States Patent #Redacted  with a filing date of 03-12-2012 and Application #Redacted**

3. **United States Patent #Redacted  with a filing date of 03-12-2012 and Application #Redacted**

4. **United States Patent #Redacted  with a filing date of 03-12-2012 and Application #Redacted**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A)  All accessions, attachments, accessories, replacements of and additions to any of the collateral described herein, whether added now or later.

(B)  All products and produce of any of the property described in this Collateral section.

(C)  All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E)  All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.**  In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**BORROWER'S WAIVERS AND RESPONSIBILITIES.**  Except as otherwise required under this Agreement or by applicable law,  (A)  Borrower agrees that Lender need not tell Borrower about any action or inaction Lender takes in connection with this Agreement;  (B)  Borrower assumes the responsibility for being and keeping informed about the Collateral; and  (C)  Borrower waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the Collateral or any delay by Lender in realizing upon the Collateral; and Borrower agrees to remain liable under the Note no matter what action Lender takes or fails to take under this Agreement.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.**  Grantor warrants that:  (A)  this Agreement is executed at Borrower's request and not at the request of Lender;  (B)  Grantor has the full right, power and authority to enter into this Agreement and to pledge the Collateral to Lender;  (C)  Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and  (D)  Lender has made no representation to Grantor about Borrower or Borrower's creditworthiness.

**GRANTOR'S WAIVERS.**  Except as prohibited by applicable law, Grantor waives any right to require Lender to  (A)  make any presentment, protest, demand, or notice of any kind, including notice of change of any terms of repayment of the Indebtedness, default by Borrower or any other guarantor or surety, any action or nonaction taken by Borrower, Lender, or any other guarantor or surety of Borrower, or the creation of new or additional Indebtedness;  (B)  proceed against any person, including Borrower, before proceeding against Grantor;  (C)  proceed against any collateral for the Indebtedness, including Borrower's collateral, before proceeding against Grantor;  (D)  apply any payments or proceeds received against the Indebtedness in any order;  (E)  give notice of the terms, time, and place of any sale of any collateral pursuant to the Uniform Commercial Code or any other law governing such sale;  (F)  disclose any information about the Indebtedness, the Borrower, any collateral, or any other guarantor or surety, or about any action or nonaction of Lender; or  (G)  pursue any remedy or course of action in Lender's power whatsoever.

Grantor also waives any and all rights or defenses arising by reason of  (A)  any disability or other defense of Borrower, any other guarantor or surety or any other person;  (B)  the cessation from any cause whatsoever, other than payment in full, of the Indebtedness;  (C)  the application of proceeds of the Indebtedness by Borrower for purposes other than the purposes understood and intended by Grantor and Lender;  (D)  any act of omission or commission by Lender which directly or indirectly results in or contributes to the discharge of Borrower or any other guarantor

# COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: Redacted                                                                                                                 Page 2

---

or surety, or the Indebtedness, or the loss or release of any collateral by operation of law or otherwise; (E) any statute of limitations in any action under this Agreement or on the Indebtedness; or (F) any modification or change in terms of the Indebtedness, whatsoever, including without limitation, the renewal, extension, acceleration, or other change in the time payment of the Indebtedness is due and any change in the interest rate.

Grantor waives all rights and defenses arising out of an election of remedies by Lender even though that election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Grantor's rights of subrogation and reimbursement against Borrower by operation of Section 580d of the California Code of Civil Procedure or otherwise.

Grantor waives all rights and defenses that Grantor may have because Borrower's obligation is secured by real property.  This means among other things:  (1) Lender may collect from Grantor without first foreclosing on any real property collateral pledged by Borrower ; and (2) If Lender forecloses on any real property collateral pledged by the Borrower :  (A) The amount of the Borrower's obligation may be reduced only by the price for which the Collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price;  (B) The Lender may collect from the Grantor even if the Lender, by foreclosing on the real property collateral, has destroyed any right the Grantor may have to collect from the borrower.  This is an unconditional and irrevocable waiver of any rights and defenses the Grantor may have because the Borrower's obligation is secured by real property.  These rights and defenses include, but are not limited to, any rights and defenses based upon Sections 580a, 580b, 580d, or 726 of the Code of Civil Procedure.

Grantor understands and agrees that the foregoing waivers are unconditional and irrevocable waivers of substantive rights and defenses to which Grantor might otherwise be entitled under state and federal law.  The rights and defenses waived include, without limitation, those provided by California laws of suretyship and guaranty, anti-deficiency laws, and the Uniform Commercial Code.  Grantor further understands and agrees that this Agreement is a separate and independent contract between Grantor and Lender, given for full and ample consideration, and is enforceable on its own terms.  Grantor acknowledges that Grantor has provided these waivers of rights and defenses with the intention that they be fully relied upon by Lender.  Until all Indebtedness is paid in full, Grantor waives any right to enforce any remedy Grantor may have against Borrower or any other guarantor, surety, or other person, and further, Grantor waives any right to participate in any collateral for the Indebtedness now or hereafter held by Lender.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.**  With respect to the Collateral, Grantor represents and promises to Lender that:

> **Perfection of Security Interest.**  Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral.  Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.  **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Borrower may not be indebted to Lender.**

> **Notices to Lender.**  Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any  (1)  change in Grantor's name;  (2)  change in Grantor's assumed business name(s);  (3)  change in the authorized signer(s);  (4)  change in Grantor's principal office address;  (5)  change in Grantor's principal residence;  (6)  conversion of Grantor to a new or different type of business entity; or  (7)  change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender.  No change in Grantor's name or principal residence will take effect until after Lender has received notice.

> **No Violation.**  The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party.

> **Enforceability of Collateral.**  To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral.  There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

> **Location of the Collateral.**  Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender.  Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following:  (1)  all real property Grantor owns or is purchasing;  (2)  all real property Grantor is renting or leasing;  (3)  all storage facilities Grantor owns, rents, leases, or uses; and  (4)  all other properties where Collateral is or may be located.

> **Removal of the Collateral.**  Except in the ordinary course of Grantor's business, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent.  Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

> **Transactions Involving Collateral.**  Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral.  Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender.  This includes security interests even if junior in right to the security interests granted under this Agreement.  Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition.  Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

> **Title.**  Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement.  No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented.  Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

> **Repairs and Maintenance.**  Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order,

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: Redacted                                                                      Page 3

repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral if the estimated cost of repair or replacement exceeds $10,000.00, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

## COMMERCIAL SECURITY AGREEMENT
### (Continued)

Loan No: Redacted            Page 4

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Borrower, any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's, any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of Borrower or Grantor or the dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's or Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Borrower would be required to pay, immediately due and payable, without notice of any kind to Borrower or Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an

# COMMERCIAL SECURITY AGREEMENT
### (Continued)

agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**JUDICIAL REFERENCE.** If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, who shall be a retired state or federal court judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**CONSENT TO JURISDICTION AND CHOICE OF VENUE.** Grantor consents to any litigation in connection with this Security Agreement being brought and maintained in the courts of the State of California located in Los Angeles County, provided that the Lender is not precluded from bringing suit or taking other legal action in any other jurisdiction. Grantor expressly and irrevocably submits to the jurisdiction of the courts of the State of California for the purpose of any such litigation. Grantor further irrevocably consents to the service of process by registered mail, postage prepaid, or by personal service within or outside the State of California. Grantor expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such litigation brought in any such court referred to above and any claim that any such litigation has been brought in an inconvenient forum.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Agreement shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Agreement.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Borrower's or Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Borrower and Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Oral Agreements Not Effective.** This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section. Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

# COMMERCIAL SECURITY AGREEMENT
## (Continued)

Loan No: Redacted                                                                                        Page 7

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Vario Corp. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Sheng-Yi Chuang.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means East West Bank, its successors and assigns.

**Note.** The word "Note" means the Note dated December 31, 2016 and Change in Terms Agreement dated February 16, 2018, in the principal amount of $2,500,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

BORROWER AND GRANTOR HAVE READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREE TO ITS TERMS. THIS AGREEMENT IS DATED FEBRUARY 16, 2018.

GRANTOR:

X _____
Sheng-Yi Chuang, Individually

BORROWER:

VARIO CORP.

By: _____
Eva Shih, President of Vario Corp.

LaserPro, Ver. 17.3.0.019  Copr. D+H USA Corporation 1997, 2018.  All Rights Reserved.  - CA  E:\PROD\LOAN\DOC\FNL\PL\E40.FC  TR-25249  PR-11

# ASSIGNMENT OF DEPOSIT ACCOUNT

| **Grantor:** | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA  91710 | **Lender:** | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

**THIS ASSIGNMENT OF DEPOSIT ACCOUNT** dated **December 31, 2016,** is made and executed between Vario Corp. ("Grantor") and East West Bank ("Lender").

**ASSIGNMENT.**  For valuable consideration, Grantor assigns and grants to Lender a security interest in the Collateral, including without limitation the deposit account(s) described below, to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.**  The word "Collateral" means the following described deposit account(s) ("Account"):

  Savings Account Number Redacted   **with Lender with an approximate balance of $350,000.00**

together with  (A)  all interest, whether now accrued or hereafter accruing;  (B)  all additional deposits hereafter made to the Account;  (C)  any and all proceeds from the Account; and  (D)  all renewals, replacements and substitutions for any of the foregoing.

**CROSS-COLLATERALIZATION.**  In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.**  With respect to the Collateral, Grantor represents and promises to Lender that:

  **Ownership.**  Grantor is the lawful owner of the Collateral free and clear of all loans, liens, encumbrances, and claims except as disclosed to and accepted by Lender in writing.

  **Right to Grant Security Interest.**  Grantor has the full right, power, and authority to enter into this Agreement and to assign the Collateral to Lender.

  **No Prior Assignment.**  Grantor has not previously granted a security interest in the Collateral to any other creditor.

  **No Further Transfer.**  Grantor shall not sell, assign, encumber, or otherwise dispose of any of Grantor's rights in the Collateral except as provided in this Agreement.

  **No Defaults.**  There are no defaults relating to the Collateral, and there are no offsets or counterclaims to the same.  Grantor will strictly and promptly do everything required of Grantor under the terms, conditions, promises, and agreements contained in or relating to the Collateral.

  **Proceeds.**  Any and all replacement or renewal certificates, instruments, or other benefits or proceeds related to the Collateral that are received by Grantor shall be held by Grantor in trust for Lender and immediately shall be  delivered by Grantor to Lender to be held as part of the Collateral.

  **Validity; Binding Effect.**  This Agreement is binding upon Grantor and Grantor's successors and assigns and is legally enforceable in accordance with its terms.

  **Financing Statements.**  Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest.  At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property.  Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs.  Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default.  Lender may file a copy of this Agreement as a financing statement.  Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor, any individual who is a partner for a Grantor, and any individual who is a trustee or settlor or trustor for a Grantor under this Agreement.  Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**LENDER'S RIGHTS AND OBLIGATIONS WITH RESPECT TO THE COLLATERAL.**  While this Agreement is in effect, Lender may retain the rights to possession of the Collateral, together with any and all evidence of the Collateral, such as certificates or passbooks.  This Agreement will remain in effect until  (a) there no longer is any Indebtedness owing to Lender;  (b) all other obligations secured by this Agreement have been fulfilled; and  (c) Grantor, in writing, has requested from Lender a release of this Agreement.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral.  All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor.  All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.  The Agreement also

# ASSIGNMENT OF DEPOSIT ACCOUNT
## (Continued)

**Page 2**

will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**LIMITATIONS ON OBLIGATIONS OF LENDER.** Lender shall use ordinary reasonable care in the physical preservation and custody of any certificate or passbook for the Collateral but shall have no other obligation to protect the Collateral or its value. In particular, but without limitation, Lender shall have no responsibility (A) for the collection or protection of any income on the Collateral; (B) for the preservation of rights against issuers of the Collateral or against third persons; (C) for ascertaining any maturities, conversions, exchanges, offers, tenders, or similar matters relating to the Collateral; nor (D) for informing the Grantor about any of the above, whether or not Lender has or is deemed to have knowledge of such matters.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default, or at any time thereafter, Lender may exercise any one or more of the following rights and remedies, in addition to any rights or remedies that may be available at law, in equity, or otherwise:

**Accelerate Indebtedness.** Lender may declare all Indebtedness of Grantor to Lender immediately due and payable, without notice of any kind to Grantor.

**Application of Account Proceeds.** Lender may take directly all funds in the Account and apply them to the Indebtedness. If the Account is subject to an early withdrawal penalty, that penalty shall be deducted from the Account before its application to the Indebtedness, whether the Account is with Lender or some other institution. Any excess funds remaining after application of the Account proceeds to the Indebtedness will be paid to Grantor as the interests of Grantor may appear. Grantor agrees, to the extent permitted by law, to pay any deficiency after application of the proceeds of the Account to the Indebtedness. Lender also shall have all the rights of a secured party under the California Uniform Commercial Code, even if the Account is not otherwise subject to such Code concerning security interests, and the parties to this Agreement agree that the provisions of the Code giving rights to a secured party shall nonetheless be a part of this Agreement.

**Transfer Title.** Lender may effect transfer of title upon sale of all or part of the Collateral. For this purpose, Grantor irrevocably appoints Lender as Grantor's attorney-in-fact to execute endorsements, assignments and instruments in the name of Grantor and each of them (if more than one) as shall be necessary or reasonable.

**Other Rights and Remedies.** Lender shall have and may exercise any or all of the rights and remedies of a secured creditor under the provisions of the California Uniform Commercial Code, at law, in equity, or otherwise.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Cumulative Remedies.** All of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and to exercise its remedies.

## ASSIGNMENT OF DEPOSIT ACCOUNT
### (Continued)

Loan No: Redacted                                                              Page 3

**CHOICE OF VENUE.** If there is a lawsuit, the undersigned, and if more than one, each of the undersigned, agree upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**JUDICIAL REFERENCE.** If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, who shall be a retired state or federal court judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**ORAL AGREEMENTS NOT EFFECTIVE.** This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section. Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Preference Payments.** Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written

# ASSIGNMENT OF DEPOSIT ACCOUNT
## (Continued)

notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following: (1) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from the Collateral; (2) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (3) to settle or compromise any and all claims arising under the Collateral, and in the place and stead of Grantor, to execute and deliver its release and settlement for the claim; and (4) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Grantor, or otherwise, which in the discretion of Lender may seem to be necessary or advisable. This power is given as security for the Indebtedness, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by Lender.

**Waiver of Co-Obligor's Rights.** If more than one person is obligated for the Indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Account.** The word "Account" means the deposit account(s) described in the "Collateral Description" section.

**Agreement.** The word "Agreement" means this Assignment of Deposit Account, as this Assignment of Deposit Account may be amended or modified from time to time, together with all exhibits and schedules attached to this Assignment of Deposit Account from time to time.

**Borrower.** The word "Borrower" means Vario Corp. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in this Agreement in the section titled "Default".

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Vario Corp..

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means East West Bank, its successors and assigns.

**Note.** The word "Note" means the Note dated December 31, 2016 and executed by Vario Corp. in the principal amount of $2,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

| Loan No: <span style="color:red">Redacted</span> | **ASSIGNMENT OF DEPOSIT ACCOUNT**<br>**(Continued)** | Page 5 |
|---|---|---|

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS ASSIGNMENT OF DEPOSIT ACCOUNT AND AGREES TO ITS TERMS.  THIS AGREEMENT IS DATED DECEMBER 31, 2016.

GRANTOR:


VARIO CORP.

By: _____
    Eva Shih, President of Vario Corp.

LaserPro, Ver. 16.2.0.015 Copr. D+H USA Corporation 1997, 2016.   All Rights Reserved.   - CA  E:\PROD\LOANDOC\CFI\LPL\E90.FC  TR-25740  PR-11

Motion Exhibit 3 Page 0077

# SUBORDINATION AGREEMENT

| Borrower: | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA 91710 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA 91731 |
| --- | --- | --- | --- |
| Creditor: | Eva Shih<br>1582 Pleasant Hill Drive<br>Chino Hills, CA 91709 | | |

THIS SUBORDINATION AGREEMENT dated December 31, 2016, is made and executed among Vario Corp., 14020 Central Avenue Unit #590, Chino, CA 91710 ("Borrower"); Eva Shih, 1582 Pleasant Hill Drive, Chino Hills, CA 91709 ("Creditor"); and East West Bank, Loan Servicing Department, 9300 Flair Drive, 6th Floor, El Monte, CA 91731 ("Lender").

CURRENT INDEBTEDNESS OWING TO CREDITOR. As of the date of this Agreement, Borrower is indebted to Creditor in the **aggregate amount of $2,000,000.00**. This amount is the total indebtedness of every kind from Borrower to Creditor.

REQUESTED FINANCIAL ACCOMMODATIONS. Creditor and Borrower each want Lender to provide financial accommodations to Borrower in the form of (A) new credit or loan advances, (B) an extension of time to pay or other compromises regarding all or part of Borrower's present indebtedness to Lender, or (C) other benefits to Borrower. Borrower and Creditor each represent and acknowledge to Lender that Creditor will benefit as a result of these financial accommodations from Lender to Borrower, and Creditor acknowledges receipt of valuable consideration for entering into this Agreement. **Based on the representations and acknowledgments contained in this Agreement, Borrower and Creditor agree with Lender as follows:**

SUBORDINATED INDEBTEDNESS. The words "Subordinated Indebtedness" as used in this Agreement mean all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be now or hereafter owing from **Borrower to Creditor**. The term "Subordinated Indebtedness" is used in its broadest sense and includes without limitation all principal, all interest, all costs, attorneys' fees, all sums paid for the purpose of protecting the rights of a holder of security, all contingent obligations of Borrower (such as a guaranty), and all other obligations, secured or unsecured, of any nature whatsoever.

SUPERIOR INDEBTEDNESS. The words "Superior Indebtedness" as used in this Agreement mean and include all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be now or hereafter owing from **Borrower to Lender**. The term "Superior Indebtedness" is used in its broadest sense and includes without limitation all principal, all interest, all costs, attorneys' fees, all sums paid for the purpose of protecting Lender's rights in security (such as paying for insurance on collateral if the owner fails to do so), all contingent obligations of Borrower (such as a guaranty), all obligations arising by reason of Borrower's accounts with Lender (such as an overdraft on a checking account), and all other obligations of Borrower to Lender, secured or unsecured, of any nature whatsoever.

SUBORDINATION. All Subordinated Indebtedness of Borrower to Creditor is and shall be subordinated in all respects to all Superior Indebtedness of Borrower to Lender. If Creditor holds one or more Security Interests, whether now existing or hereafter acquired, in any of Borrower's real property or personal property, Creditor also subordinates all Creditor's Security Interests to all Security Interests held by Lender, whether now existing or hereafter acquired.

PAYMENTS TO CREDITOR. Borrower will not make and Creditor will not accept, at any time while any Superior Indebtedness is owing to Lender, (A) any payment upon any Subordinated Indebtedness, (B) any advance, transfer, or assignment of assets to Creditor in any form whatsoever that would reduce at any time or in any way the amount of Subordinated Indebtedness, or (C) any transfer of any assets as security for the Subordinated Indebtedness, except upon Lender's prior written consent.

In the event of any distribution, division, or application, whether partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of Borrower's assets, or the proceeds of Borrower's assets, in whatever form, to creditors of Borrower or upon any indebtedness of Borrower, whether by reason of the liquidation, dissolution or other winding-up of Borrower, or by reason of any execution sale, receivership, insolvency, or bankruptcy proceeding, assignment for the benefit of creditors, proceedings for reorganization, or readjustment of Borrower or Borrower's properties, then and in such event, (A) the Superior Indebtedness shall be paid in full before any payment is made upon the Subordinated Indebtedness, and (B) all payments and distributions, of any kind or character and whether in cash, property, or securities, which shall be payable or deliverable upon or in respect of the Subordinated Indebtedness shall be paid or delivered directly to Lender for application in payment of the amounts then due on the Superior Indebtedness until the Superior Indebtedness shall have been paid in full.

In order that Lender may establish its right to prove claims and recover for its own account dividends based on the Subordinated Indebtedness, Creditor does hereby assign all its right, title, and interest in such claims to Lender. Creditor further agrees to supply such information and evidence, provide access to and copies of such of Creditor's records as may pertain to the Subordinated Indebtedness, and execute such instruments as may be required by Lender to enable Lender to enforce all such claims and collect all dividends, payments, or other disbursements which may be made on account of the Subordinated Indebtedness. For such purposes, Creditor hereby irrevocably authorizes Lender in its discretion to make and present for or on behalf of Creditor such proofs of claims on account of the Subordinated Indebtedness as Lender may deem expedient and proper and to vote such claims in any such proceeding and to receive and collect any and all dividends, payments, or other disbursements made thereon in whatever form the same may be paid or issued and to apply the same on account of the Superior Indebtedness.

Should any payment, distribution, security, or proceeds thereof be received by Creditor at any time on the Subordinated Indebtedness contrary to the terms of this Agreement, Creditor immediately will deliver the same to Lender in precisely the form received (except for the endorsement or assignment of Creditor if necessary), for application on or to secure the Superior Indebtedness, whether it is due or not due, and until so delivered the same shall be held in trust by Creditor as property of Lender. In the event Creditor fails to make any such endorsement or assignment, Lender, or any of its officers on behalf of Lender, is hereby irrevocably authorized by Creditor to make the same.

CREDITOR'S NOTES. Creditor agrees to deliver to Lender, at Lender's request, all notes of Borrower to Creditor, or other evidence of the Subordinated Indebtedness, now held or hereafter acquired by Creditor, while this Agreement remains in effect. At Lender's request, Borrower also will execute and deliver to Creditor a promissory note evidencing any book account or claim now or hereafter owed by Borrower to Creditor, which note also shall be delivered by Creditor to Lender. Creditor agrees not to sell, assign, pledge or otherwise transfer any of such notes except subject to all the terms and conditions of this Agreement.

CREDITOR'S REPRESENTATIONS AND WARRANTIES. Creditor represents and warrants to Lender that: (A) no representations or agreements of any kind have been made to Creditor which would limit or qualify in any way the terms of this Agreement; (B) this Agreement is executed at Borrower's request and not at the request of Lender; (C) Lender has made no representation to Creditor as to the creditworthiness of Borrower; and (D) Creditor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Creditor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Creditor's risks under this Agreement, and Creditor further agrees that Lender shall have no obligation to disclose to Creditor

## SUBORDINATION AGREEMENT
### (Continued)

**Page 2**

---

information or material acquired by Lender in the course of its relationship with Borrower.

**CREDITOR'S WAIVERS.** Creditor waives any right to require Lender: (A) to make, extend, renew, or modify any loan to Borrower or to grant any other financial accommodations to Borrower whatsoever; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Superior Indebtedness or of any nonpayment related to any Security Interests, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Superior Indebtedness, or in connection with the creation of new or additional Superior Indebtedness; (C) to resort for payment or to proceed directly or at once against any person, including Borrower; (D) to proceed directly against or exhaust any Security Interests held by Lender from Borrower, any other guarantor, or any other person; (E) to pursue any other remedy within Lender's power; or (F) to commit any act or omission of any kind, at any time, with respect to any matter whatsoever.

**LENDER'S RIGHTS.** Lender may take or omit any and all actions with respect to the Superior Indebtedness or any Security Interests for the Superior Indebtedness without affecting whatsoever any of Lender's rights under this Agreement. In particular, without limitation, Lender may, without notice of any kind to Creditor, (A) make one or more additional secured or unsecured loans to Borrower; (B) repeatedly alter, compromise, renew, extend, accelerate, or otherwise change the time for payment or other terms of the Superior Indebtedness or any part thereof, including increases and decreases of the rate of interest on the Superior Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) take and hold Security Interests for the payment of the Superior Indebtedness, and exchange, enforce, waive, and release any such Security Interests, with or without the substitution of new collateral; (D) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or guarantors on any terms or manner Lender chooses; (E) determine how, when and what application of payments and credits, shall be made on the Superior Indebtedness; (F) apply such security and direct the order or manner of sale thereof, as Lender in its discretion may determine; and (G) assign this Agreement in whole or in part.

**DEFAULT BY BORROWER.** If Borrower becomes insolvent or bankrupt, this Agreement shall remain in full force and effect.

**DURATION AND TERMINATION.** This Agreement will take effect when received by Lender, without the necessity of any acceptance by Lender, in writing or otherwise, and will remain in full force and effect until Creditor shall notify Lender in writing at the address shown above to the contrary. Any such notice shall not affect the Superior Indebtedness owed Lender by Borrower at the time of such notice, nor shall such notice affect Superior Indebtedness thereafter granted in compliance with a commitment made by Lender to Borrower prior to receipt of such notice, nor shall such notice affect any renewals of or substitutions for any of the foregoing. Such notice shall affect only indebtedness of Borrower to Lender arising after receipt of such notice and not arising from financial assistance granted by Lender to Borrower in compliance with Lender's obligations under a commitment. Any notes lodged with Lender pursuant to the section titled "Creditor's Notes" above need not be returned until this Agreement has no further force or effect.

**JUDICIAL REFERENCE.** If the waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, who shall be a retired state or federal court judge, mutually selected by the parties or, if they cannot agree, then any party may seek to have a private judge appointed in accordance with California Code of Civil Procedure §§ 638 and 640 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts). The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

The parties agree that time is of the essence in conducting the referenced proceedings. The parties shall promptly and diligently cooperate with one another and the referee, and shall perform such acts as may be necessary to obtain prompt and expeditious resolution of the dispute or controversy in accordance with the terms hereof. The costs shall be borne equally by the parties.

**ORAL AGREEMENTS NOT EFFECTIVE.** This Note or Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written negotiations, agreements and understandings of the parties with respect to the subject matter hereof and shall remain in full force and effect in accordance with its terms and conditions. Moreover, any subsequent oral statements, negotiations, agreements or understandings of the parties shall not be effective against Lender unless (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Borrower shall not rely or act on any oral statements, negotiations, agreements or understandings between the parties at anytime whatsoever, including before or during any Lender approval process stated above. Borrower acknowledges and agrees that Borrower shall be responsible for its own actions, including any detrimental reliance on any oral statements, negotiations, agreements or understandings between the parties and that Lender shall not be liable for any possible claims, counterclaims, demands, actions, causes of action, damages, costs, expenses and liability whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, at law or in equity, originating in whole or in part in connection with any oral statements, negotiations, agreements or understandings between the parties which the Borrower may now or hereafter claim against the Lender. Neither this Note or Agreement nor any other Related Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this section. Lender may from time to time, (a) enter into with Borrower written amendments, supplements or modifications hereto and to the Related Documents or (b) waive, on such terms and conditions as Lender may specify in such instrument, any of the requirements of this Note or Agreement or the Related Documents or any Event Default and its consequences, if, but only if, such amendment, supplement, modification or waiver is (i) expressly stated in writing, (ii) duly approved and authorized by an appropriate decision making committee of Lender on such terms and conditions as such committee shall deem necessary or appropriate in the committee's sole and absolute opinion and judgment and (iii) executed by an authorized officer of Lender. Then such amendment, supplement, modification or waiver shall be effective only in the specific instance and specific purpose for which given.

**CHOICE OF VENUE.** If there is a lawsuit, the undersigned, and if more than one, each of the undersigned, agree upon Lender's request to submit to the jurisdiction of the courts of Los Angeles County, State of California.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**SUBORDINATION AGREEMENT**
**(Continued)**

Page 3

---

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Creditor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Creditor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Creditor also shall pay all court costs and such additional fees as may be directed by the court.

**Authority.** The person who signs this Agreement as or on behalf of Creditor represents and warrants that he or she has authority to execute this Agreement and to subordinate the Subordinated Indebtedness and the Creditor's security interests in Creditor's property, if any.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

**Interpretation.** In all cases where there is more than one Creditor, then all words used in this Agreement in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Creditor named in this Agreement or when this Agreement is executed by more than one , the words "Creditor" shall mean all and any one or more of them. Reference to the phrase "Creditor" includes the heirs, successors, assigns, and transferees of each of them.

**Successors and Assigns.** This Agreement shall be understood to be for the benefit of Lender and for such other person or persons as may from time to time become or be the holder or owner of any of the Superior Indebtedness or any interest therein, and this Agreement shall be transferable to the same extent and with the same force and effect as any such Superior Indebtedness may be transferable.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Creditor, shall constitute a waiver of any of Lender's rights or of any of Creditor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Waive Jury.** To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Subordination Agreement, as this Subordination Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Subordination Agreement from time to time.

**Borrower.** The word "Borrower" means Vario Corp. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Creditor.** The word "Creditor" means Eva Shih.

**Lender.** The word "Lender" means East West Bank, its successors and assigns.

**Note.** The word "Note" means the Note dated December 31, 2016 and executed by Vario Corp. in the principal amount of $2,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Superior Indebtedness.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**Subordinated Indebtedness.** The words "Subordinated Indebtedness" mean the indebtedness described in the section of this Agreement titled "Subordinated Indebtedness".

**Superior Indebtedness.** The words "Superior Indebtedness" mean the indebtedness described in the section of this Agreement titled "Superior Indebtedness".

**BORROWER AND CREDITOR EACH ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS SUBORDINATION AGREEMENT, AND BORROWER AND CREDITOR EACH AGREE TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 31, 2016.**

**Loan No:** Redacted

### SUBORDINATION AGREEMENT
### (Continued)

**Page 4**

BORROWER:

VARIO CORP.

By: _____
    Eva Shih, President of Vario Corp.

CREDITOR:

X _____
  Eva Shih, Individually

LaserPro, Ver. 16.2.0.015 Copr. D+H USA Corporation 1997, 2016.   All Rights Reserved.   - CA  E:\PROD\LOANDOC\CFI\LPL\F10.FC  TR-25740  PR-11

# REAFFIRMATION OF SUBORDINATION AGREEMENT

| Borrower: | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA 91710 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA 91731 |
|---|---|---|---|

Re: Loan #: Redacted

The undersigned Creditor has executed a Subordination Agreement (the "Subordination Agreement") dated as of December 31, 2016, in favor of Lender subordinating to Lender obligations owing to it by Borrower. The undersigned respectively represents and agrees that it has reviewed and approved the foregoing Change in Terms Agreement and/or Modification Agreement and it hereby reaffirms the Subordination Agreement.

Agreed and acknowledged as of May 16, 2017:

CREDITOR:

Eva Shih.

LaserPro, Ver. 17.1.10.015 Copr. D+H USA Corporation 1997, 2017. All Rights Reserved. - CA E:\PROD\LOANDOC\CFI\LPL\G52.FC T6-25749 PR-11

# REAFFIRMATION OF SUBORDINATION AGREEMENT

| Borrower: | Vario Corp.<br>14020 Central Avenue Unit #590<br>Chino, CA  91710 | Lender: | East West Bank<br>Loan Servicing Department<br>9300 Flair Drive, 6th Floor<br>El Monte, CA  91731 |
|---|---|---|---|

Re:  Loan Redacted

The undersigned Creditor has executed a Subordination Agreement (the "Subordination Agreement") dated as of December 31, 2016, in favor of Lender subordinating to Lender obligations owing to it by Borrower.  The undersigned respectively represents and agrees that it has reviewed and approved the foregoing Change in Terms Agreement and/or Modification Agreement and it hereby reaffirms the Subordination Agreement.

**Agreed and acknowledged as of February 16, 2018:**

CREDITOR:

Eva Shih.

LaserPro, Ver. 17.3.0.019 Copr. D+H USA Corporation 1997, 2018.  All Rights Reserved.  - CA  E:\PROD\LOANDOC\CFILPL\G60.FC  TR-25740  PR-11

# iLien Cover Page

Date Printed: 01/06/2017

Debtor:
Eva  Shih
1582 Pleasant Hill Drive
Chino Hills, CA  91709

Cost Center:  322
Loan Number:  Redacted
REF3:
Loan Type:
Ref5:
Employee Name:  Lois Chiang
Ref7:
Law Firm Bill Code:

iLien File #:  Redacted
Order Confirmation #:  Redacted

UserID:  Redacted
UserName:  JENNY  LLAMAS
Number of Collateral Pages Attached: 0

Transaction Type:  Original
Jurisdiction:  CA, Secretary of State

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

CT Lien Solutions
Representation of filing

**This filing is Completed**
File Number : 177564826804
File Date  : 06-Jan-2017

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Phone: Fax:

**B. E-MAIL CONTACT AT FILER (optional)**
jllamas@eastwestbank.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)** 23797 - EAST WEST

East West Bank          57134718
9300 Flair Drive
6th Floor              CALI
El Monte, CA  91731

File with: Secretary of State, CA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| Shih | Eva | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1582 Pleasant Hill Drive | Chino Hills | CA | 91709 | USA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name: do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| East West Bank | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 9300 Flair Drive, 6th Floor | El Monte | CA | 91731 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All Trademarks including but not limited to the following:

1. United States Serial #86691523 with a filing date of 07-13-2015 and Registration #4940000 with a filing date of 04-19-2016.

Owner: Eva Shih ; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and accounts proceeds)

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
57134718          322                                    3803078

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**

Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# iLien Cover Page

Date Printed: 01/06/2017

Debtor:
Vario Corp.
14020 Central Avenue Unit #590
Chino, CA 91710

Cost Center: 322
Loan Number: <span style="color:red">Redacted</span>
REF3:
Loan Type:
Ref5:
Employee Name: Lois Chiang
Ref7:
Law Firm Bill Code:

iLien File #: <span style="color:red">Redacted</span>
Order Confirmation #: <span style="color:red">Redacted</span>

UserID: <span style="color:red">Redacted</span>
UserName: JENNY LLAMAS
Number of Collateral Pages Attached: 0

Transaction Type: Original
Jurisdiction: CA, Secretary of State

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**CT Lien Solutions**
Representation of filing

**This filing is Completed**
File Number : 177564826662
File Date   : 06-Jan-2017

A. NAME & PHONE OF CONTACT AT FILER (optional)
Phone:     Fax:

B. E-MAIL CONTACT AT FILER (optional)
jllamas@eastwestbank.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   23797 - EAST WEST

East West Bank                    57134684
9300 Flair Drive
6th Floor                         CALI
El Monte, CA 91731

File with: Secretary of State, CA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Vario Corp. | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 14020 Central Avenue Unit #590 | Chino | | CA | 91710 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| East West Bank | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 9300 Flair Drive, 6th Floor | El Monte | | CA | 91731 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter-of-credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all oil, gas and other minerals before extraction; all oil, gas, other minerals and accounts constituting as-extracted collateral; all fixtures; all timber to be cut; all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property; all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; all good will relating to the foregoing property; all records and data and embedded software relating to the foregoing property, and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
57134684               322               3803078

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>VARIO CORP.,<br><br>            Debtor. | CASE NO.  6:18-bk-19730-WJ<br><br>Chapter 11<br><br>Declaration of Frank Chan in Support of Motion for Approval of Application of Pledged East West Bank Account in Payment of Secured Debt Owed to East West Bank<br><br><u>Hearing</u><br>Date: March 5, 2019<br>Time: 10:00 a.m.<br>Place: Courtroom 304<br>3420 Twelfth Street<br>Riverside, CA 92501 |

I, Frank Chan, declare as follows:

1.    I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I am over 18 years of age. I have knowledge regarding Debtor's obligations to and transactions with East West Bank that are the subject of this Declaration because I am employed by East West Bank as Senior Vice President, Special Assets Group, and have previously had personal involvement with Debtor's obligations to EWB.

2. East West Bank is a depositary and lending institution the accounts of which are insured by the Federal Deposit Insurance Corporation. East West Bank is creditor of the Debtor under a revolving loan agreement secured by a lien on Debtor's inventory, accounts receivable and general intangibles, and a deposit account, and claiming a first in priority lien on those assets.

3. I am one of the custodians of the books, records and files of East West

ELMER DEAN MAKLIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

-1-

Motion Exhibit 4 Page 0088

Bank that pertain to loans and extensions of credit given to Debtor concerning the Property. I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of East West Bank on behalf of East West Bank, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of East West Bank's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of East West Bank by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. The business records are available for inspection and copies can be submitted to the court if required.

4. This declaration is offered in support of Motion for Approval of Application of Pledged East West Bank Account in Payment of Secured Debt Owed to East West Bank

5. Attached to the Motion are true and correct copies of the following documents:

    a. Proof of Claim filed by East West Bank in the above captioned case the attachments to which are true and correct copies of the documents which relate to the indebtedness of Debtor to East West Bank, including the Assignment of Deposit Account executed by Debtor on December 31, 2016. The Deposit Account referenced in that Assignment has been maintained continually since December 31, 2016 as it was maintained on that date. As indicated in the loan documents the loan in issue matured on December 31, 2018. Under the terms of the Assignment East West Bank may "take directly all funds in the Account and apply them to the Indebtedness." Indebtedness is defined as the EWB Prepetition Indebtedness as defined in the Cash Collateral Agreement a true and correct copy of

ELMER DEAN MAKLIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

-2-

Motion Exhibit 4 Page 0089

which is attached as Exhibit 1 of the Motion.  The Proof of Claim is attached as Exhibit 3 of the Motion;

    b.  Cash Collateral Stipulation which is attached as Exhibit 1 of the Motion;

    c.  Order approving the Cash Collateral Stipulation which is attached as Exhibit 2 of the Motion and of which this Court may take judicial notice of the existence and content thereof.

    6.  Attached hereto is a copy of a UCC lien search report which I obtained for the purpose of determining what UCC lien notices have been filed with the California Secretary of State relating to liens against the Debtor in the above captioned case.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed January *30* , 2019 at Pasadena, California

Frank Chan
Senior Vice President, Special Assets Group
East West Bank

ELMER DEAN MAKLIN III
POST OFFICE BOX 4670
DIAMOND BAR, CALIFORNIA 91765
(909)861-6700

c:/winword/pleadings/1t5633

Motion Exhibit 4 Page 0090

Lien Solutions
UCC Search Report

The following represents a listing of the documentation you requested through a search of effective UCC filings recorded in the Office of the Secretary of State of California. Variations of the Name and Address of the search key may appear on this report as a result of the search findings and your individual request for that information.

Because Lien Solutions cannot independently verify the accuracy of the public information maintained by the responsible government agency or other sources of this data, we make no guaranties, representations or warranties as to the accuracy or completeness of this report. In addition, we cannot verify whether any personally identifiable information (such as social security numbers or similar personal information) is included in these results, and to the extent such personally identifiable information is included, you agree that you will not use such information in violation of any applicable law. Lien Solutions cannot and does not accept any liability for delays, errors or omissions in the information provided, nor do we accept any liability with respect to the disclosure or your use of any information or record that may include personally identifiable information.

Lien Solutions is not an insurer with regard to this information or these services. Under no circumstances shall Lien Solutions be liable for any loss of underlying collateral or loss (or decreased priority) of security interest in connection with this information or these services. Any categorization of search results is provided for convenience only and is not to be construed as a legal opinion concerning the status of filings.

**THIS DATA IS FOR INFORMATION PURPOSES ONLY. CERTIFICATION CAN ONLY BE OBTAINED THROUGH THE APPROPRIATE OFFICE OF THE STATE OF CALIFORNIA.THIS DATA IS NOT AN OFFICIAL RECORD OF THE STATE OF CALIFORNIA.**

This report reflects records effective 11/09/2018

| | |
|---|---|
| **Order No** | 67424712 |
| **User Name** | LI SUN |
| **Cost Center** | 322 |
| **Loan Number** | Ref2 |
| **REF3** | Ref3 |
| **Loan Type** | Ref4 |
| **Ref5** | Ref5 |
| **Employee Name** | Ref6 |
| **Ref7** | Ref7 |
| **Law Firm Bill Code** | legalbillcode |

**State of California UCC Debtor Name Search results performed on the following Search Key**
**Name = VARIO CORP**
**Exp./Term. Liens = No**

Active

1    **187675028812 filed on 10/10/2018 at 1248**
     **expires on 10/10/2023**
     Debtor      SHIH SHUCHUAN
                 14020 CENTRAL AVE STE 590
                 CHINO NY 91710

     Debtor      VARIO CORP
                 14020 CENTRAL AVE STE 590
                 CHINO CA 91710

     Sec.Pty.    BUSINESS MERCHANT FUNDING
                 1022 AVENUE M
                 BROOKLYN NY 11230

Motion Exhibit 4 Page 0091

**2    187683068249 filed on 11/15/2018 at 1324**
**expires on 11/15/2023**

| Debtor | DEERPORT DECOR CORP |
|---|---|
| | 14020 CENTRAL AVE, UNIT 590 |
| | CHINO CA 91710 |

| Debtor | MEILO CREATION, LLC |
|---|---|
| | 14020 CENTRAL AVE, UNIT 590 |
| | CHINO CA 91710. |

| Debtor | SHIH SHUCHUAN |
|---|---|
| | 1582 PLEASANT HILL DR |
| | CHINO HILLS CA 91709 |

| Debtor | VARIO CORP |
|---|---|
| | 14020 CENTRAL AVE STE 590 |
| | CHINO CA 91710 |

| Sec.Pty. | ACE FUNDING SOURCE LLC, |
|---|---|
| | 366 NORTH BROADWAY |
| | JERICHO NY 11753 |

**3    177564826662 filed on 01/06/2017 at 0808**
**expires on 01/06/2022**

| Debtor | VARIO CORP. |
|---|---|
| | 14020 CENTRAL AVENUE UNIT #590 |
| | CHINO CA 91710 |

| Sec.Pty. | EAST WEST BANK |
|---|---|
| | 9300 FLAIR DRIVE, 6TH FLOOR |
| | EL MONTE CA 91731 |

**4    187680244222 filed on 10/30/2018 at 1247**
**expires on 10/30/2023**

| Debtor | DEERPORT DECOR CORP. |
|---|---|
| | 14020 CENTRAL AVE. #590 |
| | CHINO CA 91710 |

| Debtor | MEILO CREATION, LLC |
|---|---|
| | 14020 CENTRAL AVE. #590 |
| | CHINO CA 91710 |

| Debtor | SHIH SHUCHUAN EVA |
|---|---|
| | 14020 CENTRAL AVE. #590 |
| | CHINO CA 91710 |

| Debtor | VARIO CORP. |
|---|---|
| | 14020 CENTRAL AVE. #590 |
| | CHINO CA 91710 |

| Debtor | VARIO CORPORATION / MELIO CREATION |
|---|---|
| | 14020 CENTRAL AVE. #590 |
| | CHINO CA 91710 |

| Sec.Pty. | KINGS CASH GROUP |
|---|---|
| | 30 BROAD ST, STE 1201 |

NEW YORK NY 10004

**5    187680246628 filed on 10/30/2018 at 1248**
**expires on 10/30/2023**

**Debtor**      MEILO CREATION, LLC
             14020 CENTRAL AVE
             CHINO CA 91710

**Debtor**      SHIH SHUCHUAN
             1582 PLEASANT HILL DR
             CHINO HILLS CA 91709

**Debtor**      VARIO CORP.
             14020 CENTRAL AVE
             CHINO CA 91710

**Sec.Pty.**    ASSN COMPANY
             P.O. BOX 2576
             SPRINGFIELD IL 62708

                                          Terminated

**6    147413252675 filed on 05/27/2014 at 0931**
**expires on 05/27/2019**

**Debtor**      VARIO CORP.
             14020 CENTRAL AVE. #590
             CHINO CA 91710

**Sec.Pty.**    CATHAY BANK
             9650 FLAIR DRIVE, 3RD. FLOOR
             EL MONTE CA 91731

**1775697349**   filed on 02/06/2017
**Termin.**

**7    187657086199 filed on 07/03/2018 at 0729**
**expires on 07/03/2023**

**Debtor**      MEILO CREATION, LLC
             14020 CENTRAL AVE #590
             CHINO CA 91710

**Debtor**      VARIO CORP.
             14020 CENTRAL AVE #590
             CHINO CA 91710

**Sec.Pty.**    ASSN COMPANY
             P.O. BOX 2576
             SPRINGFIELD IL 62708

**1876571001**   filed on 07/03/2018
**Termin.**

**8    187654650557 filed on 06/18/2018 at 1357**
**expires on 06/18/2023**
**Debtor**

VARIO CORP. / MEILO CREATION, LLC
14020 CENTRAL AVE #590
CHINO CA 91710

**Sec.Pty.**    <mark>ASSN COMPANY</mark>

P.O. BOX 2576
SPRINGFIELD IL 62708

**1876570934**    filed on 07/03/2018
<mark>Termin.</mark>

**9**    **187657086210 filed on 07/03/2018 at 0730**
**expires on 07/03/2023**
**Debtor**    VARIO CORP. / MEILO CREATION, LLC
14020 CENTRAL AVE #590
CHINO CA 91710

**Sec.Pty.**    <mark>ASSN COMPANY</mark>

P.O. BOX 2576
SPRINGFIELD IL 62708

**1876571002**    filed on 07/03/2018
<mark>Termin.</mark>

Report generated on 11/19/2018 at 12:16 PM CST

[End of Report]



| Fill in this information to identify the case: | |
|---|---|
| Debtor 1 | Vario Corp. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 6:18-bk-19730 WJ |

Filed in SA

FILED

DEC 06 2018

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

RC'd in ILS on 12/10/

## Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:    Identify the Claim

| | | |
|---|---|---|
| 1. Who is the current creditor? | Business Merchant Funding | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes.  From whom? _____ | |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>Jason Gang, Esq.<br>Name<br><br>1245 Hewlett Plaza, #478<br>Number      Street<br><br>Hewlett      NY      11557<br>City      State      ZIP Code<br><br>Contact phone 6463895610<br><br>Contact email jason@jasongang.com | Where should payments to the creditor be sent? (if different)<br><br>Jason Gang, Esq.<br>Name<br><br>1245 Hewlett Plaza, #478<br>Number      Street<br><br>Hewlett      NY      11557<br>City      State      ZIP Code<br><br>Contact phone 6463895610<br><br>Contact email jason@jasongang.com |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____ | Filed on _____<br>MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ | |

Motion Exhibit 5 Page 0095

**Part 2:** **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No <br> ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

7. **How much is the claim?**  $_____313,203.23_  Does this amount include interest or other charges?

    ☑ No

    ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

    Purchase of Receivables

9. **Is all or part of the claim secured?**

    ☐ No

    ☑ Yes.  The claim is secured by a lien on property.

        **Nature of property:**

        ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

        ☐ Motor vehicle

        ☑ Other. Describe: _____

        **Basis for perfection:**  _____UCC_____

        Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

        **Value of property:**  $_____

        **Amount of the claim that is secured:**  $____313,203.23___

        **Amount of the claim that is unsecured:**  $_____0.00_ (The sum of the secured and unsecured amounts should match the amount in line 7.)

        **Amount necessary to cure any default as of the date of the petition:**  $_____

        **Annual Interest Rate** (when case was filed) _16.00_ %

        ☑ Fixed

        ☐ Variable

10. **Is this claim based on a lease?**

    ☑ No

    ☐ Yes. Amount necessary to cure any default as of the date of the petition.  $_____

11. **Is this claim subject to a right of setoff?**

    ☑ No

    ☐ Yes. Identify the property: _____

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  12/03/2018
                  MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Jason | Adam | Gang |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    Attorney for Creditor

Company    The Law Office of Jason Gang
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    1245 Hewlett Plaza, #478
           Number    Street
           Hewlett                          NY      11557
           City                             State   ZIP Code

Contact phone    6463895610          Email jason@jasongang.com

# iLien Cover Page

Date Printed: 10/10/2018

Debtor:
VARIO CORP
14020 CENTRAL AVE STE 590
CHINO, CA 91710

Syndicate Account #: 2
Client Business Name: VARIO CORP
REF3:
REF4:
Ref5:
Ref6:
Ref7:
Law Firm Bill Code:

iLien File #: 69430918
Order Confirmation #: 66872307

UserID: 254726
UserName: Binie Borenstein
Number of Collateral Pages Attached: 0

Transaction Type: Original
Jurisdiction: CA, Secretary of State

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Phone: (800) 331-3282 Fax: (818) 662-4141 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)   36303 - EMPIRE

Lien Solutions
P.O. Box 29071
Glendale, CA  91209-9071

66872307

CALI

File with: Secretary of State, CA

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| VARIO CORP | | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 14020 CENTRAL AVE STE 590 | CHINO | CA | 91710 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| SHIH | SHUCHUAN | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 14020 CENTRAL AVE STE 590 | CHINO | NY | 91710 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Business Merchant Funding | | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1022 Avenue M | Brooklyn | NY | 11230 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All Assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets:
a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credits Rights; j. General Intangibles; k. Supporting Obligations; and l. Proceeds and Products of the foregoing.
NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS
AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN, THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCE IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

| 8. OPTIONAL FILER REFERENCE DATA: | | |
|---|---|---|
| 66872307                    2 | | VARIO CORP |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Motion Exhibit 5 Page 0099

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282



**BUSINESS MERCHANT FUNDING** — SECURED MERCHANT AGREEMENT

Agreement dated 10/31/18 _____ between Business Merchant Funding ("BMF") and the merchant listed below ("the Merchant").

Merchant's Legal Name: VARIO CORP

D/B/A: VARIO

Physical Address: 14020 CENTRAL AVE STE 590

City: CHINO      State: CA      Zip: 91710

[✓] Same as Physical Address
Mailing Address: 14020 CENTRAL AVE STE 590

City: CHINO      State: CA      Zip: 91710

Type of Entity (check one):  [✓] Corporation  [ ] Limited Liability Company  [ ] Limited Liability Partnership  [ ] Limited Partnership  [ ] Sole Proprietor

## PURCHASE AND SALE OF FUTURE RECEIVABLES

*[fine print paragraphs — illegible]*

PURCHASE PRICE: $ 175,000.00      SPECIFIED PERCENTAGE: 10%      RECEIPTS PURCHASED AMOUNT: $ 262,325.00

THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM" HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.

MERCHANT #1 (Print Name)
By: First Name SHUCHUAN EVA      Last Name SHIH
Title: OWNER

MERCHANT #2 (Print Name)
By: First Name _____      Last Name _____
Title: _____

OWNER/GUARANTOR #1 (Print Name)
By: First Name SHUCHUAN EVA      Last Name SHIH
Title: OWNER

OWNER/GUARANTOR #2 (Print Name)
By: First Name _____      Last Name _____
Title: _____

BUSINESS MERCHANT FUNDING
By (Company Officer): _____      Sales Associate Name (Signature): _____

ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.

Rev. 09/18

MERCHANT AGREEMENT TERMS AND CONDITIONS

## 1 TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to BMF with a Bank acceptable to BMF to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to BMF with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide BMF and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes BMF and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to BMF for the receipts as specified herein and to pay such amounts to BMF. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by BMF or not. This additional authorization is not a waiver of BMF's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which BMF did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of BMF.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by BMF as per the terms of this Agreement.

**1.3 Future Purchase of Increments.** Subject to the terms of this Agreement, BMF offers to purchase additional Receipts in the "Increments" stated in on Page 1 of this Agreement, if any. BMF reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion.

**1.4 Adjustments to the Remittance.** If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to BMF to request a decrease in the Remittance. The amount shall be decreased if the amount received by BMF was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide BMF with viewing access to their bank account as well as all information reasonably requested by BMF to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined and limited) authorize BMF and its agents to investigate their financial responsibility and history, and will provide to BMF any authorizations, bank or financial statements, tax returns, etc., as BMF deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. BMF is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6 Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide BMF with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide BMF with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from BMF.

**1.7 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by BMF for monies owed to BMF from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by BMF.

**1.8 No Liability.** In no event will BMF be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of BMF's attorney's fees and expenses resulting therefrom.

**1.9 Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of BMF, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**1.10 Sale of Receipts.** Merchant and BMF agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from BMF to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. BMF has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to BMF in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products

and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that BMF has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and BMF shall promptly refund to Merchant any interest received by BMF in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that BMF not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11 Power of Attorney.** Merchant irrevocably appoints BMF as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to BMF from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause

(ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to BMF; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which BMF may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant and BMF is authorized to use Merchant's funds to pay for same; and (vii) BMF shall have the right, without waiving any of its rights and remedies and without notice to Merchant or any Owner/Guarantor, to notify any credit card processor of the sale of future payment rights and re-direct the remittance of daily settlements to an account of BMF's choosing in order to settle all obligations due to BMF under this Agreement.

**1.12 Protections against Default.** The following Protections 1 through 8 may be invoked by BMF immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the BMF electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to BMF; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of BMF, and (ii) the written agreement of any BMF or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to BMF; (e) Merchant takes any action, fails to take any action, or offers any incentive- economic or otherwise- the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; or (f) Merchant fails to provide BMF with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from BMF. These protections are in addition to any other remedies available to BMF at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** BMF may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

INITIALS

Rev. 09/18

Protection 3. Merchant hereby authorizes BMF to execute in the name of the Merchant a Confession of Judgment in favor of BMF in the amount of Purchased Amount stated in the Agreement. Upon an Event of Default, BMF may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

Protection 4. BMF may enforce its security interest in the Collateral.

Protection 5. The entire Purchased Amount and all fee (including reasonable attorney's fees) shall become immediately payable to BMF from Merchant.

Protection 6. BMF may proceed to protect and enforce its right and rnedies by lawsuit. In any such lawsuit, if BMF recovers a Judgment against Merchant, Merchant shall be liable for all of BMF's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

Protection 7. This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to BMF. Upon breach of any provision in this Agreement, BMF may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. BMF may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to BMF.

1.13    **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes BMF to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that BMF obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against BMF or any of its affiliates relating to any (i)investigation undertaken by or on behalf of BMF as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.14    **Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by BMF, including this Agreement and any other BMF documents (collectively, "Confidential Information") are proprietary and confidential information of BMF. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of BMF to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles BMF to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

1.15    **Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes BMF to use its, his or her name in listings of clients and in advertising and marketing materials.

1.16    **D/B/A's.** Merchant hereby acknowledges and agrees that BMF may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between BMF and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

2       REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

2.1    **Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial statements, copies of which have been furnished to BMF, and future statements which will be furnished hereafter at the discretion of BMF, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise BMF of any material adverse change in their financial condition, operation or ownership. BMF may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to BMF within five business days after request from BMF. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

2.2    **Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

2.3    **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been dulyauthorized.

2.4    **Use of Funds.** Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

2.5    **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without BMF's prior written consent. Any such changes shall be a material breach of this Agreement

2.6    **Change of Name or Location.** Merchant will not conduct Merchant's businesses

under any name other than as disclosed to the Processor and BMF, nor shall Merchant change any of its places of business without prior written consent by BMF.

2.7    **Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

2.8    **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from BMF to Merchant, execute, acknowledge and deliver to BMF and/or to any other person, firm or corporation specified by BMF, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.9    **No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10    **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of BMF.

2.11    **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.12    **Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

2.13    **Good Faith.** Merchant and Guarantors hereby affirm that Merchant is receiving the Purchase Price and selling the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business.

3       EVENTS OF DEFAULT AND REMEDIES

3.1    **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a)    Merchant or Guarantor shall violate any term or covenant in this Agreement;

(b)    Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c)    the sending of notice of termination by Merchant or verbally notifying BMF of its intent to breach this Agreement;

(d)    the Merchant fails to give BMF 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, and the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e)    Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by seller to any other party.

(f) Merchant shall transfer or sell all or substantially all of its assets;

(g)    Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;

(h)    Merchant shall use multiple depository accounts without the prior written consent of BMF

(i)    Merchant shall change its depositing account without the prior written consent of BMF; or

(j)    Merchant shall close its depositing account used for ACH debits without the prior written consent of BMF

(k) Merchant's bank returns a code other than NSF cutting BMF from its collections

(l)    Merchant shall default under any of the terms, covenants and conditions of any other agreement with BMF.



INITIALS

4.2 Limited Personal Guaranty. In the Event of a Default, BMF will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to BMF for all of BMF's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3 Remedies. In case any Event of Default occurs and is not waived pursuant to Section 4.4. hereof, BMF may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of BMF in connection with this Agreement may be exercised at any time by BMF after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4 Costs. Merchant shall pay to BMF all reasonable costs associated with (a) an Event of Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of BMF's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.5 Required Notifications. Merchant is required to give BMF written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give BMF seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

4 MISCELLANEOUS

4.1 Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by BMF.

4.2 Assignment. BMF may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3 Notices. All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to BMF shall become effective only upon receipt by BMF. Notices to Merchant shall become effective three days after mailing.

4.4 Waiver Remedies. No failure on the part of BMF to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5 Binding Effect; Governing Law, Venue and Jurisdiction. This Agreement shall be binding upon and inure to the benefit of Merchant, BMF and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of BMF which consent may be withheld in BMF's sole discretion. BMF reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if BMF so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by BMF to transfer such proceeding to an Acceptable Forum.

4.6 Survival of Representation, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7 Interpretation. All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

4.8 Severability. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

4.9 Entire Agreement. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and BMF and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10 JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11 CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12 Facsimile & Digital Acceptance. Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

INITIALS

## BUSINESS MERCHANT FUNDING – SECURITY AGREEMENT AND GUARANTY

**Merchant's Legal Name:** VARIO CORP

**D/B/A:** VARIO

**Physical Address:** 14020 CENTRAL AVE STE 590

**City:** CHINO                          **State:** CA          **Zip:** 91710

**Federal ID#:** 46-1059358

### SECURITY AGREEMENT

Security Interest. This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant and Guarantor(s) grants to BMF a security interest and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to BMF under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to BMF upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover BMF's entitlements under this Agreement, BMF is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of BMF's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, BMF or an affiliate of BMF. BMF is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by BMF without notice or demand of any kind by making an immediate withdrawal of or freezing the Secured Assets. BMF shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, BMF has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets.

With respect to such security interests and liens, BMF will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from BMF written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor (s) agree(s) that this is a contract of recoupment and BMF is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by BMF. Merchant and Guarantor(s) agree(s) to execute and deliver to BMF such instruments and documents BMF may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. BMF is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

Merchant and Guarantor(s) each acknowledge and agree that any security interest granted to BMF under any other agreement between Merchant or Guarantor(s) and BMF (the "Cross Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s) each agrees to execute any documents or take any action in connection with this Agreement as BMF deems necessary to perfect or maintain BMF's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s) each hereby authorizes BMF to file any financing statements deemed necessary by BMF to perfect or maintain BMF's security interest. Merchant and Guarantor(s) shall be liable for, and BMF may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by BMF in protecting, preserving and enforcing BMF's security interest and rights.

### GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS

BMF as an additional inducement for BMF to enter into this Agreement, the undersigned Guarantor(s) hereby provides BMF with this Guaranty. Guarantor(s) will not be personally liable for any amount due under this Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of this Agreement. Each Guarantor shall be jointly and severally liable for all amounts owed to BMF in the Event of Default. Guarantor(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations").Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

Guarantor Waivers. In the event of a breach of the above, BMF may seek recovery from Guarantors for all of BMF's losses and damages by enforcement of BMF's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral BMF may hold pursuant to this Agreement or any other guaranty.

BMF does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) BMF's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to BMF. In addition, BMF may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to BMF; (ii) release Merchant from its obligations to BMF; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to BMF under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that BMF must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

Guarantor Acknowledgement. Guarantor acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (iii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

Rev. 09/18

**FILED**

**U.S. Bankruptcy Court**
**Central District of California**

1/14/2019

**Kathleen J. Campbell, Clerk**

**Fill in this information to identify the case:**

Debtor 1  **Vario Corp.**

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court  **Central District of California**

Case number:  **18–19730**

## Official Form 410
## Proof of Claim
04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:  Identify the Claim

**1. Who is the current creditor?**
Fora Financial West, LLC
Name of the current creditor (the person or entity to be paid for this claim)
Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**
☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**
Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?
Fora Financial West, LLC
Name
12 Powder Springs Street, Suite 240
Marietta, GA 30064

Contact phone  404–978–1355
Contact email  awalker@aubreyfirm.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

Where should payments to the creditor be sent? (if different)
Name
Contact phone
Contact email

**4. Does this claim amend one already filed?**
☑ No
☐ Yes. Claim number on court claims registry (if known)          Filed on          MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☑ No
☐ Yes. Who made the earlier filing?

Official Form 410                Proof of Claim                page 1

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: |

**7. How much is the claim?**  $ 219867.67

**Does this amount include interest or other charges?**
☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Money Loaned

**9. Is all or part of the claim secured?**

☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*
☐ Motor vehicle
☑ Other. Describe:    All of debtor's assets

**Basis for perfection:**    UCC Financing Statement

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $

**Amount of the claim that is secured:**  $ 219867.67

**Amount of the claim that is unsecured:**  $ 0.00    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $ 219867.67

**Annual Interest Rate** (when case was filed)  0.00  %

☑ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property:

Official Form 410    Proof of Claim    page 2

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No ☐ Yes. *Check all that apply:* | | Amount entitled to priority |
|---|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $ _____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $ _____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies    $ _____

* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
**18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    1/14/2019

MM / DD / YYYY

/s/  Anitra Walker

Signature

Print the name of the person who is completing and signing this claim:

| Name | Anitra Walker |
|---|---|
| | First name    Middle name    Last name |
| Title | Associate |
| Company | Aubrey Law Firm, PC |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 12 Powder Springs Street, Suite 240 |
| | Number   Street |
| | Marietta, GA 30064 |
| | City   State   ZIP Code |
| Contact phone | 404–978–1355    Email    awalker@aubreyfirm.com |

Official Form 410                              Proof of Claim                              page 3

# Addendum

### Pre-Payment Schedule

Except as provided below, Borrower may prepay this Loan in full by paying Lender the Pre-Payment Amount for the relevant pre-payment period, as set forth below, less the amount of any Loan payments made prior to the prepayment date, plus any unpaid fees or charges. The prepay period begins on the next calendar day following the date on which Lender distributed the loan proceeds to Borrower. In the event that a pre-payment discount's expiration date falls on a weekend or federal holiday, the expiration date shall become the following business day. A business day shall be Monday through Friday excluding any federal holidays or any dates that Lender is closed for business. Payment must be received by the lender (i.e. the date Lender's bank receives negotiable funds from Borrower) on or before the expiration date to receive the Pre-Payment Amount listed below.  Except as provided in this addendum, all terms and conditions of the Business Loan and Security Agreement and the Supplement shall remain in full force and effect.

***Borrower shall have no right to prepay this Loan if:***
- The funds come from Fora Financial West, LLC, a related entity, affiliate, assignee, or any another funding company in the form of a business loan or a merchant cash advance.
- There has been any delayed or missed payments.
- There has been any modifications to your agreement with Fora Financial West, LLC.
- There has been a breach or default of your agreement with Fora Financial West, LLC.

| | | | |
|---|---|---|---|
| Calendar Day 1-30 | $ 427,000.00 | Calendar Day 361-390 | $ |
| Calendar Day 31-60 | $ 427,000.00 | Calendar Day 391-420 | $ |
| Calendar Day 61-90 | $ 427,000.00 | Calendar Day 421-450 | $ |
| Calendar Day 91-120 | $ 441,000.00 | Calendar Day 451-480 | $ |
| Calendar Day 121-150 | $ 451,500.00 | | |
| Calendar Day 151-180 | $ 479,500.00 | | |
| Calendar Day 181-210 | $ 479,500.00 | | |
| Calendar Day 211-240 | $ 479,500.00 | | |
| Calendar Day 241-270 | $ 479,500.00 | | |
| Calendar Day 271-300 | $ 479,500.00 | | |
| Calendar Day 301-330 | $ | | |
| Calendar Day 331-360 | $ | | |

Initial Here: #1 _eS_   #2_____   #3_____   #4_____

Doc ID: 5fafee08dc5fcd2e29a69f020442c1da588fd266

Borrower(s):

| | |
|---|---|
| X: *Eva Shih* | X: |
| **Name:** SHUCHUAN Shih | **Name:** |
| **Title:** | **Title:** |
| **Date:** 05/24/2018 | **Date:** |
| X: | X: |
| **Name:** | **Name:** |
| **Title:** | **Title:** |
| **Date:** | **Date:** |

Fora Financial West, LLC

| |
|---|
| X: |
| **Name:** Fora Financial West, LLC |
| **Title:** |
| **Date:** May 24 2018 |

Doc ID: 5fafee08dc5fcd2e29a69f020442c1da588fd266



**Fora Financial West, LLC**
A member of Fora Financial™

**Authorization Agreement For
Direct Deposit (ACH Credit)
and Direct Payments (ACH Debits)**

*Licensed California Finance Lender, License # 603J080*

**This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.**

**DISBURSEMENT OF LOAN PROCEEDS.** *By signing below, Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit to the checking account indicated below (or a substitute checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it.*

**AUTOMATIC PAYMENT PLAN.** *Enrollment in Lender's Automatic Payment Plan is required for Loan approval. By signing below, Borrower agrees to enroll in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep Borrower's designated checking account in good standing or if there are insufficient funds in Borrower's checking account to process any payment. If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, Borrower still will be responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.*

**BUSINESS PURPOSE ACCOUNT.** *By signing below, Borrower attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.*

**ACCOUNT CHANGES.** *Borrower agrees to notify Lender promptly if there are any changes to the account and routing numbers of the Designated Checking Account.*

**MISCELLANEOUS.** *Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law.*

| Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) |
|---|
| *This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.* |

| Depository Name: East West Bank |
|---|

| Branch: 9300 Flair Drive, 4th Fl. |
|---|

| City: El Monte | State: CA | Zip: 91731 |
|---|---|---|

| Routing #. | Account #: |
|---|---|

| Business Name (Plus): VARIO CORP. / MEILO CREATION, LLC | Tax ID #: |
|---|---|

| Name (Sign): *Eva Shih* | Title: |
|---|---|

| Date: 05/24/2018 |
|---|

Case 6:18-bk-19730-WJ    Claim 4    Filed 02/01/19    Desc Attachment 1-3 Page 4 of 20

**Fora Financial West, LLC**
A member of Fora Financial™

## BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*Licensed California Finance Lender, License # 603J080*

### Business Loan & Security Agreement Supplement

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

**Borrower:** VARIO CORP. / MEILO CREATION, LLC dba VARIO CORP. / MEILO CREATION, LLC

**Lender:** Fora Financial West, LLC

**Disbursement Amount:** $ 350,000.00
*(Amount of Loan Less Origination Fee)*

**Amount of Loan ("Loan"):** $ 350,000.00

**Total Repayment Amount:** $ 479,500.00
*(Amount of Loan, Plus Interest Charge)*

**Payment Schedule:** 204 payments of $ 2,339.03 due each business day beginning on the first business day after the Loan Disbursement Amount is disbursed to you, followed by a final payment of $ 2,337.88.

*("Business Day" means any Monday through Friday, except for Federal Reserve holidays )*

**Interest Charge:** Total Interest Paid: $ 129,500.00
*(Dollar amount of interest excluding fees)*

**Fees:**
Origination Fee: $ 0.00
Insufficient Funds Fee: $ 15.00
Wire Transfer Fee: $ 50.00
*If you elect to receive your funds via wire transfer, a separate fee may be deducted directly from your bank account in the amount indicated above.

### Borrower's Information

| | |
|---|---|
| **DBA:** VARIO CORP. / MEILO CREATION, LLC | Legal Entity: Corporation |
| **Business Legal Name:** VARIO CORP. / MEILO CREATION, LLC | |

| | | | |
|---|---|---|---|
| Address: 14020 Central Ave | City: Chino | State: CA | Zip: 91710 |
| Business Phone: (909) 627-5036 | Fax #: | | |
| Federal State # (Tax ID): | Mobile #: | | |
| Website: http://www.meilocreation.com/ | Email: eva.shih@meilocreation.com | | |

2017-01-03 18 CON AUTH FFW (FP)    Page: 2    Initial Here: #1 _es_    #2 _____    #3 _____    #4 _____

Doc ID: 5fafee08dc5fcd2e29a69f020442c1da588fd266

**BUSINESS LOAN AND SECURITY AGREEMENT**

**1.   INTRODUCTION.** This Business Loan and Security Agreement ("Agreement") governs your business loan ("Loan") from Fora Financial West, LLC. Please read it and keep it for your reference.   In this Agreement, the words "you," "your" and "Borrower" mean each individual or entity that signs this Agreement or on whose behalf this Agreement is signed.   The words "Lender", "we", "us", and "our" mean Fora Financial West, LLC or its successor(s) and assign(s). To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies every customer. What this means to you: When you apply for a loan, we will ask your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**2.   AUTHORIZATION.**   Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

**3.   LOAN FOR SPECIFIC PURPOSES ONLY.       Borrower certifies that the Loan proceeds will be used for business purposes only and will not be used for personal, family or household purposes. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to the Loan or the Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Loan conforms to this section and Borrower acknowledges and agrees that Lender is relying on Borrower's representations and agreements concerning the Loan purpose. Borrower agrees that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Loan is in fact obtained or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Loan been made for consumer purposes.**

**4.   DISBURSEMENT OF LOAN PROCEEDS.**   If Borrower applied and was approved for a Loan, Borrower's Loan will be disbursed upon approval as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits).

**5.   PROMISE TO PAY.**   Borrower agrees to pay Lender the Total Repayment Amount shown in the accompanying Business Loan and Security Agreement Supplement in accordance with the Payment Schedule shown in the Business Loan and Security Agreement Supplement.   Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to collect required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). If Lender debits from the Designated Checking Account any amount greater than the amount permitted under this Agreement (an "Unauthorized Amount"), Lender shall refund the Unauthorized Amount to Borrower within a reasonable time.

**6.   DEFAULT.** To the extent not prohibited by applicable law, the occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment on three consecutive dates due and/or, Borrower fails to pay any Obligations on three consecutive dates due; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower to Lender, in any documents, instrument, agreement, or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9–102 of the Uniform Commercial Code, to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower; (xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee; (xvi) the of-

Initial Here: #1 _____  #2 _____  #3 _____  #4 _____

fering by or against Borrower or any composition, extension or other arrangement seeking an extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a reorganization or arrangement with creditors; (xvii) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower; (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower; (xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any guarantor of Borrower denies it has any further liability or obligation hereunder; (xxiv) any guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his guaranty or support agreement in favor of Lender or any corporate guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) Borrower dies; if Borrower is a sole proprietorship, the owner dies; if Borrower is a trust, a trustor dies; if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 10% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies.

**7. RIGHTS AND REMEDIES UPON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. <u>Refrain from Disbursing Loan Proceeds</u>: Lender may refrain from disbursing Borrower's Loan proceeds to Borrower's Designated Checking Account.

B. <u>Debit Amounts Due From Borrower's Accounts</u>: Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

C. <u>Accelerate Indebtedness</u>: Lender may declare the entire Obligations immediately due and payable, without notice of any kind to Borrower.

D. <u>Assemble Collateral</u>: Lender may require Borrower to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower after repossession.

E. <u>Sell the Collateral</u>: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent not prohibited by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

F. <u>Appoint Receiver</u>: Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employ-

G.  Collect Revenues, Apply Accounts: Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender and/or may notify any merchant processors to remit to Lender any and all amounts received by the merchant processors from charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions.

H.  Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

I.  Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

J.  Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**8. ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must promptly mail or deliver a check to Lender in the amount of the missed payment or, if offered, make the missed payment by any pay-by-phone or on-line service that Lender may make available from time to time. If Borrower elects to send payments on Borrower's Account by postal mail, then Borrower agrees to send such payments to **Fora Financial West, LLC, 242 West 36th Street, 14th floor, New York, New York 10018 or such other address as Lender notifies Borrower in writing.** All alternative payments must be made in good funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting. If Borrower makes an alternative payment on Borrower's Loan by mail or by any pay-by-phone or on-line service that Lender makes available while Borrower is enrolled in the Automatic Payment Plan, Lender may treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments or may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received, in Lender's sole discretion.

**9. APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to apply payments to Borrower's Loan in any manner Lender chooses in Lender's sole discretion.

**10. POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement. (A postdated check is a check dated later than the day it was actually presented for payment.) Lender is under no obligation to hold a post dated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any post-dated check. **Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be delivered to Fora Financial West, LLC, 242 West 36th Street, 14th floor, New York, New York 10018 or such other address as Lender notifies Borrower in writing.**

**11. SECURITY INTEREST.** Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of

Borrower to Lender of liabilities and Claims and other indebtedness and obligations of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not such obligations are related to the Loan described in this Agreement, by class, or kind, or whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, other fees and expenses (all hereinafter called "Obligations").   The Collateral includes all Assets that Borrower now owns  or  hereafter acquires and wherever located including without limitation:  (i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions; and (ii) all other tangible and intangible personal property,  including,  but not limited   to   (a) inventory,   (b) equipment, (c) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts,  (d) instruments,  including  promissory notes  (e)  chattel  paper, including tangible chattel paper and electronic chattel paper, (f) documents, (g) letter  of  credit rights,  (h)  accounts,  including  healthcare  insurance receivables, (i) deposit accounts, (j) commercial tort claims, (k) general intangibles, including payment intangibles and software and (l) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code.  The security interest Borrower grants includes all acces-sions, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.  Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest.

**12. PROTECTING THE SECURITY INTEREST.** Borrower agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender and Lender's Repre-sentative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems neces-sary to protect Lender's security interest in the Collateral, and that any financing statement may state that Borrower is prohibited from pledging or selling any receivables owing to Borrower now or in the future to any person or entity other than Lender during the term of this Agreement. In this Agreement "Lender's Representative" means any entity or individual affiliated with Lender that is designated by Lender to serve in such capacity.

**13. LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.**   Unless Lender has agreed otherwise in writing,  Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel pa-per and general intangibles) shall be located at Borrower's address as shown in the application, (ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about in writing, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement, (v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof, and (vi) Bor-rower shall not enter into any agreement that relates to or involves the pledge or sale of any receivables owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card,debit card or Electronic Benefit Transfer transactions.  Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons.   All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender.   This requirement, however, does not constitute consent by Lender to any such disposition.

**14. TAXES, ASSESSMENTS AND LIENS.**  Borrower will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Lender upon request.

**15. INSURANCE.**  Borrower shall procure and maintain such insurance as Lender may require with respect to the Col-lateral, in, form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably accept-able to Lender naming Lender as loss payee.  If Borrower at any time fails to obtain or maintain any insurance as required under  this Agreement, Lender may obtain such insurance, or obtain insurance that covers only Lender's interest, as Lender deems appropriate. Borrower shall promptly notify Lender of any loss of or damage to the Collateral.

**16. REPAIRS AND MAINTENANCE.**  Borrower agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect.  Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**17. INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS  AND  TESTIMONIALS.** Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Bor-

Initial Here: #1 _____  #2 _____  #3 _____  #4 _____

rower place of business or a personal residence is served. Lender may examine, among other things, whether Borrower (i) has a place of business that is separate from a personal residence, (ii) is open for business, (iii) has sufficient inventory to conduct Borrower's business and (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory.  Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower.  Any photograph and testimonial will become and remain the sole property of Lender.  Borrower and each Signatory grant Lender the irrevocable and permanent right to display and share any photograph and testimonial in all forms and media, including composite and modified representations, for all purposes, including but not limited to any trade or commercial purposes with any Lender employees and agents and with the general public.  Lender, may, but is not required to use the name of any Borrower and Signatory as a credit in connection with any photograph and testimonial. Borrower and each Signatory waive the right to inspect or approve versions of any photograph or testimonial or the written copy or other media that may be used in connection with same. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

**18. LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent not prohibited by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**19. BORROWER'S REPRESENTATIONS AND WARRANTIES.**  Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the exact legal name of the Borrower is set forth in the application; (v) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other organization papers, or of any indenture, agreement or undertaking to which Borrower is a party; (vi) all organization papers and all amendments thereto of Borrower have been duly filed and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (vii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its organization documents and by-laws, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of the Collateral; (viii) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral; and (ix) the Loan proceeds will only be used for non-personal, household, and/or household purposes and only as provided in the Use of Proceeds Certification below.

**20. INTEREST AND FEES.** Borrower agrees to pay the Interest Charge in full as set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in the Agreement, Borrower agrees to pay the following fees:

A. Origination Fee: A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

B. Returned Payment Fee: A Returned Payment Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if any payment made on Borrower's Loan is returned unpaid or dishonored (including any payment made via ACH or debit) for any reason.

C. Late Fee: A Late Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if a scheduled payment is not received by Lender as provided in the payment schedule set forth in the Business Loan and Security Agreement Supplement.

**21. INTEREST AND FEE REFUNDS.** If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

**22. FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower and each guarantor (if any) authorize Lender to obtain business and personal credit bureau reports in Borrower's and any guarantor's name, respectively, at any time and from time to time for purposes of deciding whether to approve the requested Loan or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's or any guarantor's request, Lender will advise Borrower or guarantor if Lender obtained a credit report and Lender will give Borrower or guarantor the credit bureau's name and address. Borrower and each guarantor (if any) agree to submit current financial information, a new credit application, or both, in Borrower's name and in the name of each guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may report Lender's credit experiences with Borrower and any guarantor of Borrower's Loan to third parties as permitted by law. Borrower also agrees that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Borrower also agrees to allow Lender to share information regarding this Agreement with any trade association or similar group.

**23. ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Borrower's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security, and shall be secured hereby.

**24. BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each guarantor agrees to provide Lender with such information about the financial condition and operations of Borrower or any guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to provide notice thereof to Lender in writing.

**25. INDEMNIFICATION.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of this Agreement.

**26. MERGERS, CONSOLIDATIONS OR SALES.** Borrower covenants that Borrower will not (i) merge or consolidate with or into any other business entity or (ii) enter into any joint venture or partnership with any person, firm or corporation.

**27. CHANGE IN LEGAL STATUS.** Borrower covenants that Borrower will not (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure. If Borrower does not have an organizational identification number and later obtains one, Borrower shall forthwith notify Lender of such organizational identification number.

**28. CONSENT TO JURISDICTION AND VENUE.** Borrower and Lender agree that any action or proceeding to enforce or arising

Initial Here: #1 _____  #2 _____  #3 _____  #4 _____

out of this agreement or any action or proceeding concerning it shall be filed in the courts located in the County of Los Angeles, in the State of California, in the United States Central District of California and Borrower waives any provision of law or statute that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Borrower, or as otherwise provided by the laws of the State of California, or the United States of America. Borrower and Lender agree that venue is proper in such courts.

**29. NO WAIVER BY LENDER.**  No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right.  Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.  All Lender's rights and remedies, whether evidenced by any or other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

**30. ASSIGNMENT.**  This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely void.  No consent to an assignment by Lender shall release Borrower from its Obligations.  Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment.  Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder.  In connection with any assignment or participation, Lender may  disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business.  To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party.

**31.  INTERPRETATION.**     Paragraph and section headings used  in  this Agreement are for convenience only, and shall not affect the construction of this Agreement.  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**32. SEVERABILITY.**  If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in  any  jurisdiction,  the  same  shall  not  invalidate  or  render  illegal  or  unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**33. NOTICES.**  Except as otherwise provided in this Agreement, notice under this  Agreement must be in writing.   Notices will be deemed given when deposited in the U.S. mail, postage prepaid, first class mail; when delivered in person; or when sent by registered mail; by certified mail; or by nationally recognized overnight courier.  Notice to Borrower will be sent to Borrower's last known address in Lender's records for this Loan.  Notice to Lender may be sent to:  **Fora Financial West, LLC, 242 West 36th Street, 14th floor, New York, New York 10018 or such other address as Lender notifies Borrower in writing.**

**34.  RECORDKEEPING REQUIREMENTS.**  Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement for more than four months after receipt of the same by Lender.  Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender:  (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Lender shall request.  Lender, or any of its agents, shall have the right to call at Borrower's place or places of business at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's  accounts and Collateral or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof.

**35. GOVERNING LAW.**  Our relationship [including this Agreement  and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement] is governed by, and this Agreement will be construed in accordance with, applicable federal law and (to the extent not preempted by federal law) the law of the State of California without regard to internal principles of  conflict of  laws.    The  legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws.

**36. WAIVER OF NOTICES AND OTHER TERMS.**  Except for any  notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (e.g., a guarantor), to the extent not prohibited by applicable  law hereby, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest.  To the extent not prohibited by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agree:  Lender is not required to file suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral; Lender may, but will  not  be  obligated  to, substitute,  exchange or  release  any  Collateral;  Lender  may  release  any Collateral, or fail to

2017-01-03.18.CON.AUTH.FFW (FP)        Page: 9

Initial Here: #1 _____  #2 _____  #3 _____  #4 _____

Doc ID: 5fafee08dc5fcd2e29a69f020442c1da588fd266

realize upon collateral or exercise any rights hereunder, against one or more persons without joining or suing others; and (v) modify, renew or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

**37. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower on Borrower's cell phone and electronically by e-mail or by text message. Borrower understands that Borrower's cell phone service provider may charge Borrower for text messages, e-mails and calls and that Lender will not be responsible for those costs.

**38. JURY TRIAL WAIVER.**   TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, BORROWER AND LENDER AND ANY GUARANTOR WAIVE THEIR RIGHT TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THE AGREEMENT, THE PERSONAL GUARANTY, AND ALL OTHER DOCUMENTATION EVIDENCING THE OBLIGA-TIONS, IN ANY LEGAL ACTION OR PROCEEDING. ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY COURT SITTING WITHOUT A JURY.

**39. ENTIRE AGREEMENT.**   Any application Borrower signed or otherwise submitted in connection with the Loan,   accompanying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Loan are hereby incorporated into and made a part of this Agreement.  This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

**40. COUNTERPARTS; ELECTRONIC AND FAX SIGNATURES.**  This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.   For purposes of the execution of this Agreement, electronic or fax signatures shall be treated in all respects as original signatures.

**41. EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of amounts to Borrower until all required security interests have been perfected and Lender has received all required personal guarantees or other documentation.

**42. CELL PHONE, E-MAIL AND ELECTRONIC TRANSACTIONS.**  Borrower authorizes Lender and Lender's affiliates, agents and independent contractors to contact Borrower at any telephone number Borrower provides to Lender or from which Borrower places a call to Lender, or any telephone number where Lender believes it may reach Borrower, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Borrower incurs charges for receiving such communications. Lender and Lender's affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Borrower. Borrower expressly consents to conduct business by electronic means. Borrower may opt-out of receiving autodialed or prerecorded calls or texts on Borrower's cellular telephone by contacting customer service via phone at   1-877-861-2213  or e-mail via customerservice@forafinancial.com . Even if Borrower opts out of receiving automated calls or texts on a cellular telephone, we may still continue to communicate with Borrower by other means.

**43. PAYMENTS TO ISOS.**  Borrower understands that some transactions funded by Lender are originated by third-party independent service organizations ("ISOs") who act as brokers.  Lender compensates ISOs based on the amount of the loan a referred borrower obtains from Lender and, in some cases, the rate paid by the borrower.

**44. ARBITRATION.**  If any of Borrower, Lender or a Guarantor requests, Borrower, Lender and the Guarantor agree to arbitrate all disputes and claims arising out of or relating to this Agreement and the Guaranty.  If Borrower, Lender or a Guarantor seeks to have a dispute settled by arbitration, that person must first send to the other person(s) by certified mail, a written Notice of Intent to Arbitrate.  If Borrower, Lender or the Guarantor do not reach an agreement to resolve the claim within 30 days after the Notice is received, any person may commence an arbitration proceeding with the American Arbitration Association ("AAA").  Lender will promptly reimburse Borrower or the Guarantor any arbitration filing fee, however, in the event that both the Borrower and the Guarantor must pay filing fees, Lender will only reimburse the Borrower's arbitration filing fee and, except as provided in the next sentence, the Lender will pay all administration and arbitrator fees.  If the arbitrator finds that either the substance of the claim raised by Borrower or the Guarantor or the relief sought by Borrower or the Guarantor is improper or not warranted, as measured by the standards set forth in Federal Rule of Procedure 11(b), then Lender will pay these fees only if required by the AAA Rules. If the arbitrator grants relief to the Borrower or the Guarantor that is equal to or greater than the value of what the Borrower or the Guarantor has requested in the arbitration, Lender shall reimburse Borrower or the Guarantor for that person's reasonable attorneys' fees and expenses incurred for the arbitration.  Borrower and the Guarantor agree that, by entering into this Agreement,

Initial Here: #1 _____  #2 _____  #3 _____  #4 _____

they are warranted by law. THE UNDERSIGNED BORROWER, LENDER, GUARANTOR AND ANY OTHER PERSON ONLY IN THEIR INDIVIDUAL CAPACITY, as a Plaintiff, claims or acts only in any purported class or representative proceeding. Further, Borrower, Lender and the Guarantor agree that the arbitrator may not consolidate proceedings for more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding, and that if this specific provision is found unenforceable, then the entirety of this arbitration clause shall be null and void.

**45. PERSONAL GUARANTY.** The undersigned (each a "Guarantor"), jointly and severally with any other guarantors, uncondi-
tionally and irrevocably guarantees, to Lender, its successors and assigns, without deduction by reason of setoff, defense or coun-
terclaim, the full and timely payment by Borrower of all sums payable by Borrower under the Agreement and the full and timely
performance by Borrower of each and every one of the terms, conditions, covenants and obligations of this Agreement to be kept
and performed by Borrower.  This Guaranty shall be binding and enforceable against Guarantor, and his/her/its heirs, personal
representatives, successors and assigns.  If Borrower shall at any time default in the payment, performance or observance of any
of the terms, conditions or covenants in this Agreement contained on Borrower's part to be kept, performed or observed, Guaran-
tor will pay, keep, perform and observe same, as the case may be.  Any act of Lender consisting of a waiver of any of the terms or
conditions of the Loan, or the giving of any consent to any matter or thing relating to the Loan, or the granting of any extensions
of time to Borrower, may be done without notice to Guarantor and without releasing Guarantor from any of his/her/its obliga-
tions hereunder, or otherwise affecting same.  The terms of the Loan may be altered, modified, changed, extended or renewed by
agreement between Lender and Borrower, or by a course of conduct, and the Loan may be assigned by Lender or any assignee
of Lender, or by Borrower or any successor thereto, without consent or notice to Guarantor and this Guaranty shall thereupon and
thereafter guarantee the performance of Borrower or any such successors thereto under the Loan as so changed, altered, modi-
fied, assigned, extended or renewed.  Without authorization from or notice to Guarantor, Lender and Borrower may alter, com-
promise or change the time or manner of payment or performance of any or all of the Obligations, may release or add any one or
more guarantors, sureties or endorsers in respect of any of the Obligations, and may take and hold collateral to secure payment,
performance, discharge and satisfaction of any or all of the Obligations, may foreclose upon or otherwise realize all or any part of
any such collateral in any order, and may release all or of any part of any such collateral, all without impairing, affecting or oth-
erwise exonerating any of the covenants, agreements, duties or obligations of Guarantor hereunder.  No exercise or non-exercise
by Lender of any right or remedy hereby given to Lender, no dealings by Lender with Guarantor or with any other guarantor,
endorser or surety in respect of any of the Obligations, or with all or part of any collateral securing any of the Obligations, and no
change, impairment or suspension of any right or remedy of Lender shall in any way impair or affect any of Guarantor's covenants,
agreements, duties or obligations hereunder or give Guarantor any recourse against Lender.  Guarantor hereby waives all right of
subrogation and all benefit of or right to participate in any security now or hereafter held by Lender for the payment, performance,
satisfaction or discharge of any of the Obligations or otherwise.  Notwithstanding any other provisions of this Guaranty or anything
to the contrary contained in the Agreement, Guarantor's obligations under this Guaranty shall be continuing obligations and shall
survive until the Obligations are fully, effectively and irrevocably paid, performed, satisfied and discharged.  Guarantor agrees that
/he/she/it  may be joined in any action against Borrower in connection with the Obligations under this Agreement and recovery
may be had against Guarantor in any such action.  Lender may enforce the obligations of Guarantor hereunder without previous
notice to or demand upon either Borrower or Guarantor and without first taking any action whatsoever against Borrower or its
successors and assigns, or pursuing any other remedy or applying any security it may hold.  Guarantor hereby expressly waives,
relinquishes and releases any right, defense, protection, claim of exoneration or other claim, and any right to assert any right,
defense, protection, claim of exoneration or other claim, in any action brought on this Guaranty or otherwise, whether the laws
of the State of California, or any other jurisdiction may apply. Without limiting the generality of the foregoing, Guarantor hereby
expressly waives (a) notice of the acceptance of this Guaranty by any person, (b) notice of the Obligations now existing or that my
hereafter exist, (c) notice of demand for payment or performance, or notice of default or nonpayment or nonperformance, under
the Agreement or otherwise in respect of any of the Obligations, and (d) all other notices to which Guarantor might otherwise
be entitled in connection with this Guaranty, the Agreement or otherwise in respect of the Obligations, provided any such notice
is given to the Borrower, if required by the terms of the Agreement.  Guarantor hereby expressly waives (a) any right to require
Lender, as a condition precedent to the enforcement of the Guaranty or otherwise, to exhaust any security for the payment,
performance, satisfaction or discharge of the Obligations under the Agreement in any manner, or to pursue any other rights or
remedies that Lender currently or hereafter may have against Guarantor, or any other guarantors, payors, endorsers or sureties of
the Agreement or the Obligations, whether such rights exist in law, in equity, by contract, by statute or otherwise, it being agreed
by Guarantor that this Guaranty is and constitutes an absolute, unconditional and irrevocable guarantee by Guarantor of payment
and performance, and the failure of Lender to exercise any rights or remedies they have or may have against Guarantor shall in no
way abrogate, impair, nullify, terminate or otherwise affect the Obligations of Guarantor under this Guaranty, and that the liability
of Guarantor hereunder is and shall be direct, absolute, unconditional and irrevocable, or (b) any defense arising by reason of the
termination or other cessation of any of the Obligations for any cause whatsoever other than full, effective and irrevocable pay-
ment, performance, satisfaction or discharge of any liability or obligation comprising any of the Obligations.  Guarantor's liability
hereunder shall continue notwithstanding, and shall be unaltered, unaffected and unimpaired by (a) the bankruptcy, insolvency,
reorganization, merger, liquidation, dissolution, winding-up or cessation of existence of Borrower, (b) any fraudulent, illegal or
improper act by Borrower, or (c) any payment made on the Obligations that the recipient repays or is liable to repay to Borrower
pursuant to any court order or as otherwise required by law.  As it relates to the enforcement of this Guaranty, Guarantor hereby
waives and agrees not to exercise or take advantage of the defense of any applicable statute of limitations (as any such statute

of limitations shall apply to the Guaranty and/or any Obligations. Guarantor hereby waives any statute of limitations as a defense to the payment or performance of any of the Obligations. In the event that any action, suit or other proceeding is brought by Lender, its officers, directors, partners, employees or agents, to enforce the obligations of Guarantor under this Guaranty, the Lender shall be entitled to recover all of Lender's costs and expenses (including, without limitation, court costs and reasonable attorneys' fees) incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom. THIS GUARANTY HAS BEEN MADE AND ENTERED INTO IN THE STATE OF CALIFORNIA AND THE LAWS OF SAID STATE SHALL GOVERN THE VALIDITY AND INTERPRETATION HEREOF, AND THE PERFORMANCE BY GUARANTOR OF HIS/HER/ITS DUTIES AND OBLIGATIONS HERE-UNDER.

**46. CERTIFICATION AND SIGNATURES** - By signing below, authorizing representatives for Borrower and on Borrower's behalf, Borrower certifies that Borrower has received a copy of this Agreement and that it has read, understood and agreed to be bound by its terms. Each person signing below certifies that each person is signing on behalf of the Borrower in the capacity indicated below the signer's name and that such signer is authorized to execute this Agreement on behalf of or the in stated relation to Borrower. Use of Proceeds Certification - As referred to in Section 3, by signing below, the Borrower certifies, acknowledges and understands that the proceeds from the requested Loan will be used solely for purchasing or acquiring specific products or services, for the following purposes only:

- insurance (but not self insurance programs)
- services or equipment
- merchandise, inventory or specified goods
- improvements / construction of facilities (but not purchase of real estate)
- loans to finance specified sales transactions
- public works projects or educational services (e.g., training)

**GUARANTOR 1**

*By signing below, I agree to the terms of the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print): SHUCHUAN Shih

Name (Sign): *Eva Shih*

Date Signed: 05/24/2018

**GUARANTOR 3**

*By signing below, I agree to the terms of the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print):

Name (Sign):

Date Signed:

**GUARANTOR 2**

*By signing below, I agree to the terms of the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print):

Name (Sign):

Date Signed:

**GUARANTOR 4**

*By signing below, I agree to the terms of the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print):

Name (Sign):

Date Signed:

**Note:** *Both sections 45 (Personal Guaranty) and 46 (Certification and Signatures) must be signed and dated before a loan can be funded.*

**NOTICE OF CONSENT TO ELECTRONIC COMMUNICATIONS**: *Borrower herby consents and authorizes Lender and their affiliates to contact you at any telephone number or email address the Borrower provides, using any means of communication associated with the telephone number or email address , including, but not limited to, text messages via an automatic telephone dialing system. All automated communications systems will have an opt-out procedure in adherence to applicable law.*

By initialing here Borrower affirms that they have read the Notice of Consent to Electronic Communications:

#1 *eS* _____ #2 _____ #3 _____ #4 _____

**Borrower 1**

*By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print): SHUCHUAN Shih

Name (Sign): *Eva Shih*

Title:

Date Signed: 05/24/2018

**Borrower 3**

*By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print):

Name (Sign):

Title:

Date Signed:

**Borrower 2**

*By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print):

Name (Sign):

Title:

Date Signed:

**Borrower 4**

*By signing below, I agree to the terms of this Agreement and the Personal Guarantee above, even if signed as an officer of the Borrower. I have read this Agreement and acknowledge that this Agreement contains Jury Trial Waiver and Arbitration clauses. I agree to be bound by the Jury Trial Waiver and Arbitration clauses.*

Name (Print):

Name (Sign):

Title:

Date Signed:

**Lender Use Only**

*For Lender's Use Only: This Agreement has been received and accepted by Lender in California after being signed by Borrower and any Guarantor(s).*

Name (Print): Fora Financial West, LLC

Name (Sign):

Title:

Date Signed: May 24 2018

**Note:** *Both sections 45 (Personal Guaranty) and 46 (Certification and Signatures) must be signed and dated before a loan can be funded.*

Initial Here: #1 *eS*  #2_____ #3_____ #4_____

Doc ID: 5fafee08dc5fcd2e29a69f020442c1da588fd266

# Information Disclosure Authorization

The Merchant and Owner(s)/Officer(s) identified below ("Applicant") each represents, acknowledges and agrees that (1) all information and documents provided to __Fora Financial West, LLC__ , its affiliates, representatives, subsidiaries, divisions, successors and assigns ("Company") including credit card processor statements are true, accurate and complete, (2) Applicant will immediately notify Company of any change in such information or financial condition, (3) Applicant authorizes Company to disclose all information and documents that Company may obtain including credit reports to other persons or entities (collectively, "Third Parties") that may be involved with or acquire commercial loans having daily repayment features and/or Merchant Cash Advance transactions, including without limitation the application therefor (collectively, "Transactions") and each recipient is authorized to use such information and documents, and share such information and documents with other recipients, in connection with potential Transactions and any investigations, underwriting, and collection efforts related thereto (4) each Recipient will rely upon the accuracy and completeness of such information and documents, (5) Company is authorized to request and receive any investigative reports, credit reports, statements from creditors or financial institutions, verification of information, or any other information that Company deems necessary, (6) Applicant waives and releases any claims against __Fora Financial West, LLC__ , Company and all authorized Recipients under this agreement and any information-providers arising from any act or omission relating to the requesting, receiving or release of information, and (7) each Owner/Officer represents that he or she is authorized to sign this form on behalf of Merchant.

## MERCHANT INFORMATION

| | |
|---|---|
| Business Name: VARIO CORP. / MEILO CREATION, LLC dba VARIO CORP. / MEILO CREATION, LLC | |
| Address: 14020 Central Ave #590 | |
| City: Chino | State: CA | Zip: 91710 |
| Contact Name: SHUCHUAN Shih | |
| Phone #: (909) 627-5036 | Fax #: |

## LANDLORD INFORMATION

Do you own the property at your place of business? __Rent__ (Type Rent or Own)

Landlord Name: __Chino Central 14020__ Landlord Phone # __619-477-7000__

What is your monthly (Mortgage/Rent) payment? $ __7000__ (If none enter 0)

If LEASING when did your lease term begin? __02/01/2016__ (date) When does it expire? __02/28/2019__ (date) Is anyone else co-signed on your lease or mortgage? __No__ (Type Yes or No)

Are your current on your rent or mortgage? __Yes__ (Type Yes or No)

If you are NOT current what is your outstanding balance? _____

Do you pay your **business rent/mortgage** out of your **business account** ? __No__ (Type Yes or No)

Permission is also granted to contact any business past, present or future, we may deal with including Banks, Landlords, and insurance companies we currently use or will use in the future.

## Verification of this Authorization may be confirmed by calling the business at: (909) 627-5036

(Business Tel. #)

519 8th Avenue • 11th Floor • New York, NY 10018-7748 • Tel: 1-877-861-2213 • Fax: 800-976-0968

BORROWER(s):

X: *Eva Shih*

Name: SHUCHUAN Shih

Title:

Date: 05/24/2018

X:

Name:

Title:

Date:

X:

Name:

Title:

Date:

X:

Name:

Title:

Date:

Fora Financial West, LLC

X:

Name: Fora Financial West, LLC

Title:

Date:

Doc ID: 5fafee08dc5fcd2e29a69f020442c1da588fd266

**LOAN PROCEEDS DISBURSEMENT AND AUTHORIZATION LETTER**

This Loan Proceeds Disbursement and Authorization Letter ("Letter") refers to that certain Business Loan and Security Agreement (the "Agreement"), dated <u>May 24 2018</u> by and between <u>Fora Financial West, LLC</u> the ("Lender"), and <u>VARIO CORP. / MEILO CREATION, LLC</u> ("Borrower"). Capitalized terms used herein and not otherwise defined have the meaning ascribed to such terms in the Agreement.

The undersigned, on behalf of the Borrower, hereby authorizes and directs Lender to make the following disbursements (collectively, the "Disbursements") from the proceeds of the Loan:

| Authorized Payee: | VARIO CORP. / MEILO CREATION, LLC | | |
|---|---|---|---|
| Address: | 14020 Central Ave #590 | | |
| Address: | Chino                    CA         91710 | | |
| Phone Number: | | | |
| Pay Amount: | $ 350,000.00 | | |
| Routing Number: | | Account Number: | |

| Authorized Payee: | | | |
|---|---|---|---|
| Address: | | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | | | |
| Routing Number: | | Account Number: | |

| Authorized Payee: | | | |
|---|---|---|---|
| Address: | | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | | | |
| Routing Number: | | Account Number: | |

| Authorized Payee: | | | |
|---|---|---|---|
| Address: | | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | | | |
| Routing Number: | | Account Number: | |

| Authorized Payee: | | | |
|---|---|---|---|
| Address: | | | |
| Address: | | | |
| Phone Number: | | | |
| Pay Amount: | | | |
| Routing Number: | | Account Number: | |

Lender has agreed to make the Disbursements direct above as an accommodation only.  The Borrower acknowledges and agrees that upon disbursement of the loan proceeds as directed above, the Disbursements are not refundable to Borrower by Lender.

The undersigned, on behalf of the Borrower, hereby agrees to indemnify, defend, and hold Lender harmless from any and all claims related to the Disbursements made in accordance with this Letter.

Initial Here: #1 _____ #2 _____ #3 _____ #4 _____

Doc ID: 5fafee08dc5fcd2e29a69f020442c1da588fd266

BORROWER(s):

| | |
|---|---|
| X: _Eva Shih_ | X: _____ |
| **Name:** SHUCHUAN Shih | **Name:** _____ |
| **Title:** _____ | **Title:** _____ |
| **Date:** 05/24/2018 | **Date:** _____ |
| X: _____ | X: _____ |
| **Name:** _____ | **Name:** _____ |
| **Title:** _____ | **Title:** _____ |
| **Date:** _____ | **Date:** _____ |

Lender

X: _____

**Name:** Fora Financial West, LLC

**Title:** _____

**Date:** _____

Doc ID: 5fafee08dc5fcd2e29a69f020442c1da588fd266

### Merchant Information

Legal Name:VARIO CORP. / MEILO CREATION, LLC
DBA Name:VARIO CORP. / MEILO CREATION, LLC
Address:14020 Central Ave
City/State:Chino, CA 91710
Phone #:(909) 627-5036

**Transactions for deal funded on 5/25/2018**

| Batch Date | Settle. Date | Amount Received. | Current Balance | Type |
|---|---|---|---|---|
| 5/25/2018 | 5/25/2018 | $ 479,500.00 | -$ 479,500.00 | Funded |
| 5/25/2018 | 5/29/2018 | $ 2,339.03 | -$ 477,160.97 | Payment |
| 5/29/2018 | 5/30/2018 | $ 2,339.03 | -$ 474,821.94 | Payment |
| 5/30/2018 | 5/31/2018 | $ 2,339.03 | -$ 472,482.91 | Payment |
| 5/31/2018 | 6/1/2018 | $ 2,339.03 | -$ 470,143.88 | Payment |
| 6/1/2018 | 6/4/2018 | $ 2,339.03 | -$ 467,804.85 | Payment |
| 6/4/2018 | 6/5/2018 | $ 2,339.03 | -$ 465,465.82 | Payment |
| 6/5/2018 | 6/6/2018 | $ 2,339.03 | -$ 463,126.79 | Payment |
| 6/6/2018 | 6/7/2018 | $ 2,339.03 | -$ 460,787.76 | Payment |
| 6/7/2018 | 6/8/2018 | $ 2,339.03 | -$ 458,448.73 | Payment |
| 6/8/2018 | 6/11/2018 | $ 2,339.03 | -$ 456,109.70 | Payment |
| 6/11/2018 | 6/12/2018 | $ 2,339.03 | -$ 453,770.67 | Payment |
| 6/12/2018 | 6/13/2018 | $ 2,339.03 | -$ 451,431.64 | Payment |
| 6/13/2018 | 6/14/2018 | $ 2,339.03 | -$ 449,092.61 | Payment |
| 6/14/2018 | 6/15/2018 | $ 2,339.03 | -$ 446,753.58 | Payment |
| 6/15/2018 | 6/18/2018 | $ 2,339.03 | -$ 444,414.55 | Payment |
| 6/18/2018 | 6/19/2018 | $ 2,339.03 | -$ 442,075.52 | Payment |
| 6/19/2018 | 6/20/2018 | $ 2,339.03 | -$ 439,736.49 | Payment |
| 6/20/2018 | 6/21/2018 | $ 2,339.03 | -$ 437,397.46 | Payment |
| 6/21/2018 | 6/22/2018 | $ 2,339.03 | -$ 435,058.43 | Payment |
| 6/22/2018 | 6/25/2018 | $ 2,339.03 | -$ 432,719.40 | Payment |
| 6/25/2018 | 6/26/2018 | $ 2,339.03 | -$ 430,380.37 | Payment |
| 6/26/2018 | 6/27/2018 | $ 2,339.03 | -$ 428,041.34 | Payment |
| 6/27/2018 | 6/28/2018 | $ 2,339.03 | -$ 425,702.31 | Payment |
| 6/28/2018 | 6/29/2018 | $ 2,339.03 | -$ 423,363.28 | Payment |
| 6/29/2018 | 7/2/2018 | $ 2,339.03 | -$ 421,024.25 | Payment |
| 7/2/2018 | 7/3/2018 | $ 2,339.03 | -$ 418,685.22 | Payment |
| 7/3/2018 | 7/5/2018 | $ 2,339.03 | -$ 416,346.19 | Payment |
| 7/5/2018 | 7/6/2018 | $ 2,339.03 | -$ 414,007.16 | Payment |
| 7/6/2018 | 7/9/2018 | $ 2,339.03 | -$ 411,668.13 | Payment |

| 7/9/2018 | 7/10/2018 | $ 2,339.03 | -$ 409,329.10 | Payment |
|---|---|---|---|---|
| 7/10/2018 | 7/11/2018 | $ 2,339.03 | -$ 406,990.07 | Payment |
| 7/11/2018 | 7/12/2018 | $ 2,339.03 | -$ 404,651.04 | Payment |
| 7/12/2018 | 7/13/2018 | $ 2,339.03 | -$ 402,312.01 | Payment |
| 7/13/2018 | 7/16/2018 | $ 2,339.03 | -$ 399,972.98 | Payment |
| 7/16/2018 | 7/17/2018 | $ 2,339.03 | -$ 397,633.95 | Payment |
| 7/17/2018 | 7/18/2018 | $ 2,339.03 | -$ 395,294.92 | Payment |
| 7/18/2018 | 7/19/2018 | $ 2,339.03 | -$ 392,955.89 | Payment |
| 7/19/2018 | 7/20/2018 | $ 2,339.03 | -$ 390,616.86 | Payment |
| 7/20/2018 | 7/23/2018 | $ 2,339.03 | -$ 388,277.83 | Payment |
| 7/23/2018 | 7/24/2018 | $ 2,339.03 | -$ 385,938.80 | Payment |
| 7/24/2018 | 7/25/2018 | $ 2,339.03 | -$ 383,599.77 | Payment |
| 7/25/2018 | 7/26/2018 | $ 2,339.03 | -$ 381,260.74 | Payment |
| 7/26/2018 | 7/27/2018 | $ 2,339.03 | -$ 378,921.71 | Payment |
| 7/27/2018 | 7/30/2018 | $ 2,339.03 | -$ 376,582.68 | Payment |
| 7/30/2018 | 7/31/2018 | $ 2,339.03 | -$ 374,243.65 | Payment |
| 7/31/2018 | 8/1/2018 | $ 2,339.03 | -$ 371,904.62 | Payment |
| 8/1/2018 | 8/2/2018 | $ 2,339.03 | -$ 369,565.59 | Payment |
| 8/2/2018 | 8/3/2018 | $ 2,339.03 | -$ 367,226.56 | Payment |
| 8/3/2018 | 8/6/2018 | $ 2,339.03 | -$ 364,887.53 | Payment |
| 8/6/2018 | 8/7/2018 | $ 2,339.03 | -$ 362,548.50 | Payment |
| 8/7/2018 | 8/8/2018 | $ 2,339.03 | -$ 360,209.47 | Payment |
| 8/8/2018 | 8/9/2018 | $ 2,339.03 | -$ 357,870.44 | Payment |
| 8/9/2018 | 8/10/2018 | $ 2,339.03 | -$ 355,531.41 | Payment |
| 8/10/2018 | 8/13/2018 | $ 2,339.03 | -$ 353,192.38 | Payment |
| 8/13/2018 | 8/14/2018 | $ 2,339.03 | -$ 350,853.35 | Payment |
| 8/14/2018 | 8/15/2018 | $ 2,339.03 | -$ 348,514.32 | Payment |
| 8/15/2018 | 8/16/2018 | $ 2,339.03 | -$ 346,175.29 | Payment |
| 8/16/2018 | 8/17/2018 | $ 2,339.03 | -$ 343,836.26 | Payment |
| 8/17/2018 | 8/20/2018 | $ 2,339.03 | -$ 341,497.23 | Payment |
| 8/20/2018 | 8/21/2018 | $ 2,339.03 | -$ 339,158.20 | Payment |
| 8/21/2018 | 8/22/2018 | $ 2,339.03 | -$ 336,819.17 | Payment |
| 8/22/2018 | 8/23/2018 | $ 2,339.03 | -$ 334,480.14 | Payment |
| 8/23/2018 | 8/24/2018 | $ 2,339.03 | -$ 332,141.11 | Payment |
| 8/24/2018 | 8/27/2018 | $ 2,339.03 | -$ 329,802.08 | Payment |
| 8/27/2018 | 8/28/2018 | $ 2,339.03 | -$ 327,463.05 | Payment |
| 8/28/2018 | 8/29/2018 | $ 2,339.03 | -$ 325,124.02 | Payment |
| 8/29/2018 | 8/30/2018 | $ 2,339.03 | -$ 322,784.99 | Payment |

| 8/30/2018 | 8/31/2018 | $ 2,339.03 | -$ 320,445.96 | Payment |
|-----------|-----------|------------|---------------|---------|
| 8/31/2018 | 9/4/2018 | $ 2,339.03 | -$ 318,106.93 | Payment |
| 9/4/2018 | 9/5/2018 | $ 2,339.03 | -$ 315,767.90 | Payment |
| 9/5/2018 | 9/6/2018 | $ 2,339.03 | -$ 313,428.87 | Payment |
| 9/6/2018 | 9/7/2018 | $ 2,339.03 | -$ 311,089.84 | Payment |
| 9/7/2018 | 9/10/2018 | $ 2,339.03 | -$ 308,750.81 | Payment |
| 9/10/2018 | 9/11/2018 | $ 2,339.03 | -$ 306,411.78 | Payment |
| 9/11/2018 | 9/12/2018 | $ 2,339.03 | -$ 304,072.75 | Payment |
| 9/12/2018 | 9/13/2018 | $ 2,339.03 | -$ 301,733.72 | Payment |
| 9/13/2018 | 9/14/2018 | $ 2,339.03 | -$ 299,394.69 | Payment |
| 9/14/2018 | 9/17/2018 | $ 2,339.03 | -$ 297,055.66 | Payment |
| 9/17/2018 | 9/18/2018 | $ 2,339.03 | -$ 294,716.63 | Payment |
| 9/18/2018 | 9/19/2018 | $ 2,339.03 | -$ 292,377.60 | Payment |
| 9/19/2018 | 9/20/2018 | $ 2,339.03 | -$ 290,038.57 | Payment |
| 9/20/2018 | 9/21/2018 | $ 2,339.03 | -$ 287,699.54 | Payment |
| 9/21/2018 | 9/24/2018 | $ 2,339.03 | -$ 285,360.51 | Payment |
| 9/24/2018 | 9/25/2018 | $ 2,339.03 | -$ 283,021.48 | Payment |
| 9/25/2018 | 9/26/2018 | $ 2,339.03 | -$ 280,682.45 | Payment |
| 9/26/2018 | 9/27/2018 | $ 2,339.03 | -$ 278,343.42 | Payment |
| 9/27/2018 | 9/28/2018 | $ 2,339.03 | -$ 276,004.39 | Payment |
| 9/28/2018 | 10/1/2018 | $ 2,339.03 | -$ 273,665.36 | Payment |
| 10/1/2018 | 10/2/2018 | $ 2,339.03 | -$ 271,326.33 | Payment |
| 10/2/2018 | 10/3/2018 | $ 2,339.03 | -$ 268,987.30 | Payment |
| 10/3/2018 | 10/4/2018 | $ 2,339.03 | -$ 266,648.27 | Payment |
| 10/4/2018 | 10/5/2018 | $ 2,339.03 | -$ 264,309.24 | Payment |
| 10/5/2018 | 10/9/2018 | $ 2,339.03 | -$ 261,970.21 | Payment |
| 10/9/2018 | 10/10/2018 | $ 2,339.03 | -$ 259,631.18 | Payment |
| 10/10/2018 | 10/11/2018 | $ 2,339.03 | -$ 257,292.15 | Payment |
| 10/11/2018 | 10/12/2018 | $ 2,339.03 | -$ 254,953.12 | Payment |
| 10/12/2018 | 10/15/2018 | $ 2,339.03 | -$ 252,614.09 | Payment |
| 10/15/2018 | 10/16/2018 | $ 2,339.03 | -$ 250,275.06 | Payment |
| 10/16/2018 | 10/17/2018 | $ 2,339.03 | -$ 247,936.03 | Payment |
| 10/17/2018 | 10/18/2018 | $ 2,339.03 | -$ 245,597.00 | Payment |
| 10/18/2018 | 10/19/2018 | $ 2,339.03 | -$ 243,257.97 | Payment |
| 10/19/2018 | 10/22/2018 | $ 2,339.03 | -$ 240,918.94 | Payment |
| 10/22/2018 | 10/23/2018 | $ 2,339.03 | -$ 238,579.91 | Payment |
| 10/23/2018 | 10/24/2018 | $ 2,339.03 | -$ 236,240.88 | Payment |
| 10/24/2018 | 10/25/2018 | $ 2,339.03 | -$ 233,901.85 | Payment |

| 10/25/2018 | 10/26/2018 | $ 2,339.03 | -$ 231,562.82 | Payment |
| 10/26/2018 | 10/29/2018 | $ 2,339.03 | -$ 229,223.79 | Payment |
| 10/29/2018 | 10/30/2018 | $ 2,339.03 | -$ 226,884.76 | Payment |
| 10/30/2018 | 10/31/2018 | $ 2,339.03 | -$ 224,545.73 | Payment |
| 10/30/2018 | 11/5/2018 | -$ 2,339.03 | -$ 226,884.76 | Bounced Payment (Bounced) |
| 11/14/2018 | 11/15/2018 | $ 2,339.03 | -$ 224,545.73 | Payment |
| 11/14/2018 | 11/15/2018 | $ 5,847.50 | -$ 218,698.23 | Payment |
| 11/15/2018 | 11/16/2018 | $ 2,339.03 | -$ 216,359.20 | Payment |
| 11/14/2018 | 11/19/2018 | -$ 2,339.03 | -$ 218,698.23 | Bounced Payment (Bounced) |
| 11/14/2018 | 11/19/2018 | -$ 5,847.50 | -$ 224,545.73 | Bounced Payment (Bounced) |
| 11/16/2018 | 11/19/2018 | $ 2,339.03 | -$ 222,206.70 | Payment |
| 11/19/2018 | 11/20/2018 | $ 2,339.03 | -$ 219,867.67 | Payment |
| | | $ 739,132.33 | -$ 219,867.67 | |

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |
| CSC   1-800-858-5294 |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |
| SPRFiling@cscglobal.com |

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

1542 73541
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: California
(S.O.S.)

Initial Filing #: 187680246628
Initial Book #:
Initial Page #:
Initial Filing Date: 10/30/2018

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME VARIO CORP. | | | |
| --- | --- | --- | --- |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 14020 Central Ave | CITY Chino | STATE CA   POSTAL CODE 91710 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME MEILO CREATION, LLC | | | |
| --- | --- | --- | --- |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS 14020 Central Ave | CITY Chino | STATE CA   POSTAL CODE 91710 | COUNTRY USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME ASSN COMPANY | | | |
| --- | --- | --- | --- |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS P.O. Box 2576 | CITY Springfield | STATE IL   POSTAL CODE 62708 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:

"All Assets that Borrower now owns or hereafter acquires and wherever located, including without limitation:
(i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card, debit card or Electronic Benefit Transfer transactions; and
(ii) all other tangible and intangible personal property, including, but not limited to (a) inventory, (b) equipment, (c) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (d) instruments, including promissory notes (e) chattel paper, including tangible chattel paper and electronic chattel paper, (f) documents, (g) letter of credit rights, (h) accounts, including health-care insurance receivables, (i) deposit accounts, (j) commercial tort claims, (k) general intangibles, including payment intangibles and software and (l) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative |
| --- |

| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box: | |
| --- | --- | --- | --- | --- |
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

| 7. ALTERNATIVE DESIGNATION (if applicable): | ☐ Lessee/Lessor | ☐ Consignee/Consignor | ☑ Seller/Buyer | ☐ Bailee/Bailor | ☐ Licensee/Licensor |
| --- | --- | --- | --- | --- | --- |

8. OPTIONAL FILER REFERENCE DATA:

1542 73541

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**
This document was auto-generated from data received from the California Department of State

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

VARIO CORP.

OR

9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR

10b. INDIVIDUAL'S SURNAME

Shih

INDIVIDUAL'S FIRST PERSONAL NAME

SHUCHUAN

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS 1582 Pleasant Hill Dr | CITY Chino Hills | STATE CA | POSTAL CODE 91709 | COUNTRY USA |
|---|---|---|---|---|

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME  or  ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**
Borrower is prohibited from pledging or selling any receivables owing to Borrower now or in the future to any person or entity other than Secured Party." The secured party named in this record is acting in a representative capacity for purposes of forwarding notices & inquiries regarding this record. For more information, please contact the secured party at the address listed above or at [UCCSPREP@CSCINFO.COM].

**13.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS  (if applicable)

**14.** This FINANCING STATEMENT:  ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing

**15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

**16.** Description of real estate:

**17. MISCELLANEOUS:**

**FILING OFFICE COPY** — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**1300 Valley Vista Drive, Suite 201**
**Diamond Bar, CA 91765**

A true and correct copy of the foregoing document entitled (*specify*): **_Notice of Motion and Motion for Approval of Application of Pledged East West Bank Account in Payment of Secured Debt Owed to East West Bank_** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **_February 1, 2019_** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Abram Feuerstein    abram.s.feuerstein@usdoj.gov**
- **Everett L Green    everett.l.green@usdoj.gov**
- **Clifford P Jung    clifford@jyllp.com, victoria@jyllp.com;karill@jyllp.com**
- **Michael Y Lo    bklolaw@gmail.com, jaylo1225@gmail.com**
- **Elmer D Martin    elmermartin@gmail.com**
- **United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov**

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **_February 1, 2019_**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Wayne Johnson
United States Bankruptcy Court
Central District of California
3420 Twelfth Street, Suite 384 / Courtroom 304
Riverside, CA 92501-3819

Interested Parties

| | | |
|---|---|---|
| Vario Corp.<br>14020 Central Ave., Suite 590<br>Chino, CA 91710-5524 | Christopher J. Langley<br>Law Offices of Langley & Chang<br>4158 14th St.<br>Riverside, CA 92501 | ACE Funding Source, LLC<br>366 North Broadway<br>Jericho, NY 11753 |
| Bank of America<br>PO Box 982238<br>El Paso, TX 79998-2238 | Straight Forwarding, Inc.<br>Coface North America Insurance<br>Company<br>650 College Road East, Suite 605<br>Princeton, NJ 08540 | c/o Harmeet K. Dillon<br>Dillon Law Group<br>177 Post Street, Suite 700<br>San Francisco, CA 94108 |
| California Franchise Tax Board<br>P.O Box 942857<br>Sacramento, CA 94257 | Chino Central 14040, LLC<br>132 W. 8th Street<br>National City, CA 91950 | Deloitte & Touch<br>20 F, Taipei Nan Shan Plaza<br>No. 100 Songren Rd., Xinyi Dist. |
| FedEx<br>PO Box 7221<br>Pasadena, CA 91109 | Fora Financial West, LLC<br>519 8th Ave. 11th Floor<br>New York, NY 10018 | Grand Universal Limited<br>10/F/. Double Bldg.<br>22 St., Central, Hong Kong |
| GV Trucking<br>409 N. Willowbrook Ave.<br>Compton, CA 90220 | H. Saga International Co. Ltd.<br>11F, No. 132 Sec 2<br>Nanjing E. Rd., Zhongshan Distrit<br>Taipei Dist, Taiwan | Ikura Capital Group, LLC<br>162 Elmora Ave., #211<br>Elizabeth, NJ 07202 |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| | | |
|---|---|---|
| Influx Capital, LLC<br>32 Court Street, Suite 205<br>Brooklyn, NY 11201 | Inland Forklift Repair<br>P.O. Box 908<br>Chino, CA 91708 | Internal Revenue Service<br>Centralized Insolvency Operation<br>Post Office Box 21126<br>Philadelphia, PA 19114-0326 |
| King Cash Group<br>30 Broad Street, Suite 1201<br>New York, NY 10004 | Laura Lefebvre<br>9535 Pryor Dr.<br>Santee, CA 92071 | Lexint Law<br>13300 Crossroads Pkwy. N.<br>Ste. 100<br>City of Industry, CA 91746 |
| Loza & Loza, LLP<br>305 N. Second Ave. #127<br>Upland, CA 91786 | Mascot International Logistics, Inc<br>21700 E. Copley Drive, #150<br>Diamond Bar, CA 91765 | Meilo Creation, LLC<br>14020 Central Ave. Unit 590<br>Chino, CA 91710 |
| ML Factors Funding, LLC<br>456A Central Ave. #128<br>Cedarhurst, NY 11516 | PricewaterhouseCoopers<br>22nd Floor Price's Building<br>Central Hong Kong | Rowland Shuttle<br>2197 Edmore Ave.<br>Rowland Heights, CA 91748 |
| Shuchuan Eva Shih<br>1582 Pleasant Hill Dr.<br>Chino Hills, CA 91709 | Shunchuan Eva Shih<br>14020 Central Ave. Unit 590<br>Chino, CA 91710 | SPG Advance<br>1221 McDonald Ave.<br>Brooklyn, NY 11230 |
| SPS Commerce, Inc.<br>PO Box 205782<br>Dallas, TX 75320-5782 | Straight Forwarding, Inc.<br>20970 Currier Road<br>City of Industry, CA 91789 | TopOcean Consolidation Service<br>2727 Workman Mill Rd.<br>City of Industry, CA 90601 |
| TVT 2.0, LLC<br>8 Hunters Ln.<br>Roslyn, NY 11576 | UNIPAC<br>Continental Agency, Inc.<br>Pomona, CA 91766 | Yellowstone Capital West LLC<br>116 Nassau Street, Suite 804<br>New York, NY 10038 |
| Business Merchant Funding<br>c/o Jason Gang, Esq.<br>1245 Hewlett Plaza #478<br>Hewlett, NY 11557 | Fora Financial West, LLC<br>12 Powder Springs Street, Suite 240<br>Marietta, GA 30064 | Internal Revenue Service<br>Centralized Insolvency Operation<br>PO BOX 7346<br>Philadelphia, PA 19101-7346 |

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **February 1, 2019** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Email: Business Merchant Funding-Jason Gang- jason@jasongang.com
Email: Fora Financial West, LLC - awalker@aubreyfirm.com
Email: Straight Forwarding, Inc.- jane@straightforwardinginc.com
Email: Straight Forwarding, Inc/Coface.- amy.schmidt@coface.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| *2/1/2019* | *Cynthia P. Miller* | */s/ Cynthia P. Miller* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.